**08 CV 5480**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

PAN AMERICAN WORLD AIRWAYS, INC.,                               :

                                                               :    Case No. 08 Civ _____

                                    Plaintiff,                 :

                                                               :    **COMPLAINT AND**
                                                               :    **DEMAND FOR JURY TRIAL**
                    v.                                          :

VETEMENTS, INC., KINSER CHIU,                                  :

                                                               :
                                    Defendants.                :

                                                               :
-------------------------------------------------------------- X



Plaintiff, PAN AM WORLD AIRWAYS, INC., ("Pan Am") for its complaint, alleges as follows:

## NATURE OF THIS ACTION

1.      This action involves the unlicensed and unauthorized sale of goods bearing Pan Am's trademarks by defendants Vetements, Inc. ("Vetements") and its principal Kinser Chiu ("Chiu"). Until March 2008, Vetements had a limited authorization to **manufacture** goods for Pan Am's licensee Machine Project Inc. ("Machine Project"), who was licensed to sell, distribute, advertise and promote goods with Pan Am's trademarks. Neither Vetements nor Chiu ever had the right to sell, distribute, advertise or promote those goods.

2.      When Pan Am properly terminated its license agreement with Machine Project in March 2008, Machine Project lost all of its rights in connection with Pan Am's trademarks and Vetements lost any right to manufacture those goods. Despite this clear termination and the fact that Vetements never had the right to sell Pan Am merchandise under any circumstances,

Vetements and Chiu have sold various goods bearing Pan Am's trademarks and will continue to do so unless stopped by this Court.

## THE PARTIES

3.    Plaintiff PAN AM WORLD AIRWAYS, INC. ("Plaintiff") is a Delaware corporation with its principal place of business located at 14 Aviation Avenue, Portsmouth, New Hampshire, 03801.

4.    Until recently, Pan Am was in the business of providing airline services between several cities on the East Coast of the United States, as well as providing rail freight services. Pan Am also sells retail merchandise bearing its trademarks, including, model airplanes and travel related products, and it licenses others to do so.

5.    Pan Am is the current owner of all rights in the following registered trademarks/service marks: (1) the words "PAN AM," (2) the PAN AM GLOBE DESIGN, and (3) the words "PAN AMERICAN WORLD AIRWAYS," (collectively, with the marks described in paragraphs 15 through 16, the "Pan Am Marks").

6.    On information and belief, Defendant Vetements is a New York corporation with its principal place of business located at 241 West 37th Street, Suite #726, New York, New York 10018. It is engaged in the business of manufacturing and arranging for the manufacture of apparel and accessories.

7.    Defendant Chiu (a/k/a King Wah Chiu) is, upon information and belief, the acting President of Vetements, Inc. On information and belief, Chiu resides in the state of New Jersey.

## JURISDICTION AND VENUE

8.    This is an action for trademark infringement, false designation of origin and false representation and description, and dilution in violation of the Lanham Act, 15 U.S.C. §§ 1114

and 1125(a) and (c), dilution in violation of New York General Business Law section 360-1, unfair competition under the common law of the State of New York, and deceptive acts and practices in violation of New York General Business Law 349-350.

9.    This court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1121 and 1125(a) and 28 U.S.C. §§ 1331 and 1338.

10.    Alternatively, jurisdiction for this action is based upon 28 U.S.C. § 1332, as a civil action between, upon information and belief, citizens of different states in which the matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs.

11.    This Court has personal jurisdiction over Vetements and Chiu because they both do business regularly within New York state through continuous and systematic commercial conduct.

12.    Venue is founded on 28 U.S.C. §§ 1391 (b) and (c) in that the claim arises in this district and, Defendants' principal place of business is in this district.

## PAN AM'S TRADEMARKS AND SERVICE MARKS

13.    Pan Am owns U.S. federal trademark registrations for each of these marks with the following registration numbers in the classes as indicated:

**PAN AM**

| Registration # | Good and Services |
|---|---|
| 3171134 | (IC 039) Transportation by rail; freight transportation; rental leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail |

**Pan Am Globe Design**

| Registration # | Goods and Services |
|---|---|
| 0668792 | (IC 039) Transporting freight and passengers by air |
| 3288129 | (IC 018) Luggage; all-purpose carrying bags; carry-all bags; carry-on bags; travel bags<br><br>(IC 028) Toy model vehicles; toy model airplanes; toy model trains; toy model train cars; scale model vehicles, trains, train cars, airplanes. |

| 3171135 | (IC 039) Transportation by rail; freight transportation; rental leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail |
|---|---|

## PAN AMERICAN WORLD AIRWAYS

| Registration # | Good and Services |
|---|---|
| 3166414 | (IC 025) Clothing, namely, Hats, Bandanas, Scarves, T-Shirts, Long Sleeve Shirts, Short Sleeve Shirts, Jackets, Sweaters, Dresses, Short Pants, Long Pants, Swim Suits, Underwear, Pajamas, Socks, Shoes |

14.    Also, Pan Am has filed an intent to use application for the PAN AM GLOBE DESIGN, Serial No. 78899615, for use in the following international classes, covering the following goods:

| International Class | Goods |
|---|---|
| IC016 | pens, pencils, writing utensils, calendars, posters, blank cards, greeting cards, note cards |
| IC 018 | Luggage tags, non-motorized collapsible luggage carts, purses |
| IC021 | Mugs, cups |
| IC025 | Shirts, head wear, jackets, sweat shirts, sweat pants, pants, gloves, socks |

15.    Moreover, Pan Am possesses unregistered, common law trademarks for the use of the Pan Am Marks on travel related retail merchandise by virtue of Pan Am's use of the marks in commerce for these goods.

16.    Pan Am also possess an unregistered, common law trademark in the Pan Am Wing Design by virtue of Pan Am's use of that mark in commerce on travel-related retail merchandise. The Pan Am Wing Design is depicted below:

4



## STATEMENT OF THE FACTS

### Background on Pan Am's Trademarks

17.     Until 1993, all right, title and interest in the Pan Am Marks and all goodwill associated with each of them, was owned by Pan American World Airways, Inc. (New York corporation).  In 1993, in the context of the airline's first bankruptcy proceeding, all such rights were assigned to Eclipse Holdings, Inc. (Maryland corporation) with approval of the bankruptcy court.

18.     All such rights then were assigned from Eclipse Holdings, Inc. to Cobb Partners, Inc.  An agreement executed on December 29, 1993 by Eclipse Holdings, Inc. and Cobb Partners, Inc. substituted the current owner and the Plaintiff in this action, Pan American World Airways, Inc. (Delaware corporation), as "Purchaser" and assignee of the rights assigned from Eclipse Holdings, Inc.  Pan Am has owned all rights, title and interest in the all of the marks since that time.

19.     In 1998, pursuant to a second bankruptcy proceeding involving Pan Am and entities related to it at the time, Pan Am became a wholly owned subsidiary of Pan Am Systems, Inc. (then known as Pan American Airlines, Inc.).

20.     At least as early as March 31, 1931 - more than three quarters of a century ago - the Pan Am Companies began using the PAN AM word mark to identify their pioneering air

transportation services.   The Pan Am Companies have used the PAN AM word mark continuously since that date, except perhaps for short durations, for example during bankruptcy proceedings, at which time efforts were successfully undertaken to resume or continue use of the mark.   At all times, the PAN AM word mark continued to retain significant goodwill, and it continues to do so to this day.

21.    At least as early as October 5, 1956 - nearly half a century ago - the Pan Am Companies began using the federally registered Pan Am Globe Design on their aircraft and in the marketing and sale of their air travel-related products and services.   The Pan Am Companies have used the Pan Am Globe Design continuously since that date, except perhaps for short durations, for example during bankruptcy proceedings, at which time efforts were successfully undertaken to resume or continue use of the Design.   At all times, the Pan Am Globe Design continued to retain significant goodwill, and it continues to do so to this day.

22.    Photographs of a jet formerly operated by Pan Am,  and a currently operational jet hanger, appear below:





23.     Pan Am owns registrations for the Pan Am Globe Design in foreign jurisdictions throughout the world, including the European Union, China, Japan, Hong Kong, Israel and Germany.

24.     Below is a depiction containing representations of the Pan Am Globe Design from newspaper advertising:



WE DON'T HAVE TO WORK FOR PAN AM WE WANT TO

PAN AM

25.    Since at least the late 1950s, the Pan Am Companies consistently have depicted the PAN AM word mark and Pan Am Globe Design using a distinctive light blue and white color combination.

26.    Immediately below and in paragraphs 27 through 29 is a series of photographs demonstrating the extensive use and notoriety of the Pan Am Marks.

8



27.    Below is a depiction of the cover of the January 19, 1970 edition of Time Magazine:



28.    Between 1963 and 1991, 200 Park Avenue, known as the Pan Am Building prominently displayed the PAN AM word mark in a distinctive stylization.  Immediately below is a depiction of the Pan Am Building as it appeared before 1991:



29.    Below are depictions of print-advertising materials for the Pan Am Companies' air services:





30.    The Pan Am Marks are associated with innovation in aviation.  Many of the services and technologies taken for granted today in the aviation industry find their roots in the history of the Pan Am Companies.  Following is a partial list of some of the firsts of the Pan Am Companies:

- first American airline to operate an ongoing international service;

- first American airline to develop an airport and airway traffic control system;

- first American airline to order aircraft built to its own specifications;

- first American airline to employ cabin attendants and serve meals aloft;

- first American airline to install facilities for heating food aboard aircraft;

- first American airline to operate scheduled transatlantic passenger and mail service;

- first airline to complete a round-the-world-flight;

- first airline to operate jets within the continental U.S.;

- first airline to schedule transatlantic service in American-built jets;

- first airline to operate round-the-world jet freighter service;

- first airline to operate the Boeing 747 in regularly scheduled service;

- first airline to operate round-the-world service with the Boeing 747; and,

- first airline to offer upper-deck dining service on the 747.

31.    The celebrated history of the Pan Am Companies has been the subject of numerous documentaries, including an installment in the PBS television series entitled *Chasing the Sun*.  Such media coverage has greatly enhanced the value and continued public recognition of the Pan Am Marks.

32.    In 1998, Congress established the U.S. Centennial of Flight Commission in order to celebrate and document the first century of flight.  As stated by the Commission, the Pan Am

Companies play a leading role in that history. In an article authored by the U.S. Centennial of Flight Commission (the "Centennial of Flight Article") and pasted on its website, the Commission notes that:

> [i]n the history of American commercial aviation, *there is no airline more influential, important, and better known than Pan American Airways* . . . Pan Am (as it was more commonly known), represented a new adventurous image of the United States to the world. When filmmaker Stanley Kubrick produced his landmark vision of the future in the 1968 movie "2001: A Space Odyssey," he envisioned Pan Am as the space carrier that would take men and women regularly into space.

(emphasis added)

33. The Centennial of Flight Article further refers to the Pan Am Companies as "the most important American airline" and states that:

> *Pan American left behind a legacy unmatched by any other airline in the history of U.S. aviation.* . . . .[I]t was Pan American Airways that set the standards for service in the commercial aviation era. Pan Am's China Clipper services, its expansion into South America, its pioneering partnership with Boeing, its ambitious routes - such as its round-the-world jet service inaugurated in October 1959, its flashy advertising campaigns, and its reputation for good service, all made the company a leader and a trendsetter.

(emphasis added)

34. A photograph of the Pan Am Globe Design and the Beatles rock band, that many Internet resources indicate was taken during the Beatles' historic first visit to the United States in February 1964, is depicted directly below:

13



35.    A photograph of President John F. Kennedy and a flight bag bearing the Pan Am Globe Design is depicted directly below:



36.    Many well-known feature films have included prominent references to or depictions of the Pan Am Marks and have drawn on the aura of Pan Am's brand identity. Notable examples include the appearance of the fictional PAN AM "Space Clipper" *Orion III* in Stanley Kubrick's classic *2001: A Space Odyssey*, numerous movies in the James Bond series, and the 2002 feature film, *Catch Me If You Can*, starring Tom Hanks and Leonardo DiCaprio. Pan Am and its predecessors have licensed others to use the Pan Am Marks in feature films, as well.

14

37.     Below are depictions of the fictional PAN AM "Space Clipper" that played a prominent role in Stanley Kubrick's film *2001: A Space Odyssey*.  The "Space Clipper" clearly displays the Pan Am Globe Design:





38.    A still image that Internet resources indicate is taken from the 2002 feature film Catch Me If You Can appears below:



39.    The prestige symbolized by the Pan Am Marks and the aura of Pan Am's brand identity are summed up well by James Bond in the film version of *From Russia With Love*, when he instructs his secretary Miss Moneypenny to book his flight on "Pan Am, as always."

40.    The Pan Am Companies have been and continue to be active in the distribution of a wide range of merchandise bearing the PAN AM word mark and Pan Am Globe Design, including flight bags and other travel-related products, and model aircraft (collectively "Merchandising Products").

41.    The Pan Am Companies first used the PAN AM word mark and Pan Am Globe Design on Merchandising Products at least as early as 1963.

42.    Pan Am continues to this day to license others to use the PAN AM word mark and Pan Am Globe Design on merchandise, including model airplanes and trains, cufflinks, artwork, and travel-related products such as the flight bag depicted in paragraph 43 of this Declaration. A photograph of a licensed model airplane and lamp appear below.



43.    Below is a depiction of a flight bag manufactured by a licensee of the Pan Am

Companies:



44.    Through Pan Am's licensee, Pan Am also uses the PAN AM word mark and Pan

Am Globe Design in connection with the operation of a retail store that sells travel-related

products.  Such use of the Pan Am Marks commenced at least as early as 1994 and continues to

this day.

18

45.    In March of 2005, the Pan Am Companies began using the PAN AM word mark and Pan Am Globe Design in connection with rail freight services. The Pan Am Companies' rail cars and locomotives now feature the Pan Am Globe Design and the PAN AM word mark.

46.    Below is a photograph of one of the Pan Am Companies' rail cars:



47.    During the past several years, Pan Am has planned and implemented various efforts aimed at enhancing the value of the Pan Am Marks through licensing. In particular, Pan Am has initiated a campaign to expand the scope of their past licensing of the Pan Am Marks for use on various sorts of merchandising items, and to aggressively pursue marketing opportunities in that area. Pan Am's planned initial focus has been on clothing, model aircraft and trains, stationery, artwork, and travel-related items such as flight bags. Pan Am also has planned to expand its existing operations in the retail services arena, including the operation of Pan Am-branded stores that would sell Pan Am Merchandising Products and other items that relate to travel or otherwise to the legacy of Pan Am.

**Merchandising License Agreement**

48.     Effective January 1, 2007, Pan Am entered into a merchandising license agreement ("MLA") with Machine Project.  (A copy of this agreement is attached as Exhibit A.) In the MLA, Pan Am licensed the right to use the Pan Am Marks for the sale, distribution, advertising and promotion of certain merchandise, such as luggage, accessories, apparel, model airplanes, memorabilia and house wares, bearing the Pan Am Marks.  MLA ¶ 2.

49.     The MLA allowed Machine Project to appoint sublicensees to assist in these efforts on the condition that Machine Project notify Pan Am of its intent to do so, and that Pan Am give its written approval for each sublicensee and that Machine Project use Pan Am's form sublicense agreement containing specific provisions called for in the MLA.  *Id.* ¶ 2(B)(ii).

50.     The MLA also provides that Machine Project may contract with a manufacturer for the Pan Am merchandise, but that Pan Am must give its written approval for each manufacturer.  MLA ¶ 2(B)(iv).  As distinct from a sublicense, an approved manufacturer may not sell, market, advertise or promote the Pan Am Merchandise, but may only manufacture those goods for Machine Project to sell by virtue of its license.

51.     The MLA contains clear terms for its termination.  It provides that Pan Am may terminate the agreement on 30 days notice if Machine Project failed to meet its Minimum Performance Requirement, which is defined as producing gross revenues of $1,500,000 in each year of the agreement's first term.  This right to terminate is absolute and unconditional, with no right on the part of Machine Project to cure.  The MLA further provides that Pan Am may terminate the agreement "in the event of a breach of a material provision" if the breaching party fails to cure within 30 days.  The failure to pay monthly royalty payments when due constitutes such a material breach.  In the event of such a termination, the MLA provides that "all of the

rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR." MLA ¶ 4(E).

## Machine Project's Relationship With Vetements

52.    Machine Project enlisted the help of Vetements, a company controlled by Kinser Chiu, to manufacture Pan Am merchandise for Machine Project's sale in accordance with the MLA. In late 2006, Machine Project sought Pan Am's approval to contract with defendant Vetements, Inc. to manufacture the Pan Am merchandise. Pan Am approved Machine Project's use of Vetements for this limited purpose.

53.    Upon information and belief, Vetements and its principal, Chiu, manufactured Pan Am merchandise for sale through Barnes & Noble on its website www.barnesnoble.com and in its stores. Some of this merchandise was manufactured after Machine Project had terminated Vetements authority to do so as well as after the termination of the MLA. Vetements maintained its supply of Pan Am merchandise in its warehouse in Brooklyn.

54.    Although Machine Project appointed Vetements to manufacture Pan Am merchandise, it did not and could not give Vetements the right to sell or market these products. It could not do so without Pan Am's consent which was never sought. Vetements role was limited to manufacturing these goods in accordance with its contract with Machine Project.

## Machine Project's Failure to Perform and Termination of the MLA

55.    In the first year of its performance under the MLA, Machine Project failed to meet its Minimum Performance Requirement of $1,500,000 in gross revenues. In fact, Machine Project sold only $755,917.32 in Pan Am Merchandise in 2007 -- over $700,000 short of this requirement. This failure to meet the Minimum Performance Requirement gave Pan Am the absolute right to terminate the MLA under Section 4(B)(ii), which states in part:

> In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:
>
> * * *
>
> (ii) LICENSOR shall have the option …(ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

MLA § 4(B)(ii).

56.    Machine Project also breached the MLA by failing to make timely royalty payments in accordance with Section 6 of the MLA. Under Section 6 of the MLA, Machine Project was required to pay Pan Am a percentage of its revenues for each month within 30 days of that month's end.  In all of 2007, Machine Project only made two royalty payments, despite generating some revenue for each of the 12 months.  By the middle of March 2008, Machine Project had not made any of its required royalty payments for 2008.

57.    Finally, Machine Project breached Section 8 of the MLA by failing to submit its new products for approval to Pan Am before manufacturing them.   Under Section 8, Machine Project was required to present any new product to Pan Am for its approval.  MLA ¶ 8(D).  Since the beginning of the license's initial term in January 2007 through March 2008, Machine Project manufactured and sold new Pan Am products without ever seeking the required approval.  These products include brown leather bags to commemorate the eightieth anniversary of Pan Am's first flight.

58.    Consequently, on March 14, 2008, Pan Am gave Machine Project notice of termination based on Machine Project's failure to meet the Minimum Performance Requirement, as well as uncured material breaches of the Agreement consisting of Machine Project's failure to make royalty payments under Section 6 and its failure to submit new merchandise for approval to Pan Am before selling them.

59.    Since receiving this notice of termination Machine Project has stopped selling, marketing and promoting Pan Am merchandise.

## Defendant Chiu's Knowledge of Pan Am's Termination of the MLA

60.    Chui was made aware that Pan Am terminated the MLA at least as early as April 9, 2008.  On that day, Mr. Chiu's attorney Raymond Chin wrote to Stacy Beck, Pan Am's Director of Marketing and Corporate Development, acknowledging that Pan Am terminated the MLA.

61.    On April 10, 2008, Pan Am wrote to Chiu's attorney and notified him that Chiu was obligated to account for and transfer any Pan Am merchandise to Pan Am or Machine Project.  Specifically, Pan Am informed Chiu's attorney:

> Pan Am is aware that Mr. Chiu is in possession of merchandise that was manufactured pursuant to authority granted by Machine in early 2008, and that this authority did not extend to a sale of the merchandise to anyone other than Machine, as Pan Am's licensee, or Pan Am as owner of the relevant intellectual property.
>
> Consequently, please accept this letter as a demand that Mr. Chiu provide Pan Am with an offer to purchase these goods at no more than fair market value within three (3) days of receipt of this letter, as well as proposed dates for inspection and possible delivery of the merchandise. Furthermore, please be advised that if Mr. Chiu declines to abide by this demand, Pan Am reserves all of its rights to pursue appropriate remedies to prevent any unauthorized sale of this merchandise to third parties.

62.    In response to this letter, Chiu's attorney did not deny that Chiu possessed goods bearing the Pan Am trademarks.  Instead, he threatened to commence litigation concerning Chiu's alleged financial interest in Machine Project.

63.    By letter dated April 28, 2008, Pan Am requested that Chiu provide documentation of his alleged financial interest in Machine Project and his authority to speak and act on its behalf.  To Pan Am's knowledge, Machine Project is and always has been wholly

owned by Anthony Lukas; Lukas and his wife are the sole officers and directors of that Company; and Chui appears to have no legal interest in Machine Project. Finally, Pan Am explained that regardless of whether Chiu owns any part of Machine Project, Pan Am terminated the MLA on March 14, 2008.

64.    On or about May 12, 2008, Chiu commenced litigation in New York Supreme Court, New York County seeking, *inter alia*, a declaration that he has a financial interest in Machine Project and to enforce the MLA between Pan Am and Machine Project. Chiu also caused his attorney to bring suit in the name of Machine Project, even though he is not an officer, director or shareholder of that company and thus has no legal right to instruct anyone to file suit on that corporation's behalf. Pan Am removed this action to the United States District Court for the Southern District of New York, and it is currently pending before Judge Holwell.

**Vetements' And Chiu's Sale Of Pan Am Merchandise**

65.    Pan Am recently learned that despite termination of the MLA and Chiu's awareness of this fact, Vetements is currently selling Pan Am Merchandise on the Barnes & Noble website and in its stores.

66.    Specifically, Vetements is selling (1) "Pan Am Vintage Poster Art Postcards," (2) "Pan Am Airmail Design Blue and White Note Cards," (3) Pan Am passport covers, (4) Pan Am flight bags, (5) Pan Am key chains and (6) "Pan Am Travel White and Blue Wire Journals." The web-page describes some of these items as originating from "Pan Am by Vetements." All of these products bear Pan Am's registered marks.

67.    Specifically, the site features "Pan Am Airmail Design Blue and White Note Cards-Set of 12" listing "Pan Am for Vetements" as the original seller. The site shows the top of the note card's box, which is printed in Pan Am's distinctive blue on a white background and has the title "Air Mail," with the Pan Am Globe Design mark and the PAN AM word mark in the

center surrounded by a picture of a plane, a flight attendant, and two travelers, with the PAN AM mark at the bottom.

68.     Also featured on the site is a "Pan Am Travel White and Blue Wire Journal" again listing "Pan Am for Vetements" as the product's origin. The site shows the front cover of the journal, which is printed in Pan Am's distinctive blue on a white background, and has the Pan Am Globe Design mark in the center with a plane, flight attendant, and travelers super-imposed on it, and the words "travel journal" and the PAN AM mark at the bottom.

69.     The site also offers for sale "Pan Am Vintage Poster Art Postcards-Set of 20" again listing "Pan Am for Vetements" as the originator of the product. The site shows several of these post cards, which contain the PAN AM mark, the PAN AM WORLD AIRWAYS mark, and the Pan Am Winged Design mark.

70.     Upon information and belief, all of the products described in paragraphs 66 through 69 are being sold in Barnes & Noble retail outlets.

71.     Also for sale at Barnes & Noble retail outlets are passport covers, key chains, and flight bags bearing the Pan Am Globe Design. The flight bag also bears the PAN AM mark and the PAN AMERICAN WORLD AIRWAYS mark.

72.     Moreover, on information and belief, Chiu has a substantial inventory of merchandise bearing the Pan Am Marks in his warehouse  I have been informed that some of this merchandise was manufactured after the MLA was terminated in March and after the authority to manufacture was revoked by Machine Project. I am also aware that some of this merchandise was not approved by Pan Am and was not subject to Pan Am's stringent quality control standards.

73.    The confusion that associating Pan Am with Vetements causes, as well as the misperception that Vetements is the source of Pan Am merchandise, has already harmed Pan Am and will continue to do so unless Chiu and Vetements are prevented from selling these goods. As a result of Vetements' actions, consumers will believe that Vetements is somehow affiliated with Pan Am and that Vetements' products are being sold by Pan Am.

## FIRST CLAIM FOR RELIEF
**(Trademark Infringement in Violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114)**

74.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 73 of this complaint as if fully set forth herein.

75.    Defendants' use in commerce of the federally registered Pan Am Marks in connection with the sale, offering for sale, distribution, or advertising of Defendants' goods and services is likely to cause and, based on Pan Am's information and belief, has caused, confusion, mistake or deception as to the source, origin, sponsorship or approval of Defendants' products and services.

76.    Defendants' distribution of merchandise bearing the Pan Am Marks without the authority to do so and Defendants continued manufacture of said merchandise after their authority to do so was terminated constitutes trademark infringement.

77.    Defendants' use of the Pan Am Marks has and will continue to cause the consumer to believe that the Vetements products were approved for sale by Pan Am or that Pan Am is the sponsor of the Vetements products.

78.    Defendants' use of the federally registered PAN AM marks as described in the Complaint constitutes trademark infringement within the meaning of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

79.    Defendants have acted as described in this Complaint with full knowledge of their violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

80.    Defendants have acted as described in this Complaint with the intent to cause confusion, mistake and deception among the public as to source, origin, sponsorship or approval of Defendants' products and services.

81.    As a result of Defendants' conduct, Plaintiff has been damaged and is entitled to damages, including but not limited to, Defendants' profits from the sale of all infringing goods, actual damages, statutory damages, treble damages, corrective advertising damages, costs of litigation, and attorneys' fees.

82.    Defendants' willful and deliberate acts described above have caused irreparable injury to Plaintiff's goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (Unfair Competition and False Designations of Origin in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a))

83.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 82 of this complaint as if fully set forth herein.

84.    Defendants' conduct alleged above constituted unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.    Defendants' actions and use of the Pan Am Marks in connection with the distribution, sale and offering for sale of travel-related products constitute the willful use of false designations of origin, false descriptions and representation, and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

27

86.     Defendants' use of the Pan Am Marks has and will continue to cause the consumer to believe that the Vetements' products were approved for sale by Pan Am or that Pan Am is the sponsor of the Vetements products.

87.     Defendants' distribution of merchandise bearing the Pan Am Marks without the authority to do so and Defendants' continued manufacture of said merchandise after their authority to do so was terminated constitutes trademark infringement.

88.     Defendants' designation of the origin of the goods as "Pan Am for Vetements" is likely to cause consumer confusion in that consumers will be misled into thinking that Vetements is an authorized dealer of Pan Am products.

89.     On information and belief, Defendants have acted as described in the Complaint with full knowledge of such unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

90.     On information and belief, Defendants have acted as described in the Complaint with the intent to cause confusion, mistake and deception among the public as to source, origin, sponsorship or approval of Defendants' products and services.

91.     Defendants' violations of 15 U.S.C. §1125(a) entitle Plaintiff to recover damages, including, but not limited to, Defendants' profits from the sale of all infringing goods, actual damages, treble damages, corrective advertising damages, litigation costs, and attorneys' fees.

92.     Defendants' willful and deliberate acts described above have caused irreparable injury to Plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby Plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### (Federal Trademark Dilution Under 15 U.S.C. § 1125(c))

93.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this complaint as if fully set forth herein.

94.    The Pan Am Marks are distinctive and famous within the meaning of 15 U.S.C. § 1125(c) and were distinctive and famous prior to the date of Defendants' conduct challenged herein.

95.    Defendants' conduct alleged above violated 15 U.S.C. § 1125(c), as amended by the Trademark Dilution Revision Act of 2006, in that it is likely to dilute and is diluting the distinctive quality of the Pan Am Marks. Defendants' use of the trademarks and trade name on the various travel-related products has created an association between Defendants' products and marks owned by Pan Am, which impairs the distinctiveness of Pan Am's marks and lessens the capacity of the marks to identify and distinguish products marketed and sold by Plaintiff and its licensees under those marks.

96.    On information and belief, Defendants willfully and in bad faith intended to profit from the Pan Am Marks by trading on the valuable reputation of Pan Am and the Pan Am Marks and causing dilution of the distinctive quality of these famous marks.

97.    Defendants' violations of 15 U.S.C. §1125(c) entitle Plaintiff to recover damages, including, but not limited to, Defendants' profits from the sale of all infringing goods, actual damages, treble damages, corrective advertising damages, litigation costs, and attorneys' fees.

98.    Defendants' willful and deliberate acts described above have caused irreparable injury to Plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby Plaintiffs have no adequate remedy at law.


**FOURTH CLAIM FOR RELIEF**

29

**(Trademark Dilution Under New York Gen. Bus. Law § 360-1)**

99.    Plaintiff repeats and realleges each and every allegation contained in paragraphs1 through 98 of this complaint as if fully set forth herein.

100.    This claim is for injury to goodwill and business reputation pursuant to New York General Business Law Section 360-1, as amended.

101.    The Pan Am Marks are distinctive within the meaning of New York General Business Law Section 360-1.

102.    Defendants' distribution of merchandise bearing the Pan Am Marks without the authority to do so and Defendants continued manufacture of said merchandise after their authority to do so was terminated constitutes trademark infringement.

103.    Defendants' designation of the origin of the goods as "Pan Am for Vetements" is likely to cause consumer confusion in that consumers will be misled into thinking that Vetements is an authorized dealer of Pan Am products.

104.    Defendants' use of the Pan Am Marks has and will continue to cause the consumer to believe that the Vetements products were approved for sale by Pan Am or that Pan Am is the sponsor of the Vetements products.

105.    Defendants' conduct alleged above causes injury to the goodwill and business reputation of Pan Am and its Pan Am Marks and creates a likelihood of dilution of the distinctive quality of those marks in violation of New York General Business Law Section 360-1.

106.    Defendants' acts described above have caused injury and damages to Plaintiff, and have caused irreparable injury to Plaintiff's goodwill and business reputation and, unless enjoined, will cause further irreparable injury, whereby Plaintiff has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
**(Trademark Infringement and Unfair Competition Under State Common Law)**

107.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 106 of this complaint as if fully set forth herein.

108.    Defendants' use of the Pan Am Marks on travel-related products, as alleged above, constitutes trademark infringement and unfair competition in violation of common law.

109.    Defendants' distribution of merchandise bearing the Pan Am Marks without the authority to do so and Defendants continued manufacture of said merchandise after their authority to do so was terminated constitutes trademark infringement.

110.    Defendants' designation of the origin of the goods as "Pan Am for Vetements" is likely to cause consumer confusion in that consumers will be misled into thinking that Vetements is an authorized dealer of Pan Am products.

111.    Defendants' use of the Pan Am Marks has and will continue to cause the consumer to believe that the Vetements products were approved for sale by Pan Am or that Pan Am is the sponsor of the Vetements products.

112.    On information and belief, Defendants' acts of common law trademark infringement and unfair competition have been done willfully and deliberately and Defendants have profited and been unjustly enriched by sales that Defendants would not otherwise have made but for their unlawful conduct.

113.    Defendants' intentional and wrongful acts described above have caused injury and damages to Plaintiff, and have caused irreparable injury to Plaintiff's goodwill and business reputation and, unless enjoined, will cause further irreparable injury, whereby Plaintiff has no adequate remedy at law.

31

## SIXTH CLAIM FOR RELIEF
### (Deceptive Acts and Practices Under New York Gen. Bus. Law §§ 349-350)

114.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 113 of this complaint as if fully set forth herein.

115.    This claim is for false advertising and deceptive acts and practices under New York General Business Law Sections 349 and 350, *et seq.*

116.    Defendants' use of the Pan Am Marks and Pan Am name on travel-related products, as alleged above, constitutes false advertising and deceptive acts and practices in violation of New York General Business Law Sections 349 and 350, *et seq.*

117.    Defendants' material misrepresentations in the sale and labeling of goods to consumers causes Plaintiff harm, as well as public harm, in that consumers rely on the misrepresentation that Pan Am is selling these goods when deciding to purchase the goods, thus causing confusion.

118.    On information and belief, Defendants' deceptive acts and practices have been done willfully and deliberately and Defendants have profited and been unjustly enriched by sales that Defendants would not otherwise have made but for their unlawful conduct.

119.    Defendants' intentional and wrongful acts described above have caused injury and damages to Plaintiff, and have caused irreparable injury to Plaintiff's goodwill and business reputation and, unless enjoined, will cause further irreparable injury, whereby Plaintiff has no adequate remedy at law.


## JURY DEMAND

120.    Plaintiff requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Defendants as follows:

(A)    Ordering that Defendants be adjudged to have violated Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a) and (c), to have committed acts of trademark infringement and unfair competition in violation of state common law, to have caused trademark dilution in violation of New York Gen. Bus. Law § 360-1, and to have committed unfair competition and deceptive acts and in violation of New York Gen. Bus. Law §§ 349 and 350, *et seq.*

(B)    Ordering an accounting of all gains, profits, savings and advantages realized by Defendants from their aforesaid acts of false designation of origin, trademark infringement, unfair competition, dilution, and deceptive acts.

(C)    Awarding such damages as Plaintiff shall establish in consequence of Defendants' aforesaid acts of false designation of origin, trademark infringement, unfair competition, dilution, and deceptive acts and practices, including three times the amount found as actual damages by the trier of fact to properly compensate Plaintiff for its damages, pursuant to 11 U.S.C. § 1117(a), and, pursuant to New York Gen. Bus. Law § 349(h), statutory damages of $1,000 for each violation, together with appropriate interest theron;

(D)    Awarding punitive damages on Plaintiff's common law claims in an amount to be determined by the trier of fact for Defendants' willful and unauthorized use of Plaintiff's mark;

(E)    Granting a preliminary and permanent injunction restraining Defendants, their officer, directors, agents, employees, servants, attorneys, successors, assigns and others controlling, controlled by or affiliated with them and all those in privity or active concert or

participation with any of the foregoing, and all those who receive actual notice by personal service or otherwise:

(i)    from using, orally or in writing, the Pan Am Marks or any other name, word, mark, or designation confusingly similar to or dilutive of Plaintiff's Pan Am Marks for any and all products or services;

(ii)    from using, orally or in writing, or applying for registration of the Pan Am Marks or anything similar thereto or derivative of, either alone or in conjunction with other words or symbols for any and all products or services;

(iii)    from representing that Defendants' products are sponsored by, emanate from, or otherwise are associated with Plaintiff or any of the Pan Am companies; and

(iv)    from otherwise competing unfairly with Plaintiff;

(F)    Ordering that, pursuant to Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), Defendants shall serve upon Plaintiff within thirty (30) days after service on Defendants of an injunction or such extended period as the Court may direct, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(G)    Ordering Defendants to recall from distribution, and deliver up all advertising, marketing, promotional pieces and other items, the dissemination of which by Defendants would violate the injunction herein granted;

(H)    Awarding Plaintiffs their costs and expenses of this action;

(I)    Declaring that this is an exceptional case, pursuant to 15 U.S.C. § 1117, because of the willful and deliberate nature of Defendants' acts of trademark infringement, false designation of origin and unfair competition, and awarding Plaintiffs their reasonable attorneys' fees;

34

(J)    Awarding Plaintiffs their reasonable attorneys' fees; and

(K)    Granting such other further relief as this Court may deem just and proper.

Dated: June 7, 2008

By: _____

Thomas J. Quigley
tquigley@winston.com
Luke A. Connelly
lconnelly@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for Pan American World Airways, Inc.*

## MERCHANDISING LICENSE AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into as of the 1st day of January, 2007 ("Effective Date") by and between **PAN AMERICAN WORLD AIRWAYS, INC.**, a Delaware corporation with offices at 14 Aviation Avenue, Portsmouth, NH 03801 ("LICENSOR") and **MACHINE PROJECT, INC.**, a New York corporation with offices at 241 37th Street, Seventh Floor, New York, New York 10018 ("LICENSEE").

## W I T N E S S E T H:

**WHEREAS**, LICENSOR and Machine Ltd., which is a predecessor company of LICENSEE, entered a Merchandising License Agreement with an effective date of September 2, 2005 that was amended on June 22, 2006 to replace Machine Ltd. With LICENSEE, and LICENSOR and LICENSEE now desire to terminate that agreement in its entirety and to enter this Agreement;

**WHEREAS**, LICENSOR has certain rights in the Trademarks (as defined in Section 1.S, below;

**WHEREAS**, LICENSOR is willing to grant to LICENSEE the right to use and to authorize others to use the Trademarks;

**WHEREAS**, LICENSEE has represented that it desires and has the ability to manufacture, market, distribute and promote, and to cause others to manufacture, market, distribute and promote, Licensed Products (as defined in Section 1.F, below) in the Territory (as defined in Section 1.R, below);

**WHEREAS**, LICENSOR desires to grant to LICENSEE the right to manufacture, market, distribute and promote Licensed Products in the Territory; and

**WHEREAS**, both LICENSEE and LICENSOR are in agreement with respect to the terms and conditions upon which LICENSEE shall have such rights as more fully provided below.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the receipt and sufficiency of which are acknowledged, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1.  **DEFINITIONS:** In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below when used in this Agreement:

A.  "Artworks" shall mean the works of art identified in Schedule C to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request to add new works of art, but subject to LICENSOR's approval of such proposed works of art for consistency with the core values associated with the Trademarks.

1

**B.**     "Asia" shall mean that list of countries listed under the heading "Asia" in Schedule D, as such list may be amended from time to time pursuant to this Agreement.

**C.**     "Combined Online Revenues" shall mean the total of Online Revenues and LICENSOR Revenues.

**D.**     "First Renewal Term" shall have the meaning ascribed in Section 4.A.

**E.**     "Initial Term" shall have the meaning ascribed in Section 4.A.

**F.**     "Licensed Products" shall mean Merchandising Products on or in connection with which one or more of the Trademarks is used or appears.

**G.**     "LICENSEE Gross Revenues" shall mean the total of Online Revenues, Wholesale Revenues and Sublicensee Revenues.

**H.**     "LICENSOR Revenues" shall mean LICENSOR's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSOR for returns or allowances.

**I.**     "Merchandising Products" shall mean those products listed in Exhibit B to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request but subject to LICENSOR's approval in its sole discretion.

**J.**     "Minimum Performance Requirement" shall mean LICENSEE Gross Revenues of at least one million five hundred thousand U.S. dollars ($1,500,000.00) for each Royalty Year during the Initial Term, two million U.S. dollars ($2,000,000.00) per Royalty Year during the First Renewal Term, and two million five hundred thousand U.S. dollars ($2,500,000.00) per Royalty Year during the Second Renewal Term.

**K.**     "Online Revenues" shall mean LICENSEE's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSEE for returns or allowances.

**L.**     "Renewal Term" shall have the meaning ascribed in Section 4.A.

**M.**     "Royalty" shall mean any and all payments payable to LICENSOR by LICENSEE pursuant to this Agreement.

**N.**     "Royalty Year" shall mean a one-year period commencing on January 1 of a given year.

**O.**     "Second Renewal Term" shall have the meaning ascribed in Section 4.A.

**P.**     "Sublicensee Revenues" shall mean total gross revenues of all Sublicensees from wholesale sale of Licensed Products, less only credits granted to customers of such Sublicensees for returns or allowances.

2

Q.   "Term" shall mean the Initial Term and any Renewal Terms.

R.   "Territory" shall mean all jurisdictions listed in Exhibit D to this Agreement, as such Schedule may be amended from time to time pursuant to Section 3.

S.   "Trademarks" shall mean the trademarks/service marks PAN AM, the PAN AM AND GLOBE design, PAN AMERICAN WORLD AIRWAYS and the PAA AND WING design, in each case only in the particular logo forms and stylizations depicted in Exhibit A to this Agreement.

T.   "Wholesale Revenues" shall mean Licensee's gross revenues from wholesale sale (the amount billed to customers) of Licensed Products, less discounts and allowances actually attributable to the Licensed Products as shown on an invoice and, further, less any bona fide returns (net of all returns actually made or allowed as supported by credit memoranda actually issued to customers). All taxes shall be Licensee's responsibility. No other costs incurred in the manufacturing, selling, advertising and/or distribution of the Licensed Products shall be deducted from the Wholesale Revenues nor shall any deduction be allowed for any uncollectible amounts or allowances.

## 2.   LICENSE GRANT/LIMITATIONS ON LICENSE

A.   Subject to the limitations provided in this Agreement, LICENSOR hereby grants to LICENSEE during the Term:

  i)  the exclusive, sublicensable right (subject to the limits on exclusivity and sublicensing provided herein) to use the Trademarks in the Territory on Merchandising Products and in connection with the sale, distribution, advertising and promotion of Merchandising Products in the Territory;

  ii)  the non-exclusive and non-sublicensable right to use the Trademarks and the PAN AM ONE.COM mark in the Territory in connection with retail sales services that are rendered by means of an interactive internet website, provided that the only products sold at such interactive internet website or through such online retail sales services shall be Licensed Products; and

  iii)  the exclusive and non-sublicensable right to use the panamone.com internet domain name.

B.   License Restrictions

  i)  LICENSEE specifically acknowledges and agrees that nothing in this Agreement authorizes LICENSEE to use the Trademarks or PAN AM ONE.COM mark in connection with retail sales services other than through the interactive internet website specifically allowed in Section 2.A.ii of this Agreement or with the express written consent of Licensor, which consent may be withheld for any reasonable reason. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any

3

Merchandising Sublicense shall constitute a material breach of this Agreement.

ii) LICENSEE's right to sublicense as provided in Section 2.A.i of this Agreement is subject to LICENSEE's provision of reasonable notice to LICENSOR of LICENSEE's intent to appoint a sublicensee ("Sublicensee"), and LICENSOR's advance written consent in its sole discretion to the granting of a sublicense to the proposed Sublicensee. Each of LICENSEE's agreements with Sublicensees ("Merchandising Sublicenses") shall be in the form of agreement to be prepared and provided by LICENSOR (the "Form Merchandising Sublicense"), shall name LICENSOR as an intended third party beneficiary, and shall be subject to the express advance written approval of LICENSOR, which approval may be withheld by LICENSOR for any reasonable reason. Any deviations from the Form Merchandising Sublicense shall be subject to approval of LICENSOR in its sole discretion. Moreover, Each Merchandising Sublicense shall by its own terms (i) set a royalty rate of at least six percent (6%) of Sublicensee Revenues; (ii) provide that LICENSOR, up on t ermination o f t his Ag reement, s hall ha ve t he o ption o f either terminating such Merchandising Sublicense or assuming it from LICENSEE; a nd (iii) s hall c ontain p rovisions t o e nsure t hat t he qu ality o f Licensed Products meets the Quality Standard. All terms of each Merchandising Sublicense (including without limitation the scope of licenses granted therein) shall be consistent with and shall not exceed the scope of this Agreement. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any Merchandising Sublicense shall constitute a material breach of this Agreement.

iii) The rights granted to LICENSEE by LICENSOR in Section 2.A.i of this Agreement shall be exclusive throughout the world; provided, however, that (i) exclusivity shall not apply to those countries that now are members of, or that in the future become members of, the European Union, (ii) the exclusivity shall be subject to rights in the Trademarks granted prior to the Effective Date by LICENSOR or its predecessors to third parties, including without limitation the right granted to Dragon Models to use the PAN AM mark and PAN AM GLOBE logo on or in connection with 1:400 scale models of aircraft types operated by LICENSOR (or its predecessor) in its fleet, including Boeing B747 and Boeing B737 aircraft; and (iii) LICENSOR reserves to itself the right to use the Trademarks in the Territory on products other than Merchandising Products and in connection with the sale, distribution, advertising and promotion (but not the manufacture of Merchandising Products) of those products and Merchandising Products in the Territory, provided; however, that any sales of Merchandising Products by LICENSOR shall not be at a price lower than that charged by LICENSEE or Sublicensees, except for sales to LICENSOR's employees.

iv) Before entering any agreement with a manufacturer, distributor or retail outlet for t he m anufacture, s ale o r dis tribution o f Licensed P roducts, LICENSEE

4

shall obtain LICENSOR's advance written approval of such manufacturer, distributor or retail outlet. LICENSOR's right of approval or disapproval shall be in its reasonable and timely discretion.

v) LICENSEE specifically acknowledges and agrees that its exercise in any manner of any of the rights granted in Section 2.A.i or Section 2.A.ii in any jurisdiction that is not in the Territory shall be deemed a material breach of this Agreement.

**C.**    All LICENSOR's rights in the Trademarks and the PAN AM ONE.COM mark are reserved to LICENSOR unless specifically licensed to LICENSEE herein.

## 3.    AMENDMENT OF TERRITORY

**A.**    The scope of the Territory may be amended from time to time upon LICENSEE's request, subject to LICENSOR's approval in its reasonable discretion as provided herein. At least eight (8) weeks before LICENSEE commences (or, with respect to a Merchandising Sublicense, before a Sublicensee commences) the manufacture, distribution, promotion or sale of one or more Licensed Product in a country that is not at that time listed in Exhibit D (a "Proposed Jurisdiction"), LICENSEE shall provide LICENSOR with written notice of its desire to expand the Territory to include such Proposed Jurisdiction. Within four (4) weeks of its receipt of such notification from LICENSEE, LICENSOR shall inform LICENSEE of whether or not it approves of expansion of the Territory to include such Proposed Jurisdiction. LICENSOR's approval of such expansion shall be in its reasonable discretion, and reasonable grounds for disapproval shall include without limitation the determination that LICENSEE's manufacture, distribution, promotion or sale of Licensed Products in such Proposed Jurisdiction would create an undue risk of violation of the intellectual property rights of a third party or of damage to LICENSOR's rights in the Trademarks. In the event LICENSOR denies expansion of the Territory to include a Proposed Jurisdiction, LICENSOR shall make reasonable efforts to provide LICENSEE with an alternative mark or marks to use in such jurisdiction.

## 4.    TERM/TERMINATION/MINIMUM PERFORMANCE REQUIREMENT

**A.**    This Agreement and the provisions hereof, except as otherwise provided herein, shall be in full force and effect commencing on the Effective Date and shall continue through December 31, 2011 (the "Initial Term"). Subject to its satisfaction of the Minimum Performance Requirement, LICENSEE shall have the right to extend this Agreement for two (2) additional periods of five (5) years each (each such five (5) year period being a "Renewal Period"), with the "First Renewal Period" ending December 31, 2016, and the "Second Renewal Period" ending December 31, 2021. In order to exercise its renewal options, LICENSEE shall give LICENSOR at least twelve months written notice prior to the conclusion of the Initial Term or applicable Renewal Period.

**B.**    In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:

i) LICENSEE's right to extend this Agreement shall be subject to LICENSOR's approval in its sole discretion; or

5



ii) LICENSOR shall have the option (i) to collect from LICENSEE the Royalty that would have been due from LICENSEE if the Minimum Performance Requirement for such Royalty Year had been satisfied (with a credit for Royalty payments already made on LICENSEE Gross Revenues for that Royalty Year), or (ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

C.    In the event LICENSEE fails to satisfy the Minimum Performance Requirement during any Royalty Year or to timely exercise its option to renew this Agreement pursuant to Section 4.A, LICENSOR thereafter shall be free to negotiate with any other party in respect of the rights granted by LICENSOR to LICENSEE in this Agreement.

D.    This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) days period, the breaching party fails to cure such breach.

E.    Effects of Termination

i) Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all its and Sublicensees' inventory of Licensed Products as well as all work in progress (the "Inventory").

ii) Upon the expiration or termination of this Agreement, all of the rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR, LICENSEE shall immediately cause all Sublicensees to discontinue all use of the Trademarks (unless the applicable Merchandising Sublicense is assumed by LICENSOR pursuant to Section 2.B.ii), and LICENSEE will have one year to sell all Inventory (and, except with respect to those Merchandising Sublicenses assumed by LICENSOR pursuant to Section 2. B.ii, s hall c ause a ll S ublicensees t o d o t he s ame), all a t no c ost whatsoever to LICENSOR.  If in the case another LICENSEE is obtained, they may purchase the inventory at cost plus 20%.

iii) Immediately upon expiration or termination of this Agreement, LICENSEE shall inactivate the internet web site located at www.panamone.com, cease all commercial activity and all use of such domain name and all use of the Trademarks and the PAN AM ONE.COM mark at such site, and shall assign to LICENSOR the domain name registration for the www.panamone.com internet domain name.

iv) The agreement between LICENSOR and Machine, Ltd, a predecessor company of LICENSEE, effective as of September 2, 2005 is hereby terminated by mutual agreement of LICENSOR and LICENSEE.



## 5.    DUTIES AND OBLIGATIONS OF LICENSEE

**A.**    LICENSEE shall, subject to LICENSOR's advance review and approval, develop a cohesive imaging and licensing program that focuses upon LICENSOR's core brand values as contemplated by this Agreement.

**B.**    LICENSEE shall develop a graphic ID standards manual for LICENSOR's review and approval in its discretion (the "Usage Guidelines"). The Usage Guidelines shall delineate certain standards for use of the Trademarks. LICENSEE shall adhere to such Usage Guidelines and shall cause all Sublicensees to do the same.

**C.**    Subject to the conditions herein specified, LICENSEE shall use its best efforts consistent with sound business practices during the Term to find and conclude business arrangements with Sublicensees that are advantageous to LICENSOR and, after entry of Merchandising Sublicenses memorializing such arrangements, to reasonably service such arrangements and agreements during their term and the term hereof, including, but not limited to, providing guidance and education to Sublicensees pertaining to the imaging and licensing program, monitoring the Sublicensees for their adherence to the Quality Standards (as defined in Section 8.C), LICENSEE shall provide yearly reports to LICENSOR detailing the status of all sublicensing projects and opportunities, and all of LICENSEE's manufacturing, sales, distribution and promotion activities concerning Licensed Products.

**D.**    LICENSEE shall engage in such other activities as the parties may mutually agree and, in general use its best efforts consistent with sound business practices to maximize revenue generated from the use of the rights granted hereunder and to enhance the value and reputation of the Trademarks.

**E.**    LICENSEE shall oversee and be responsible for payments due from Sublicensees under Merchandising Sublicenses, and shall provide quarterly and annual reports to LICENSOR. Such reports shall be certified by an authorized financial officer of LICENSEE or LICENSEE's accountant, and shall include a full and accurate statement showing (i) the number of each type of Licensed Product sold by LICENSEE and Sublicensees, (ii) the revenues derived therefrom, indicating the particular Licensed Product from which the revenues were derived and whether the revenues constitute Online Revenues, Wholesale Revenues or Sublicensee Revenues, and (iii) all such other information and details necessary to compute and verify the accuracy of Royalties. If necessary, LICENSEE shall conduct periodic investigations of Sublicensees' books and records to ensure that all payments have been accurately computed and fully made. The cost of such royalty investigations shall be borne by LICENSEE; provided, however, that any recoveries received as a result of such investigation shall be applied initially against the cost of conducting such investigation and then divided equally between LICENSOR and LICENSEE.

**F.**    It is understood that LICENSOR may have concepts and uses for the Trademarks or Artworks other than for use on or in connection with the Merchandising Products. During the Term, LICENSOR shall not license the Trademarks for use on or in connection with products or services other than the Merchandising Products (with the exception of uses of the Trademarks by LICENSOR or its affiliates or licensees that predate the effective date of this Agreement), either by itself or through an agent, without first offering such opportunity to LICENSEE under the

7



same terms and conditions as this Agreement. In the event that LICENSEE does not accept such offer in writing within thirty (30) days after notification by LICENSOR, LICENSOR shall be free to commence the commercialization or licensing of the Trademarks other than on or in connection with the Merchandising Products with no obligation to LICENSEE.

     **G.**    LICENSOR recognizes that LICENSEE performs similar services for its other clients and that LICENSOR's retention of LICENSEE is subject to such understanding. Provided, however, that LICENSEE's relationships with its other clients shall not unreasonably interfere with LICENSEE's performance of the terms and conditions of this Agreement.

     **H.**    LICENSEE agrees to sell Licensed Products to LICENSOR in exchange for LICENSOR's payment of a price equal to the Wholesale price for each item less 20% plus reasonable shipping and handling costs if applicable.

     **I.**    LICENSEE agrees that it shall use at least one of the Trademarks on each Merchandising Product on which one or more of the Artworks appears.

     **J.**    LICENSEE shall make available to LICENSOR a link between LICENSOR'S internet website and LICENSEE'S panamone.com internet website (or such other website that LICENSEE develops for the online sale of Merchandise Products) that will enable users of LICENSOR'S internet website to purchase Merchandise Products at retail prices. For any purchases using such link, LICENSEE shall be responsible for shipping the Merchandise Products to the purchasers, and shall pay to LICENSOR the difference between the retail price and the cost of the Merchandise Products. If purchasers that initially purchased Merchandise Products via LICENSOR'S internet website were to purchase additional Merchandise Products in the future via LICENSEE'S internet website, those purchases shall be treated as if they were made via LICENSOR'S internet website, and payment shall be made to LICENSOR in accordance with this paragraph.

     **K.**    LICENSEE acknowledges and agrees that its breach of any of the obligations contained in this Section 5 shall be considered a material breach of this Agreement sufficient to justify termination of this Agreement.

**6.**    **COMPENSATION**

     **A.**    Wholesale sales by LICENSEE.

         i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of six percent (6%) of Wholesale Revenues attributable to Asia, and seven percent (7%) of Wholesale Revenues attributable to countries outside of Asia. In the event that Wholesale Revenues for a particular Royalty Year exceed twenty million U.S. dollars ($20,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of six percent (6%) and seven percent (7%) (for Asia and countries outside Asia, respectively) for Wholesale Revenues that exceed twenty million U.S. dollars ($20,000,000.00.

     **B.**    Online Sales

8



i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of (i) six percent (6%) of Online Revenues for the first ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year, seven percent (7%) of Online Revenues for the second ten million U.S. dollars of Combined Online Revenues in each Royalty Year, and ten percent (10%) of Online Revenues for the third ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year. In the event that Combined Online Revenues for a particular Royalty Year exceed fifty million U.S. dollars ($50,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of ten percent (10%) for Online Revenues that exceed fifty million U.S. dollars ($50,000,000.00).

**C.**    Sales by SUBLICENSEES

i) Within forty-five (45) days following the end of each quarterly period following the Effective Date, LICENSEE will pay to LICENSOR one hundred percent (100%) of the royalty received by LICENSEE at a rate of 6% from Merchandising Sublicenses during such quarter.

**D.**    Miscellaneous

i) All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

ii) All fees payable hereunder shall be based upon the HSBC official exchange rate on the date on which such payment is due. If, by any reason of any governmental or fiscal restrictions affecting the convertibility, payment cannot be made in U.S. funds; then LICENSEE shall take such reasonable actions with respect to payment due as LICENSOR may direct.

iii) Any payment not paid by LICENSEE when due for any reason shall accrue interest payable to LICENSOR from the day after payment was due until payment is made, which interest shall be at the rate of one and one half percent (1 ½%) per month or the maximum amount permitted by U.S. law, whichever is greater.

**7.    AUDIT**

**A.**    LICENSOR shall have the right, upon at least ten (10) days written notice and no more than once per calendar year, to inspect or authorize a third party [Big 4 or equal] to inspect LICENSEE's books and records and all other documents and materials in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

**B.**    All books and records relevant to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three years after the date to which they pertain.

**C.**    In the event that LICENSOR or LICENSOR's agent makes an investigation of LICENSEE's books and records, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR for purposes other than with respect to the subject matter of this Agreement or disclosed to any third party for a period of five (5) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on LICENSEE's failure to pay its Royalty obligation, or its failure otherwise to meet any of its obligations under this Agreement.

## 8.    QUALITY CONTROL & SAMPLES

**A.**    The rights granted hereunder are conditioned upon LICENSEE's full and complete compliance with the marking provisions of the trademark and copyright laws of the United States and other countries in the Territory, and LICENSEE's causing Sublicensees to do the same.

**B.**    All Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as required under law or by LICENSOR.

**C.**    The Licensed Products, whether manufactured, distributed or sold by LICENSEE or a Sublicensee, shall be of a high quality in design, materials and workmanship and of a level of quality that is reasonably acceptable to LICENSOR and at least equal to the level of quality historically associated with the Trademarks (the "Quality Standard"). For the avoidance of doubt, the failure of Licensed Products to attain the Quality Standard shall be considered a material breach of this Agreement or a Merchandising Sublicense, and shall be considered sufficient grounds for termination thereof.·

**D.**    At least two (2) weeks before LICENSEE or a Sublicensee begins the manufacture of a New Licensed Product or any alteration of a previously approved Licensed Product, LICENSEE shall submit to LICENSOR for approval one (1) prototype of such New Licensed Product, including all packaging, advertising and promotional materials. Moreover, at least two (2) weeks before LICENSEE or a Sublicensee first ships a New Licensed Product for sale or distribution, LICENSEE shall submit to LICENSOR for approval two (2) samples of such New Licensed Product and all associated packaging, advertising and promotional materials. In each case, LICENSOR shall have the right to deny approval of the New Licensed Product (i) in its reasonable discretion, (ii) if such New Licensed Product fails to be in compliance with the terms of this Agreement, (iii) if such New Licensed Product fails to meet the Quality Standard, or (iv) if LICENSOR determines in its reasonable discretion that such New Licensed Product is inconsistent with or damaging to the core attributes associated with the Trademarks. "New Licensed Product" shall mean a Licensed Product of a genus, model or version that has not previously been submitted to LICENSOR for approval under this subsection 8.D.

## 9.   NOTICE

**A.**     Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at its above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

**B.**     Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## 10.   TRADEMARK OWNERSHIP AND REGISTRATION

**A.**     LICENSOR shall determine in its sole discretion whether, when and where to file for trademark registration, or to maintain existing trademark registrations, for the Trademarks.

**B.**     In the event that LICENSOR elects to file a new application in a country located in the Territory for registration of any of the Trademarks for use on or in connection with Licensed Products, LICENSEE shall reimburse LICENSOR for all costs, expenses and legal fees associated with prosecuting and maintaining such application(s) for trademark registration and any resulting registration(s). Such applications and registrations shall be owned by LICENSOR and LICENSOR shall control and have the right to direct such prosecution and maintenance in its sole discretion.

**C.**     The parties agree to execute any documents reasonably requested by the other party to effect any of the provisions of this Section.

**D.**     LICENSEE acknowledges LICENSOR's exclusive ownership of the Trademarks and all associated goodwill. LICENSEE agrees that its and each Sublicensee's use of the Trademarks inures to the benefit of LICENSOR and that neither LICENSEE nor any Sublicensee shall acquire any rights in the Trademarks or the good will associated therewith. LICENSEE further agrees that it will not apply in any jurisdiction for trademark registration of any of the Trademarks or any confusingly similar alternatives, and that it will not oppose, petition to cancel or otherwise contest LICENSOR's applications or registrations for the Trademarks or similar marks.

## 11.   INFRINGEMENTS

**A.**     LICENSOR shall have the right, but not the obligation, at its own cost and expense, to institute and prosecute lawsuits or other enforcement efforts such as arbitrations, administrative proceedings and demand letters ("Actions") against third persons for infringement or other violation of the rights licensed in this Agreement or the Merchandising Sublicenses. Should LICENSEE learn of any potential or actual infringement or other violation of the rights licensed under this Agreement or any of the Merchandising Sublicenses, LICENSEE shall promptly notify LICENSOR. If LICENSEE should desire that LICENSOR institute an Action, LICENSEE shall make a written request to LICENSOR to do so. If LICENSOR does not institute an Action within ninety (90) days after LICENSEE has made a written request that LICENSOR do so, LICENSEE may institute and prosecute such Action on its own behalf with LICENSOR's advance written consent, which LICENSOR shall not unreasonably deny.

11

**B.**     Any Action shall be prosecuted solely at the cost and expense of the party bringing the Action. With respect to any Action brought by LICENSOR, all sums recovered, whether by judgment, settlement or otherwise, shall belong exclusively and entirely to LICENSOR. In the event LICENSEE brings an Action, all sums recovered, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees actually paid to counsel for the party bringing the Action and other out of pocket expenses incurred in such Action, shall be divided equally between LICENSOR and LICENSEE.

**C.**     Upon the reasonable request of the party bringing the Action, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such Action, including consenting to joinder in the Action. The party bringing suit shall reimburse the other party for the reasonable expenses incurred as a result of such cooperation.

## 12.     REPRESENTATIONS AND WARRANTIES

**A.**     Notwithstanding anything to the contrary herein, LICENSOR makes no representations or warranties concerning its ownership of copyrights or any other rights in the Artworks, nor with respect to the Trademarks, other than that, as of the Effective Date, it owns the trademark registrations listed in Exhibit A to this Agreement. LICENSEE acknowledges that third parties may own rights in or appurtenant to one or more of the Artworks, and that LICENSEE's use of the Artworks is at its own risk. LICENSOR agrees, however, that LICENSOR will not challenge LICENSEE on the ground that LICENSEE's reproduction of Artworks on Licensed Products or in connection with the advertising or promotion of Licensed Products, or LICENSEE's distribution of Licensed Products on which Artworks appear, infringes any copyrights that LICENSOR might own in the Artworks.

**B.**     Each of the parties represents and warrants to the other that it has the legal right, authority and capacity to enter into this Agreement and to make the covenants made in this Agreement, and that there is no other agreement, and that it will not during the term of this Agreement enter any other agreement, in conflict herewith.

## 13.     INDEMNITY

LICENSEE agrees to defend, hold harmless and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) that arise from claims of third parties against LICENSOR that relate to either LICENSEE's or a Sublicensees' use of the Trademarks, Artworks or that relate to Licensed Products or LICENSEE's actions within the scope of this Agreement or a Sublicensee's actions within the scope of a Merchandising Sublicense. LICENSEE shall ensure that each Merchandising Sublicense shall similarly provide indemnification to LICENSOR.

## 14.     INSURANCE

LICENSEE shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming LICENSOR as an additional named insured. Such policy shall provide coverage in the amount of $5 million, and protection against any and all

claims, demands and causes of action covered by the indemnification provisions of this Agreement, including without limitation those arising out of any breach by LICENSEE of the terms of this Agreement, claims of infringement or other violations concerning the Trademarks or Artworks, defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The policy shall obligate the insurer to provide notice to LICENSOR by Registered or Certified Mail, return receipt requested, within ten (10) days in the event of any modification, cancellation or termination thereof. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement. Each of the Merchandising Sublicenses shall contain similar insurance provisions applicable to each Sublicensee, with appropriate coverage limits as approved in advance by LICENSOR.

## 15.   FORCE MAJEURE

It is understood and agreed that in the event of an act of the government, or war conditions, or fire, flood or labor trouble in the factory of LICENSEE or a Sublicensee, or in the factory of those manufacturing parts necessary for the manufacture of the Licensed Products, prevent the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

## 16.   JURISDICTION & DISPUTES

A.      This Agreement shall be governed in accordance with the laws of the State of Massachusetts.

B.      All disputes under this Agreement shall be resolved by the courts located in the State of Massachusetts located in Boston, Massachusetts, including the United States District Court for the District of Massachusetts, and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it.

## 17.   ASSIGNMENT/AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, permitted successors and permitted assigns. Any assignment of this Agreement by LICENSEE shall be subject to the express written approval of LICENSOR, which approval shall not unreasonably be withheld. For the purposes of this Section, a change of control of LICENSEE shall be deemed an assignment requiring LICENSOR's express written approval. Any assignment by LICENSEE in violation of this provision shall be considered null and void from its inception.

## 18.   WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

19.    **SEVERABILITY**

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

20.    **NO JOINT VENTURE**

Nothing contained herein shall constitute this arrangement to be an employment, a joint venture or a partnership, or to create an agency relationship.

21.    **INTEGRATION**

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties (including, without limitation, the Merchandising License Agreement with an effective date of September 2, 2005 between LICENSOR and LICENSEE's predecessor, Machine Ltd.), including any option agreements that may have been entered into between the parties, and is intended as a final expression of their agreement concerning the subject matter hereof. This Agreement shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict with this Agreement.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Merchandising License Agreement on the date indicated below, effective as of the Effective Date.

PAN AMERICAN WORLD AIRWAYS, INC.        MACHINE PROJECT, INC.

By: _____          By: _____

Title: Senior VP General Counsel         Title: 4.

Date: 4.20.07                            Date: 4.20.07

Date: _____         Date: _____


Approved as to termination of agreement
with Machine, Ltd.

14

## EXHIBIT A

Trademarks:
**[To be supplemented with schedule of registrations]**







[substitute PAA AND WING logo (logo to side)]

*PAN AMERICAN WORLD AIRWAYS*

15

## EXHIBIT B

Merchandising Products:

**Luggage, travel bags**, tote bags

**Accessories, namely** umbrellas, hats, belts, sun glasses

**Apparel**

**Footwear**

**Watches, jewelry**

Model airplanes (excluding 1:400 scale model aircraft)

Stationery, calendars, note cards, posters, prints

Memorabilia, namely, art plates, ornaments, toys, coffee mugs, towels Travel accessories, namely, locks, toiletries

Home and housewares including bedding and bathroom goods

Mineral water and alcoholic/non-alcoholic drinks

Board games, card games, video and electronic games

## EXHIBIT C

Artworks:

## EXHIBIT D

Territories:

Asia: Means countries including China, Hong Kong, Macau, India, Malaysia, Thailand, Vietnam, Korea, Japan, Singapore, etc. within the Eurasian landmass next to Europe – lying approximately along Urals, the Urals River, the Caspian Sea, The Caucasus, The Black Sea The Bosporus and the Dardanelles straits, and the Aegean Sea, with the Suez Canal as the west boundary, the Bering Strait as the northeast boundary Golf of Aden, the Arabian Sea, and the Bay of Bengal as the South Boundary, the South China Sea, Yellow Sea, The Sea of Japan, The Sea of Okhotsk, and the Bering Sea as the east boundary and the Artic Ocean as the Northern boundary

The Rest of the world besides Germany and the EU.

ANNARBOR 86634v5