UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

PAN AMERICAN WORLD AIRWAYS, INC.,                :

                                                                             :    Case No. 08 Civ _____

                          Plaintiff,                     :

                                                                             :    **DECLARATION OF ROBERT B.**
            v.                                                        :    **CULLIFORD IN SUPPORT OF**
                                                                                  **PLAINTIFF'S MOTION FOR**
VETEMENTS, INC. and KINSER CHIU,             :    **PRELIMINARY INJUNCTION**

                 Defendants.        :

------------------------------------------------------------- :
                                                                             X

I, Robert B. Culliford, declare under penalty of perjury as follows:

1.      I am Senior Vice President, Secretary and General Counsel of both Pan American World Airways, Inc. ("Pan Am") as well as its parent, Pan Am Systems, Inc.

2.      I submit this declaration in support of Pan Am's motion for a temporary restraining order and preliminary injunction to stop defendants from infringing Pan Am's trademark rights by their unlicensed and unauthorized sale of merchandise bearing those trademarks.

**Background on Pan Am and Its Trademarks**

3.      Pan Am is a corporation organized under the laws of the State of Delaware with its principal place of business at 14 Aviation Avenue, Portsmouth, New Hampshire 03801. Until recently, Pan Am was in the business of providing airline services between several cities on the East Coast of the United States, as well as providing rail freight services. Pan Am also sells retail merchandise bearing its trademarks, including, model airplanes and travel related products, and it licenses others to do so.

4.     In my capacity as Senior Vice President and General Counsel of Pan Am and Pan Am Systems, Inc., I have overall responsibility for the development, licensing, and protection of the PAN AM trade name, PAN AM trademark, and Pan Am Globe Design, as well as other intellectual property rights.

5.     Pan Am is the current owner of all rights in the following registered trademarks/service marks: (1) the words "PAN AM", (2) the PAN AM GLOBE DESIGN, and (3) the words "PAN AMERICAN WORLD AIRWAYS," (collectively, with the marks described in paragraph 11, the "Pan Am Marks").  These marks are depicted as follows:







6.    Pan Am owns U.S. federal trademark registrations for each of these marks with the following registration numbers in the classes as indicated:

**PAN AM**

| Registration # | Good and Services |
|---|---|
| 3171134 | (IC 039) Transportation by rail; freight transportation; rental leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail |

**Pan Am Globe Design**

| Registration # | Goods and Services |
|---|---|
| 0668792 | (IC 039) Transporting freight and passengers by air |
| 3288129 | (IC 018) Luggage; all-purpose carrying bags; carry-all bags; carry-on bags; travel bags<br><br>(IC 028) Toy model vehicles; toy model airplanes; toy model trains; toy model train cars; scale model vehicles, trains, train cars, airplanes |
| 3171135 | (IC 039) Transportation by rail; freight transportation; rental leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail |

**PAN AMERICAN WORLD AIRWAYS**

| Registration # | Good and Services |
|---|---|
| 3166414 | (IC 025) Clothing, namely, Hats, Bandanas, Scarves, T-Shirts, Long Sleeve Shirts, Short Sleeve Shirts, Jackets, Sweaters, Dresses, Short Pants, Long Pants, Swim Suits, Underwear, Pajamas, Socks, Shoes |

7.    Evidence of the registration of these marks is attached hereto as Exhibit A.

8.    Also, Pan Am has filed an intent to use application for the PAN AM GLOBE DESIGN, Serial No. 78899615 for use in the following international classes, covering the following goods:

| International Class | Goods |
|---|---|
| IC016 | pens, pencils; writing utensils; calendars; posters; blank cards; greeting cards; note cards |
| IC 018 | luggage tags; non-motorized collapsible luggage carts; purses |
| IC021 | mugs; cups |
| IC025 | shirts; head wear; jackets; sweat shirts; sweat pants; pants; gloves; socks |

9.    Evidence of this application for registration is attached hereto as Exhibit B.

10.    These trademarks are among the best-known and most iconic trademarks in last 100 years.  Pan Am is one of the most celebrated and renowned airlines, having been a leader in the aviation industry for decades.  In addition, several generations of New Yorkers still refer to the building at 200 Park Avenue, above Grand Central Station, as the "Pan Am Building" even though it has borne MetLife's name for over a decade.  I have set forth a brief history of Pan Am and its marks, including examples of the marks use in commerce below at paragraphs 38 through 67.

11.    Pan Am also possesses a common law trademark of the Pan Am Winged design, depicted below, as well as common law trademarks rights in the registered trademarks for use on certain travel-related merchandise.



## Merchandising License Agreement

12.    Effective January 1, 2007, Pan Am entered into a merchandising license agreement ("MLA") with Machine Project Inc. ("Machine Project").  (A copy of this agreement is attached as Exhibit C.)  In the MLA, Pan Am licensed the right to use the Pan Am Marks for the sale, distribution, advertising and promotion of certain merchandise, such as luggage, accessories, apparel, model airplanes, memorabilia and house wares, bearing the Pan Am Marks.  Ex. C, MLA ¶ 2.

13.    The MLA allowed Machine Project to appoint sublicensees to assist in these efforts on the condition that Machine Project notify Pan Am of its intent to do so, and that Pan Am give its written approval for each sublicensee and that Machine Project use Pan Am's form sublicense agreement containing specific provisions called for in the MLA. *Id.* ¶ 2(B)(ii).

14.    The MLA also provides that Machine Project may contract with a manufacturer for the Pan Am merchandise, but that Pan Am must give its written approval for each manufacturer. *Id.* ¶ 2(B)(iv). As distinct from a sublicense, an approved manufacturer may not sell, market, advertise or promote the Pan Am merchandise, but may only manufacture those goods for Machine Project to sell by virtue of its license.

15.    The MLA contains clear terms for its termination. It provides that Pan Am may terminate the agreement on 30 days notice if Machine Project failed to meet its Minimum Performance Requirement, which is defined as producing gross revenues of $1,500,000 in each year of the agreement's first term. This right to terminate is absolute and unconditional, with no right on the part of Machine Project to cure. The MLA further provides that Pan Am may terminate the agreement "in the event of a breach of a material provision" if the breaching party fails to cure within 30 days. The failure to pay monthly royalty payments when due constitutes such a material breach. In the event of such a termination, the MLA provides that "all of the rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR." *Id.* ¶ 4(E).

## Machine Project's Relationship With Vetements

16.    Machine Project enlisted the help of Vetements, a company controlled by Kinser Chiu, to manufacture Pan Am merchandise for Machine Project's sale in accordance with the MLA. In late 2006, Machine Project sought Pan Am's approval to contract with defendant

Vetements, Inc. to manufacture the Pan Am merchandise. Pan Am approved Machine Project's use of Vetements for this limited purpose.

17.     Upon information and belief, Vetements and its principal, Chiu, manufactured Pan Am merchandise for sale through Barnes & Noble on its website www.barnesnoble.com and in its stores. Some of this merchandise was manufactured after Machine had terminated Vetements authority to do so as well as after the termination of the MLA. Vetements maintains its supply of Pan Am merchandise in its warehouse in Brooklyn.

18.     Although Machine Project appointed Vetements to manufacture Pan Am merchandise, it did not and could not give Vetements the right to sell or market these products. It could not do so without Pan Am's consent which was never sought. Vetements role was limited to manufacturing these goods in accordance with its contract with Machine Project.

**Machine Project's Failure to Perform and Termination of the MLA**

19.     In the first year of its performance under the MLA, Machine Project failed to meet its Minimum Performance Requirement of $1,500,000 in gross revenues. In fact, Machine Project sold only $755,917.32 in Pan Am Merchandise in 2007 -- over $700,000 short of this requirement. This failure to meet the Minimum Performance Requirement gave Pan Am the absolute right to terminate the MLA under Section 4(B)(ii), which states in part:

> In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:
>
> * * *
>
> (ii) LICENSOR shall have the option …(ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

*Id.* ¶ 4(B)(ii).

20.     Machine Project also breached the MLA by failing to make timely royalty payments in accordance with Section 6 of the MLA. Under Section 6 of the MLA, Machine

Project was required to pay Pan Am a percentage of its revenues for each month within 30 days of that month's end.  In all of 2007, Machine Project only made two royalty payments, despite generating some revenue for each of the 12 months.  By the middle of March 2008, Machine Project had not made any of its required royalty payments for 2008.

21.     Finally, Machine Project breached Section 8 of the MLA by failing to submit its new products for approval to Pan Am before manufacturing them.   Under Section 8, Machine Project was required to present any new product to Pan Am for its approval.  *Id.* ¶ 8(D).  Since the beginning of the license's initial term in January 2007 through March 2008, Machine Project manufactured and sold new Pan Am products without ever seeking the required approval.  These products include brown leather bags to commemorate the eightieth anniversary of Pan Am's first flight.

22.     Consequently, on March 14, 2008, Pan Am gave Machine Project notice of termination based on Machine Project's failure to meet the Minimum Performance Requirement, as well as uncured material breaches of the Agreement consisting of Machine Project's failure to make royalty payments under Section 6 and its failure to submit new merchandise for approval to Pan Am before selling them.  (A copy of the March 14, 2008 Notice of Termination letter is attached as Exhibit D.)

23.     Since receiving this notice of termination Machine Project has stopped selling, marketing and promoting Pan Am merchandise.

## Defendant Chiu's Knowledge of Pan Am's Termination of the MLA

24.     Chui was made aware that Pan Am terminated the MLA at least as early as April 9, 2008.  On that day, Mr. Chiu's attorney Raymond Chin wrote to Stacy Beck, Pan Am's

Director of Marketing and Corporate Development, acknowledging that Pan Am terminated the MLA.

25.    On April 10, 2008, I wrote to Chiu's attorney and notified him that Chiu was obligated to account for and transfer any Pan Am merchandise to Pan Am or Machine Project. Specifically, I informed Chiu's attorney:

> Pan Am is aware that Mr. Chiu is in possession of merchandise that was manufactured pursuant to authority granted by Machine in early 2008, and that this authority did not extend to a sale of the merchandise to anyone other than Machine, as Pan Am's licensee, or Pan Am as owner of the relevant intellectual property.

> Consequently, please accept this letter as a demand that Mr. Chiu provide Pan Am with an offer to purchase these goods at no more than fair market value within three (3) days of receipt of this letter, as well as proposed dates for inspection and possible delivery of the merchandise. Furthermore, please be advised that if Mr. Chiu declines to abide by this demand, Pan Am reserves all of its rights to pursue appropriate remedies to prevent any unauthorized sale of this merchandise to third parties.

26.    In response to this letter, Chiu's attorney did not deny that Chiu possessed goods bearing the Pan Am trademarks. Instead, he threatened to commence litigation concerning Chiu's alleged financial interest in Machine Project. (A copy of the letters referenced in paragraphs 24 through 26 are attached as Exhibit E.)

27.    By letter dated April 28, 2008, I requested that Chiu provide documentation of his alleged financial interest in Machine Project and his authority to speak and act on its behalf. To Pan Am's knowledge, Machine Project is and always has been wholly owned by Anthony Lukas; Lukas and his wife are the sole officers and directors of that Company; and Chui appears to have no legal interest in Machine Project. Finally, I explained that regardless of whether Chiu owns any part of Machine Project, Pan Am terminated the MLA on March 14, 2008. (A copy of this letter is attached as Exhibit F.)

28.    On or about May 12, 2008, Chiu commenced litigation in New York Supreme Court, New York County seeking, *inter alia*, a declaration that he has a financial interest in Machine Project and to enforce the MLA between Pan Am and Machine Project. Chiu also caused his attorney to bring suit in the name of Machine Project, even though he is not an officer, director or shareholder of that company and thus has no legal right to instruct anyone to file suit on that corporation's behalf. Pan Am removed this action to the United States District Court for the Southern District of New York, and it is currently pending before Judge Holwell.

**Vetements' And Chiu's Sale Of Pan Am Merchandise**

29.    I recently learned that despite termination of the MLA and Chiu's awareness of this fact, Vetements is currently selling Pan Am merchandise on the Barnes & Noble website and in its stores.    (A copy of the web-pages depicting the merchandise and photographs of items purchased at Barnes & Noble are attached as Exhibit G.)

30.    Specifically, Vetements is selling (1) "Pan Am Vintage Poster Art Postcards," (2) "Pan Am Airmail Design Blue and White Note Cards," (3) Pan Am passport covers, (4) Pan Am flight bags, (5) Pan Am key chains and (6) "Pan Am Travel White and Blue Wire Journals." The web-page describes some of these items as originating from "Pan Am by Vetements." *See id.* All of these products bear Pan Am's registered marks.

31.    Specifically, the site features "Pan Am Airmail Design Blue and White Note Cards-Set of 12" listing "Pan Am for Vetements" as the original seller. The site shows the top of the note card's box, which is printed in Pan Am's distinctive blue on a white background and has the title "Air Mail," with the Pan Am Globe Design and the PAN AM word mark in the center surrounded by a picture of a plane, a flight attendant, and two travelers, with the PAN AM mark at the bottom. *See id.*

32.    Also featured on the site is a "Pan Am Travel White and Blue Wire Journal" again listing "Pan Am for Vetements" as the product's origin. The site shows the front cover of the journal, which is printed in Pan Am's distinctive blue on a white background, and has the Pan Am Globe Design mark in the center with a plane, flight attendant, and travelers super-imposed on it, and the words "travel journal" and the PAN AM mark at the bottom. *See id.*

33.    The site also offers for sale "Pan Am Vintage Poster Art Postcards-Set of 20" again listing "Pan Am for Vetements" as the originator of the product. The site shows several of these post cards, which contain the PAN AM mark, the PAN AM WORLD AIRWAYS mark, and the Pan Am Winged Design mark. *See id.*

34.    Upon information and belief, all of the products described in paragraphs 30 through 33 are being sold in Barnes & Noble retail outlets.

35.    Also for sale at Barnes & Noble retail outlets are passport covers, key chains, and flight bags bearing the Pan Am Globe Design. The flight bag also bears the PAN AM mark and the PAN AMERICAN WORLD AIRWAYS mark.

36.    Moreover, on information and belief, Chiu has a substantial inventory of merchandise bearing the Pan Am Marks in his warehouse   I have been informed that some of this merchandise was manufactured after the MLA was terminated in March and after the authority to manufacture was revoked by Machine.   I am also aware that some of this merchandise was not approved by Pan Am and was not subject to Pan Am's stringent quality control standards.

37.    The confusion that associating Pan Am with Vetements causes, as well as the misperception that Vetements is the source of Pan Am merchandise, has already harmed Pan Am and will continue to do so unless Chiu and Vetements are prevented from selling these goods.

As a result of Vetements' actions, consumers will believe that Vetements is somehow affiliated with Pan Am and that Vetements' products are being sold by Pan Am.

**Background on Pan Am's Trademarks**

38.     As discussed above, the Pan Am Marks are among the best known trademarks in modern corporate history. I describe below the history of the ownership of these marks as well as a history of how these marks have been used in commerce and have attained the widespread recognition they enjoy today.

39.     Until 1993, all right, title and interest in the Pan Am Marks and all goodwill associated with each of them, was owned by Pan American World Airways, Inc. (New York corporation). In 1993, in the context of the airline's first bankruptcy proceeding, all such rights were assigned to Eclipse Holdings, Inc. (Maryland corporation) with approval of the bankruptcy court. (*See* Exhibit H, evidencing the transfer of all common law and registered trademark rights from Pan American World Airways, Inc. (New York corporation) to Eclipse Holdings, Inc.; Exhibit I, further evidencing assignment of the marks; Exhibit J, evidencing the bankruptcy court's approval). All such rights then were assigned from Eclipse Holdings, Inc. to Cobb Partners, Inc. (*See* Exhibit K evidencing the assignment of all registered and unregistered trademark rights to Cobb Partners, Inc.). An agreement executed on December 29, 1993 by Eclipse Holdings, Inc. and Cobb Partners, Inc. substituted the current owner and the Plaintiff in this action, Pan American World Airways, Inc. (Delaware corporation), as "Purchaser" and assignee of the rights assigned from Eclipse Holdings, Inc. (*See* Exhibit L, evidencing the substitution of Pan American World Airways, Inc. as "Purchaser"; Exhibit M, further evidencing assignment of the marks from Eclipse Holdings, Inc to their current owner, Pan American World Airways, Inc. (Delaware corporation)). Pan Am has owned all rights, title and interest in the all

11

of the marks since that time.  In 1998, pursuant to a second bankruptcy proceeding involving Pan Am and entities related to it at the time, Pan Am became a wholly owned subsidiary of Pan Am Systems, Inc. (then known as Pan American Airlines, Inc.).

40.    At least as early as March 31, 1931 - more than three quarters of a century ago - the Pan Am Companies began using the PAN AM word mark to identify their pioneering air transportation services.  The Pan Am Companies have used the PAN AM word mark continuously since that date, except perhaps for short durations, for example during bankruptcy proceedings, at which time efforts were successfully undertaken to resume or continue use of the mark.  At all times, the PAN AM word mark continued to retain significant goodwill, and it continues to do so to this day.

41.    At least as early as October 5, 1956 - nearly half a century ago - the Pan Am Companies began using the federally registered Pan Am Globe Design on their aircraft and in the marketing and sale of their air travel-related products and services.  The Pan Am Companies have used the Pan Am Globe Design continuously since that date, except perhaps for short durations, for example during bankruptcy proceedings, at which time efforts were successfully undertaken to resume or continue use of the Design.  At all times, the Pan Am Globe Design continued to retain significant goodwill, and it continues to do so to this day.

42.    Photographs of a Pan Am jet formerly operated by Pan Am and a currently operational jet hanger, appear below:





43.   Pan Am owns registrations for the Pan Am Globe Design in foreign jurisdictions throughout the world, including the European Union, China, Japan, Hong Kong, Israel and Germany.

44.   Below is a depiction containing at least representations of the Pan Am Globe Design from newspaper advertising:



WE DON'T HAVE TO WORK FOR PAN AM WE WANT TO

PAN AM

45.    Since at least the late 1950s, the Pan Am Companies consistently have depicted the PAN AM word mark and Pan Am Globe Design using a distinctive light blue and white color combination.

46.    Immediately below and in paragraphs 47 through 49 is a series of photographs demonstrating the extensive use and notoriety of the Pan Am Marks:



47.    Below is a depiction of the cover of the January 19, 1970 edition of Time Magazine:



48.    Between 1963 and 1991, 200 Park Avenue, known as the Pan Am Building prominently displayed the PAN AM word mark in a distinctive stylization. Immediately below is a depiction of the Pan Am Building as it appeared before 1991:



49.    Below are depictions of print-advertising materials for the Pan Am Companies' air services:





50.    The Pan Am Marks are associated with innovation in aviation. Many of the services and technologies taken for granted today in the aviation industry find their roots in the history of the Pan Am Companies. Following is a partial list of some of the firsts of the Pan Am Companies:

- first American airline to operate an ongoing international service;

- first American airline to develop an airport and airway traffic control system;

- first American airline to order aircraft built to its own specifications;

- first American airline to employ cabin attendants and serve meals aloft;

- first American airline to install facilities for heating food aboard aircraft;

- first American airline to operate scheduled transatlantic passenger and mail service;

- first airline to complete a round-the-world-flight;

- first airline to operate jets within the continental U.S.;

- first airline to schedule transatlantic service in American-built jets;

- first airline to operate round-the-world jet freighter service;

- first airline to operate the Boeing 747 in regularly scheduled service;

- first airline to operate round-the-world service with the Boeing 747; and,

- first airline to offer upper-deck dining service on the 747.

51.    The celebrated history of the Pan Am Companies has been the subject of numerous documentaries, including an installment in the PBS television series entitled *Chasing the Sun*. Such media coverage has greatly enhanced the value and continued public recognition of the Pan Am Marks.

52.    In 1998, Congress established the U.S. Centennial of Flight Commission in order to celebrate and document the first century of flight. As stated by the Commission, the Pan Am

Companies play a leading role in that history.  In an article authored by the U.S. Centennial of Flight Commission (the "Centennial of Flight Article") and pasted on its website, the Commission notes that:

> [i]n the history of American commercial aviation, *there is no airline more influential, important, and better known than Pan American Airways* . . . Pan Am (as it was more commonly known), represented a new adventurous image of the United States to the world.  When filmmaker Stanley Kubrick produced his landmark vision of the future in the 1968 movie "2001: A Space Odyssey," he envisioned Pan Am as the space carrier that would take men and women regularly into space.

(emphasis added)

53.    The Centennial of Flight Article further refers to the Pan Am Companies as "the most important American airline" and states that:

> *Pan American left behind a legacy unmatched by any other airline in the history of U.S. aviation.* . . . .[I]t was Pan American Airways that set the standards for service in the commercial aviation era.  Pan Am's China Clipper services, its expansion into South America, its pioneering partnership with Boeing, its ambitious routes - such as its round-the-world jet service inaugurated in October 1959, its flashy advertising campaigns, and its reputation for good service, all made the company a leader and a trendsetter.

(emphasis added)

54.    A photograph of the Pan Am Globe Design and the Beatles rock band, that many Internet resources indicate was taken during the Beatles' historic first visit to the United States in February 1964, is depicted directly below:



55.     A photograph of President John F. Kennedy and a flight bag bearing the Pan Am Globe Design is depicted directly below:



56.     Many well-known feature films have included prominent references to or depictions of the Pan Am Marks and have drawn on the aura of Pan Am's brand identity. Notable examples include the appearance of the fictional PAN AM "Space Clipper" *Orion III* in Stanley Kubrick's classic *2001: A Space Odyssey*, numerous movies in the James Bond series, and the 2002 feature film, *Catch Me If You Can*, starring Tom Hanks and Leonardo DiCaprio. Pan Am and its predecessors have licensed others to use the Pan Am Marks in feature films, as well.

57.    Below are depictions of the fictional PAN AM "Space Clipper" that played a prominent role in Stanley Kubrick's film *2001: A Space Odyssey*.  The "Space Clipper" clearly displays the Pan Am Globe Design:





58.     A still image that Internet resources indicate is taken from the 2002 feature film *Catch Me If You Can* appears below:



59.    The prestige symbolized by the Pan Am Marks and the aura of Pan Am's brand identity are summed up well by James Bond in the film version of *From Russia With Love*, when he instructs his secretary Miss Moneypenny to book his flight on "Pan Am, as always."

60.    The Pan Am Companies have been and continue to be active in the distribution of a wide range of merchandise bearing the PAN AM word mark and Pan Am Globe Design, including flight bags and other travel-related products, and model aircraft (collectively "Merchandising Products").

61.    The Pan Am Companies first used the PAN AM word mark and Pan Am Globe Design on Merchandising Products at least as early as 1963.

62.    Pan Am continues to this day to license others to use the PAN AM word mark and Pan Am Globe Design on merchandise, including model airplanes and trains, cufflinks, artwork, and travel-related products such as the flight bag depicted in paragraph 63 of this Declaration. A photograph of a licensed model airplane and lamp appear below.



63.    Below is a depiction of a flight bag manufactured by a licensee of the Pan Am Companies:



64.    Through Pan Am's licensee, Pan Am also uses the PAN AM word mark and Pan Am Globe Design in connection with the operation of a retail store that sells travel-related products. Such use of the Pan Am Marks commenced at least as early as 1994 and continues to this day.

65.    In March of 2005, the Pan Am Companies began using the PAN AM word mark and Pan Am Globe Design in connection with rail freight services.  The Pan Am Companies' rail cars and locomotives now feature the Pan Am Globe Design and the PAN AM word mark.

66.    Below is a photograph of one of the Pan Am Companies' rail cars:



67.    During the past few years, Pan Am has planned and implemented various efforts aimed at enhancing the value of the Pan Am Marks through licensing.  In particular, Pan Am has initiated a campaign to expand the scope of their past licensing of the Pan Am Marks for use on various sorts of merchandising items, and to aggressively pursue marketing opportunities in that area.  Pan Am's planned initial focus has been on clothing, model aircraft and trains, stationery, artwork, and travel-related items such as flight bags.  Pan Am also has planned to expand its existing operations in the retail services arena, including the operation of Pan Am-branded stores that would sell Pan Am Merchandising Products and other items that relate to travel or otherwise to the legacy of Pan Am.

**Conclusion**

68.    In sum, Pan Am owns registered trademarks for PAN AM, the PAN AM GLOBE DESIGN and PAN AMERICAN WORLD AIRWAYS.  Defendants are selling merchandise bearing those identical marks without authorization or license, to the detriment of Pan Am.

69.    Each of the factual statements in my declaration is made on the basis of my personal knowledge or my review of various documents chronicling the history of Pan Am and the Pan Am Marks.  Many of the historical documents are available to the public and may be found among materials posted at the Internet website of the U.S. Centennial of Flight Commission (www.centennialofflight.gov), which was established by Congress in 1998, records of the U.S. Patent and Trademark Office, the Pan American Heritage Web Site (www.panam.org), the Pan American World Airways, Inc. Records Collection at the University of Miami Library (see http://www.scholar.library.mimami.edu/panam/), and the website of Time Magazine (www.time.com).

I hereby certify under penalties of perjury under the law of the United States that the foregoing statements am true and correct.

Executed this 16ᵗʰ day of June, 2008, in Portsmouth, New Hampshire.

Robert B. Culliford

# Exhibit A

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-06-13 11:06:02 ET

**Serial Number:** 78755617 <u>Assignment Information</u>       <u>Trademark Document Retrieval</u>

**Registration Number:** 3171134

**Mark**

# PAN AM

**(words only):** PAN AM

**Standard Character claim:** Yes

**Current Status:** Registered.

**Date of Status:** 2006-11-14

**Filing Date:** 2005-11-16

**Transformed into a National Application:** No

**Registration Date:** 2006-11-14

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 113

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2006-11-14

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Pan American World Airways, Inc.

**Address:**
Pan American World Airways, Inc.
14 Aviation Avenue

Portsmouth, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

---

## GOODS AND/OR SERVICES

**International Class:** 039
**Class Status:** Active
transportation by rail; freight transportation by rail; rental, leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail
**Basis:** 1(a)
**First Use Date:** 2005-03-01
**First Use in Commerce Date:** 2005-03-01

---

## ADDITIONAL INFORMATION

**Prior Registration Number(s):**
668792

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2006-11-14 - Registered - Principal Register

2006-08-29 - Published for opposition

2006-08-09 - Notice of publication

2006-07-06 - Law Office Publication Review Completed

2006-06-29 - TEAS Change Of Correspondence Received

2006-06-27 - Assigned To LIE

2006-06-08 - Approved for Pub - Principal Register (Initial exam)

2006-06-01 - Examiner's Amendment Entered

2006-06-01 - Examiners amendment e-mailed

2006-06-01 - Examiners Amendment -Written

2006-05-31 - TEAS Change Of Correspondence Received

2006-05-22 - Assigned To Examiner

2005-11-22 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
John C. Nishi

**Correspondent**
John C. Nishi
Dickinson Wright PLLC
1901 L Street NW, Suite 800
Washington, DC 20006-3504
Phone Number: 734-623-1938
Fax Number: 202-659-1559

---

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on 2008-06-13 11:06:42 ET**

**Serial Number:** 72037672 <u>Assignment Information</u>        <u>Trademark Document Retrieval</u>

**Registration Number:** 668792

**Mark**



**(words only):** PAN AM

**Standard Character claim:** No

**Current Status:** This registration has been renewed.

**Date of Status:** 1999-03-24

**Filing Date:** 1957-09-23

**Transformed into a National Application:** No

**Registration Date:** 1958-10-21

**Register:** Principal

**Law Office Assigned:** (NOT AVAILABLE)

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 900 -File Repository (Franconia)

**Date In Location:** 1999-06-04

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. PAN AMERICAN WORLD AIRWAYS, INC.

**Address:**
PAN AMERICAN WORLD AIRWAYS, INC.
14 Aviation Avenue

Portsmouth, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** New York

## GOODS AND/OR SERVICES

**U.S. Class:** 105 (International Class 039)
**Class Status:** Active
TRANSPORTING FREIGHT AND PASSENGERS BY AIR
**Basis:** 1(a)
**First Use Date:** 1956-10-05
**First Use in Commerce Date:** 1956-10-05

## ADDITIONAL INFORMATION

**Lining and Stippling:** THE DRAWING IS LINED FOR THE COLOR BLUE. NO CLAIM IS MADE TO COLOR.

**Design Search Code(s):**
**01.07.02** - Globes with meridians and parallels only

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2006-12-28 - TEAS Change Of Correspondence Received

2006-12-28 - Applicant/Correspondence Changes (Non-Responsive) Entered

2006-12-28 - TEAS Change Of Owner Address Received

1999-03-24 - Second renewal 10 year

1999-01-20 - Section 9 filed/check record for Section 8

1993-10-07 - Counter claim opp. for Proceeding No.

1978-10-21 - First renewal

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
DAVID J MCKENNAN

**Correspondent**
John C. Nishi
Dickinson Wright PLLC
1901 L Street NW, Suite 800
Washington, DC 20006-3504
Phone Number: 734-623-1938
Fax Number: 202-659-1559

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-06-13 11:06:54 ET

**Serial Number:** 78899625 <u>Assignment Information</u>        <u>Trademark Document Retrieval</u>

**Registration Number:** 3288129

**Mark**



**(words only):** PAN AM

**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2007-09-04

**Filing Date:** 2006-06-02

**Transformed into a National Application:** No

**Registration Date:** 2007-09-04

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 115

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-04

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Pan American World Airways, Inc.

**Address:**
Pan American World Airways, Inc.
14 Aviation Avenue

Portsmouth, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

## GOODS AND/OR SERVICES

**International Class:** 018
**Class Status:** Active
Luggage; all-purpose carrying bags; carry-all bags; carry-on bags; travel bags
**Basis:** 1(a)
**First Use Date:** 1963-00-00
**First Use in Commerce Date:** 1963-00-00

**International Class:** 028
**Class Status:** Active
Toy model vehicles; toy model airplanes; toy model trains; toy model train cars; scale model vehicles, trains, train cars, airplanes
**Basis:** 1(a)
**First Use Date:** 1964-00-00
**First Use in Commerce Date:** 1964-00-00

## ADDITIONAL INFORMATION

**Design Search Code(s):**
**26.01.12** - Circles with bars, bands and lines
**26.01.21** - Circles that are totally or partially shaded.
**26.17.01** - Bands, straight; Bars, straight; Lines, straight; Straight line(s), band(s) or bar(s)
**26.17.04** - Bands, vertical; Bars, vertical; Lines, vertical; Vertical line(s) or band(s) or bar(s)
**26.17.09** - Bands, curved; Bars, curved; Curved line(s), band(s) or bar(s); Lines, curved

**Prior Registration Number(s):**
668792

## MADRID PROTOCOL INFORMATION

**USPTO Reference Number:** A0006573
**International Registration Number:** 0917984
**International Registration Date:** 2006-12-04
**Original Filing Date with USPTO:** 2006-12-04
**International Registration Status:** Application For IR Registered By IB
**Date of International Registration Status:** 2007-04-19
**International Registration Renewal Date:** 2016-12-04
**Irregularity Reply by Date:** (DATE NOT AVAILABLE)

**Madrid History:**
01-10-2008 - 13:21:15 - Ceasing Of Effect Reviewed - No Action Required By Office
12-05-2007 - 08:00:22 - Partial Ceasing Of Effect To Be Processed
04-19-2007 - 12:56:06 - Application For IR Registered By IB

02-07-2007 - 09:13:56 - Irregularity Notice Received From IB
12-27-2006 - 15:34:37 - Restoration Of Intl App After Initial Demise
12-08-2006 - 09:45:44 - Application For IR Rejected By MPU
12-04-2006 - 14:56:00 - New Application For IR Received

---

## PROSECUTION HISTORY

---

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2007-09-04 - Registered - Principal Register

2007-06-19 - Published for opposition

2007-05-30 - Notice of publication

2007-04-19 - Law Office Publication Review Completed

2007-04-19 - Approved for Pub - Principal Register (Initial exam)

2007-04-19 - Amendment to Use approved

2007-04-04 - Teas/Email Correspondence Entered

2007-04-04 - Communication received from applicant

2007-04-04 - TEAS Response to Office Action Received

2007-03-30 - Amendment to use processing complete

2007-02-23 - Amendment to Use filed

2007-03-30 - Assigned To LIE

2007-02-23 - TEAS Amendment of Use Received

2006-11-08 - Non-final action e-mailed

2006-11-08 - Non-Final Action Written

2006-11-02 - Assigned To Examiner

2006-06-23 - Applicant amendment prior to exam entered

2006-06-23 - TEAS Preliminary Amendment Received

2006-06-09 - Notice Of Design Search Code Mailed

2006-06-08 - New Application Entered In Tram

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
John C. Nishi

**Correspondent**
John C. Nishi
Dickinson Wright PLLC
1901 L Street NW, Suite 800
Washington, DC 20006-3504
Phone Number: 734-623-1938
Fax Number: 202-659-1559

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-06-13 11:07:08 ET

**Serial Number:** 78755634 <u>Assignment Information</u>          <u>Trademark Document Retrieval</u>

**Registration Number:** 3171135

**Mark**



**(words only):** PAN AM

**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2006-11-14

**Filing Date:** 2005-11-16

**Transformed into a National Application:** No

**Registration Date:** 2006-11-14

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 113

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2006-11-14

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. Pan American World Airways, Inc.

**Address:**
Pan American World Airways, Inc.
14 Aviation Avenue

Portsmouth, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

---

## GOODS AND/OR SERVICES

**International Class:** 039
**Class Status:** Active
transportation by rail; freight transportation by rail; rental, leasing and chartering of vehicles; rental, leasing and chartering vehicles and apparatus for locomotion by rail
**Basis:** 1(a)
**First Use Date:** 2005-03-01
**First Use in Commerce Date:** 2005-03-01

---

## ADDITIONAL INFORMATION

**Description of Mark:** The mark consists of a circle containing lines and lettering.

**Design Search Code(s):**
**01.07.02** - Globes with meridians and parallels only
**26.01.12** - Circles with bars, bands and lines
**26.17.25** - Other lines, bands or bars

**Prior Registration Number(s):**
668792

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2006-11-14 - Registered - Principal Register

2006-08-29 - Published for opposition

2006-08-09 - Notice of publication

2006-07-06 - Law Office Publication Review Completed

2006-06-29 - TEAS Change Of Correspondence Received

2006-06-27 - Assigned To LIE

2006-06-08 - Approved for Pub - Principal Register (Initial exam)

2006-06-01 - Examiner's Amendment Entered

2006-06-01 - Examiners amendment e-mailed

2006-06-01 - Examiners Amendment -Written

2006-05-31 - TEAS Change Of Correspondence Received

2006-05-22 - Assigned To Examiner

2006-04-20 - Notice Of Design Search Code Mailed

2005-11-22 - New Application Entered In Tram

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
John C. Nishi

**Correspondent**
John C. Nishi
Dickinson Wright PLLC
1901 L Street NW, Suite 800
Washington, DC 20006-3504
Phone Number: 734-623-1938
Fax Number: 202-659-1559

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-06-13 11:07:18 ET

**Serial Number:** 78566237 <u>Assignment Information</u>         <u>Trademark Document Retrieval</u>

**Registration Number:** 3166414

**Mark**


# Pan American World
# Airways


**(words only):** PAN AMERICAN WORLD AIRWAYS

**Standard Character claim:** Yes

**Current Status:** Registered.

**Date of Status:** 2006-10-31

**Filing Date:** 2005-02-12

**Transformed into a National Application:** No

**Registration Date:** 2006-10-31

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 116

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2006-09-22

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. PAN AMERICAN WORLDS AIRWAYS, INC.

**Address:**
PAN AMERICAN WORLDS AIRWAYS, INC.
14 AVIATION AVENUE

PORTSMOUTH, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

---

## GOODS AND/OR SERVICES

**International Class:** 025
**Class Status:** Active
Clothing, namely, Hats, Bandanas, Scarves, T Shirts, Long Sleeve Shirts, Short Sleeve Shirts, Jackets, Sweaters, Dresses, Short Pants, Long Pants, Swim Suits, Underwear, Pajamas, Socks, Shoes
**Basis:** 1(a)
**First Use Date:** 2006-01-01
**First Use in Commerce Date:** 2006-01-01

---

## ADDITIONAL INFORMATION

(NOT AVAILABLE)

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2007-02-21 - Automatic Update Of Assignment Of Ownership

2006-10-31 - Registered - Principal Register

2006-09-20 - Law Office Registration Review Completed

2006-09-15 - Assigned To LIE

2006-09-13 - Allowed for Registration - Principal Register (SOU accepted)

2006-08-21 - Teas/Email Correspondence Entered

2006-08-04 - Communication received from applicant

2006-08-04 - TEAS Response to Office Action Received

2006-04-15 - NON-FINAL ACTION E-MAILED

2006-04-15 - SU - Non-Final Action - Written

2006-03-31 - Statement of use processing complete

2006-03-17 - Amendment to Use filed

2006-03-17 - TEAS Statement of Use Received

2006-03-07 - Notice of allowance - mailed

2005-12-13 - Published for opposition

2005-11-23 - Notice of publication

2005-10-25 - Law Office Publication Review Completed

2005-10-21 - Assigned To LIE

2005-10-18 - Approved for Pub - Principal Register (Initial exam)

2005-09-29 - Teas/Email Correspondence Entered

2005-09-22 - Communication received from applicant

2005-09-22 - TEAS Response to Office Action Received

2005-09-15 - Non-final action e-mailed

2005-09-15 - Non-Final Action Written

2005-09-09 - Assigned To Examiner

2005-02-24 - New Application Entered In Tram

## ATTORNEY/CORRESPONDENT INFORMATION

**Correspondent**
TOMLINSON, GLEN, F.
898 NININI WAY
HONOLULU, HI 96825-2714
Phone Number: (808) 396-8112
Fax Number: (808) 396-4171

# Exhibit B

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-06-13 11:08:00 ET

**Serial Number:** 78899615 <u>Assignment Information</u>        <u>Trademark Document Retrieval</u>

**Registration Number:** (NOT AVAILABLE)

**Mark**



**(words only):** PAN AM

**Standard Character claim:** No

**Current Status:** A request for the first extension of time to file a statement of use has been granted.

**Date of Status:** 2007-12-27

**Filing Date:** 2006-06-02

**The Notice of Allowance Date is:** 2007-07-03

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 115

**Attorney Assigned:**
DEFORD JEFFREY S

**Current Location:** 700 -Intent To Use Section

**Date In Location:** 2007-07-03

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Pan American World Airways, Inc.

**Address:**

Pan American World Airways, Inc.
14 Aviation Avenue
Portsmouth, NH 03801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

## GOODS AND/OR SERVICES

**International Class:** 016
**Class Status:** Active
pens; pencils; writing utensils; calendars; posters; blank cards; greeting cards; note cards
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

**International Class:** 018
**Class Status:** Active
luggage tags; non-motorized collapsible luggage carts; purses
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

**International Class:** 021
**Class Status:** Active
mugs; cups
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

**International Class:** 025
**Class Status:** Active
shirts; head wear; jackets; sweat shirts; sweat pants; pants; gloves; socks
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

## ADDITIONAL INFORMATION

**Design Search Code(s):**
**26.01.12** - Circles with bars, bands and lines
**26.01.21** - Circles that are totally or partially shaded.

**Prior Registration Number(s):**
668792

## MADRID PROTOCOL INFORMATION

**USPTO Reference Number:** A0006573

**International Registration Number:** 0917984
**International Registration Date:** 2006-12-04
**Original Filing Date with USPTO:** 2006-12-04
**International Registration Status:** Application For IR Registered By IB
**Date of International Registration Status:** 2007-04-19
**International Registration Renewal Date:** 2016-12-04
**Irregularity Reply by Date:** (DATE NOT AVAILABLE)

**Madrid History:**
01-10-2008 - 13:21:15 - Ceasing Of Effect Reviewed - No Action Required By Office
12-05-2007 - 08:00:22 - Partial Ceasing Of Effect To Be Processed
04-19-2007 - 12:56:06 - Application For IR Registered By IB
02-07-2007 - 09:13:56 - Irregularity Notice Received From IB
12-27-2006 - 15:34:37 - Restoration Of Intl App After Initial Demise
12-08-2006 - 09:45:44 - Application For IR Rejected By MPU
12-04-2006 - 14:56:00 - New Application For IR Received

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2007-12-27 - Extension 1 granted

2007-12-27 - Extension 1 filed

2007-12-27 - TEAS Extension Received

2007-07-03 - Notice of allowance - mailed

2007-04-10 - Published for opposition

2007-03-21 - Notice of publication

2007-02-23 - Law Office Publication Review Completed

2007-02-23 - Approved for Pub - Principal Register (Initial exam)

2007-01-30 - Assigned To Examiner

2007-01-25 - Amendment From Applicant Entered

2007-01-25 - Communication received from applicant

2007-01-25 - Assigned To LIE

2006-12-26 - FAX RECEIVED

2006-12-26 - FAX RECEIVED

2006-11-09 - Non-final action mailed

2006-11-08 - Non-Final Action Written

2006-11-02 - Assigned To Examiner

2006-06-23 - Applicant amendment prior to exam entered

2006-06-23 - TEAS Preliminary Amendment Received

2006-06-09 - Notice Of Design Search Code Mailed

2006-06-08 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
John C. Nishi

**Correspondent**
John C. Nishi
Dickinson Wright PLLC
Suite 800
1901 L Street NW
Washington DC 20036-3506
Phone Number: 734-623-1938
Fax Number: 202-659-1559

---

# Exhibit C

## MERCHANDISING LICENSE AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into as of the 1st day of January, 2007 ("Effective Date") by and between **P AN AMERICAN WORLD AIRWAYS, INC.,** a Delaware corporation with offices at 14 Aviation Avenue, Portsmouth, NH 03801 ("LICENSOR") and **MACHINE PROJECT, INC.,** a New York corporation with offices at 241 37th Street, Seventh Floor, New York, New York 10018 ("LICENSEE").

## W I T N E S S E T H:

**WHEREAS,** LICENSOR and Machine Ltd., which is a predecessor company of LICENSEE, entered a Merchandising License Agreement with an effective date of September 2, 2005 that was amended on June 22, 2006 to replace Machine Ltd. With LICENSEE, and LICENSOR and LICENSEE now desire to terminate that agreement in its entirety and to enter this Agreement;

**WHEREAS,** LICENSOR has certain rights in the Trademarks (as defined in Section 1.S, below;

**WHEREAS,** LICENSOR is willing to grant to LICENSEE the right to use and to authorize others to use the Trademarks;

**WHEREAS,** LICENSEE has represented that it desires and has the ability to manufacture, market, distribute and promote, and to cause others to manufacture, market, distribute and promote, Licensed Products (as defined in Section 1.F, below) in the Territory (as defined in Section 1.R, below);

**WHEREAS,** LICENSOR desires. to grant to LICENSEE the right to manufacture, market, distribute and promote Licensed Products in the Territory; and

**WHEREAS,** both LICENSEE and LICENSOR are in agreement with respect to the terms a nd c onditions up on w hich LICENSEE s hall ha ve s uch r ights a s m ore fully provided below.

**NOW, THEREFORE,** in consideration of the promises and agreements set forth herein, the receipt and sufficiency of which are acknowledged, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1.     **DEFINITIONS:** In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below when used in this Agreement:

A.     "Artworks" shall mean the works of art identified in Schedule C to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request to add new works of art, but subject to LICENSOR's approval of such proposed works of art for consistency with the core values associated with the Trademarks.

1

**B.** "Asia" shall mean that list of countries listed under the heading "Asia" in Schedule D, as such list may be amended from time to time pursuant to this Agreement.

**C.** "Combined Online Revenues" shall mean the total of Online Revenues and LICENSOR Revenues.

**D.** "First Renewal Term" shall have the meaning ascribed in Section 4.A.

**E.** "Initial Term" shall have the meaning ascribed in Section 4.A.

**F.** "Licensed Products" shall mean Merchandising Products on or in connection with which one or more of the Trademarks is used or appears.

**G.** "LICENSEE Gross Revenues" shall mean the total of Online Revenues, Wholesale Revenues and Sublicensee Revenues.

**H.** "LICENSOR Revenues" shall mean LICENSOR's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSOR for returns or allowances.

**I.** "Merchandising Products" shall mean those products listed in Exhibit B to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request but subject to LICENSOR's approval in its sole discretion.

**J.** "Minimum Performance Requirement" shall mean LICENSEE Gross Revenues of at least one million five hundred thousand U.S. dollars ($1,500,000.00) for each Royalty Year during the Initial Term, two million U.S. dollars ($2,000,000.00) per Royalty Year during the First Renewal Term, and two million five hundred thousand U.S. dollars ($2,500,000.00) per Royalty Year during the Second Renewal Term.

**K.** "Online Revenues" shall mean LICENSEE's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSEE for returns or allowances.

**L.** "Renewal Term" shall have the meaning ascribed in Section 4.A.

**M.** "Royalty" shall mean any and all payments payable to LICENSOR by LICENSEE pursuant to this Agreement.

**N.** "Royalty Year" shall mean a one-year period commencing on January 1 of a given year.

**O.** "Second Renewal Term" shall have the meaning ascribed in Section 4.A.

**P.** "Sublicensee Revenues" shall mean total gross revenues of all Sublicensees from wholesale sale of Licensed Products, less only credits granted to customers of such Sublicensees for returns or allowances.

**Q.**    "Term" shall mean the Initial Term and any Renewal Terms.

**R.**    "Territory" shall mean all jurisdictions listed in Exhibit D to this Agreement, as such Schedule may be amended from time to time pursuant to Section 3.

**S.**    "Trademarks" shall mean the trademarks/service marks PAN AM, the PAN AM AND GLOBE design, PAN AMERICAN WORLD AIRWAYS and the PAA AND WING design, in each case only in the particular logo forms and stylizations depicted in Exhibit A to this Agreement.

**T.**    "Wholesale Revenues" shall mean Licensee's gross revenues from wholesale sale (the amount billed to customers) of Licensed Products, less discounts and allowances actually attributable to the Licensed Products as shown on an invoice and, further, less any bona fide returns (net of all returns actually made or allowed as supported by credit memoranda actually issued to customers). All taxes shall be Licensee's responsibility. No other costs incurred in the manufacturing, selling, advertising and/or distribution of the Licensed Products shall be deducted from the Wholesale Revenues nor shall any deduction be allowed for any uncollectible amounts or allowances.

## 2.    LICENSE GRANT/LIMITATIONS ON LICENSE

**A.**    Subject to the limitations provided in this Agreement, LICENSOR hereby grants to LICENSEE during the Term:

> i)   the exclusive, sublicensable right (subject to the limits on exclusivity and sublicensing provided herein) to use the Trademarks in the Territory on Merchandising Products and in connection with the sale, distribution, advertising and promotion of Merchandising Products in the Territory;

> ii)  the non-exclusive and non-sublicensable right to use the Trademarks and the PAN AM ONE.COM mark in the Territory in connection with retail sales services that are rendered by means of an interactive internet website, provided that the only products sold at such interactive internet website or through such online retail sales services shall be Licensed Products; and

> iii) the exclusive and non-sublicensable right to use the panamone.com internet domain name.

**B.**    License Restrictions

> i)   LICENSEE specifically acknowledges and agrees that nothing in this Agreement authorizes LICENSEE to use the Trademarks or PAN AM ONE.COM mark in connection with retail sales services other than through the interactive internet website specifically allowed in Section 2.A.ii of this Agreement or with the express written consent of Licensor, which consent may be withheld for any reasonable reason. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any

3

Merchandising Sublicense shall constitute a material breach of this Agreement.

ii) LICENSEE's right to sublicense as provided in Section 2.A.i of this Agreement is subject to LICENSEE's provision of reasonable notice to LICENSOR of LICENSEE's intent to appoint a sublicensee ("Sublicensee"), and LICENSOR's advance written consent in its sole discretion to the granting of a sublicense to the proposed Sublicensee. Each of LICENSEE's agreements with Sublicensees ("Merchandising Sublicenses") shall be in the form of agreement to be prepared and provided by LICENSOR (the "Form Merchandising Sublicense"), shall name LICENSOR as an intended third party beneficiary, and shall be subject to the express advance written approval of LICENSOR, which approval may be withheld by LICENSOR for any reasonable reason. Any deviations from the Form Merchandising Sublicense shall be subject to approval of LICENSOR in its sole discretion. Moreover, Each Merchandising Sublicense shall by its own terms (i) set a royalty rate of at least six percent (6%) of Sublicensee Revenues; (ii) provide that LICENSOR, up on t ermination o f t his Ag reement, s hall ha ve t he o ption o f either terminating such Merchandising Sublicense or assuming it from LICENSEE; a nd (iii) s hall c ontain p rovisions t o e nsure t hat t he qu ality o f Licensed Products meets the Quality Standard. All terms of each Merchandising Sublicense (including without limitation the scope of licenses granted therein) shall be consistent with and shall not exceed the scope of this Agreement. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any Merchandising Sublicense shall constitute a material breach of this Agreement.

iii) The rights granted to LICENSEE by LICENSOR in Section 2.A.i of this Agreement shall be exclusive throughout the world; provided, however, that (i) exclusivity shall not apply to those countries that now are members of, or that in the future become members of, the European Union, (ii) the exclusivity shall be subject to rights in the Trademarks granted prior to the Effective Date by LICENSOR or its predecessors to third parties, including without limitation the right granted to Dragon Models to use the PAN AM mark and PAN AM GLOBE logo on or in connection with 1:400 scale models of aircraft types operated by LICENSOR (or its predecessor) in its fleet, including Boeing B747 and Boeing B737 aircraft; and (iii) LICENSOR reserves to itself the right to use the Trademarks in the Territory on products other than Merchandising Products and in connection with the sale, distribution, advertising and promotion (but not the manufacture of Merchandising Products) of those products and Merchandising Products in the Territory, provided; however, that any sales of Merchandising Products by LICENSOR shall not be at a price lower than that charged by LICENSEE or Sublicensees, except for sales to LICENSOR's employees.

iv) Before entering any agreement with a manufacturer, distributor or retail outlet for t he m anufacture, s ale o r dis tribution o f Licensed P roducts, LICENSEE

4

shall obtain LICENSOR's advance written approval of such manufacturer, distributor or retail outlet. LICENSOR's right of approval or disapproval shall be in its reasonable and timely discretion.

v) LICENSEE specifically acknowledges and agrees that its exercise in any manner of any of the rights granted in Section 2.A.i or Section 2.A.ii in any jurisdiction that is not in the Territory shall be deemed a material breach of this Agreement.

C.    All LICENSOR's rights in the Trademarks and the PAN AM ONE.COM mark are reserved to LICENSOR unless specifically licensed to LICENSEE herein.

## 3.    AMENDMENT OF TERRITORY

A.    The scope of the Territory may be amended from time to time upon LICENSEE's request, subject to LICENSOR's approval in its reasonable discretion as provided herein. At least eight (8) weeks before LICENSEE commences (or, with respect to a Merchandising Sublicense, before a Sublicensee commences) the manufacture, distribution, promotion or sale of one or more Licensed Product in a country that is not at that time listed in Exhibit D (a "Proposed Jurisdiction"), LICENSEE shall provide LICENSOR with written notice of its desire to expand the Territory to include such Proposed Jurisdiction. Within four (4) weeks of its receipt of such notification from LICENSEE, LICENSOR shall inform LICENSEE of whether or not it approves of expansion of the Territory to include such Proposed Jurisdiction. LICENSOR's approval of such expansion shall be in its reasonable discretion, and reasonable grounds for disapproval shall include without limitation the determination that LICENSEE's manufacture, distribution, promotion or sale of Licensed Products in such Proposed Jurisdiction would create an undue risk of violation of the intellectual property rights of a third party or of damage to LICENSOR's rights in the Trademarks. In the event LICENSOR denies expansion of the Territory to include a Proposed Jurisdiction, LICENSOR shall make reasonable efforts to provide LICENSEE with an alternative mark or marks to use in such jurisdiction.

## 4.    TERM/TERMINATION/MINIMUM PERFORMANCE REQUIREMENT

A.    This Agreement and the provisions hereof, except as otherwise provided herein, shall be in full force and effect commencing on the Effective Date and shall continue through December 31, 2011 (the "Initial Term"). Subject to its satisfaction of the Minimum Performance Requirement, LICENSEE shall have the right to extend this Agreement for two (2) additional periods of five (5) years each (each such five (5) year period being a "Renewal Period"), with the "First Renewal Period" ending December 31, 2016, and the "Second Renewal Period" ending December 31, 2021. In order to exercise its renewal options, LICENSEE shall give LICENSOR at least twelve months written notice prior to the conclusion of the Initial Term or applicable Renewal Period.

B.    In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:

i) LICENSEE's right to extend this Agreement shall be subject to LICENSOR's approval in its sole discretion; or

5



ii) LICENSOR shall have the option (i) to collect from LICENSEE the Royalty that would have been due from LICENSEE if the Minimum Performance Requirement for such Royalty Year had been satisfied (with a credit for Royalty payments already made on LICENSEE Gross Revenues for that Royalty Y ear), or (ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

C.    In the event LICENSEE fails to satisfy the Minimum Performance Requirement during any Royalty Year or to timely exercise its option to renew this Agreement pursuant to Section 4.A, LICENSOR thereafter shall be free to negotiate with any other party in respect of the rights granted by LICENSOR to LICENSEE in this Agreement.

D.    This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) days period, the breaching party fails to cure such breach.

E.    Effects of Termination

i) Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all its and Sublicensees' inventory of Licensed Products as well as all work in progress (the "Inventory").

ii) Upon the expiration or termination of this Agreement, all of the rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR, LICENSEE shall immediately cause all Sublicensees to discontinue all use of the Trademarks (unless the applicable Merchandising Sublicense is assumed by LICENSOR pursuant to Section 2.B.ii), and LICENSEE will have one year to sell all Inventory (and, except with respect to those Merchandising Sublicenses assumed by LICENSOR pursuant to Section 2. B.ii, s hall c ause a ll S ublicensees t o d o t he s ame), all a t no c ost whatsoever to LICENSOR. If in the case another LICENSEE is obtained, they may purchase the inventory at cost plus 20%.

iii) Immediately upon expiration or termination of this Agreement, LICENSEE shall inactivate the internet web site located at www.panamone.com, cease all commercial activity and all use of such domain name and all use of the Trademarks and the PAN AM ONE.COM mark at such site, and shall assign to LICENSOR the domain name registration for the www.panamone.com internet domain name.

iv) The agreement between LICENSOR and Machine, Ltd, a predecessor company of LICENSEE, effective as of September 2, 2005 is hereby terminated by mutual agreement of LICENSOR and LICENSEE.

6

## 5.   DUTIES AND OBLIGATIONS OF LICENSEE

**A.**    LICENSEE shall, subject to LICENSOR's advance review and approval, develop a cohesive imaging and licensing program that focuses upon LICENSOR's core brand values as contemplated by this Agreement.

**B.**    LICENSEE shall develop a graphic ID standards manual for LICENSOR's review and approval in its discretion (the "Usage Guidelines"). The Usage Guidelines shall delineate certain standards for use of the Trademarks. LICENSEE shall adhere to such Usage Guidelines and shall cause all Sublicensees to do the same.

**C.**    Subject to the conditions herein specified, LICENSEE shall use its best efforts consistent with sound business practices during the Term to find and conclude business arrangements with Sublicensees that are advantageous to LICENSOR and, after entry of Merchandising Sublicenses memorializing such arrangements, to reasonably service such arrangements and agreements during their term and the term hereof, including, but not limited to, providing guidance and education to Sublicensees pertaining to the imaging and licensing program, monitoring the Sublicensees for their adherence to the Quality Standards (as defined in Section 8.C), LICENSEE shall provide yearly reports to LICENSOR detailing the status of all sublicensing projects and opportunities, and all of LICENSEE's manufacturing, sales, distribution and promotion activities concerning Licensed Products.

**D.**    LICENSEE shall engage in such other activities as the parties may mutually agree and, in general use its best efforts consistent with sound business practices to maximize revenue generated from the use of the rights granted hereunder and to enhance the value and reputation of the Trademarks.

**E.**    LICENSEE shall oversee and be responsible for payments due from Sublicensees under Merchandising Sublicenses, and shall provide quarterly and annual reports to LICENSOR. Such reports shall be certified by an authorized financial officer of LICENSEE or LICENSEE's accountant, and shall include a full and accurate statement showing (i) the number of each type of Licensed Product sold by LICENSEE and Sublicensees, (ii) the revenues derived therefrom, indicating the particular Licensed Product from which the revenues were derived and whether the revenues constitute Online Revenues, Wholesale Revenues or Sublicensee Revenues, and (iii) all such other information and details necessary to compute and verify the accuracy of Royalties. If necessary, LICENSEE shall conduct periodic investigations of Sublicensees' books and records to ensure that all payments have been accurately computed and fully made. The cost of such royalty investigations shall be borne by LICENSEE; provided, however, that any recoveries received as a result of such investigation shall be applied initially against the cost of conducting such investigation and then divided equally between LICENSOR and LICENSEE.

**F.**    It is understood that LICENSOR may have concepts and uses for the Trademarks or Artworks other than for use on or in connection with the Merchandising Products. During the Term, LICENSOR shall not license the Trademarks for use on or in connection with products or services other than the Merchandising Products (with the exception of uses of the Trademarks by LICENSOR or its affiliates or licensees that predate the effective date of this Agreement), either by itself or through an agent, without first offering such opportunity to LICENSEE under the

7



same terms and conditions as this Agreement. In the event that LICENSEE does not accept such offer in writing within thirty (30) days after notification by LICENSOR, LICENSOR shall be free to commence the c ommercialization or licensing of the Trademarks other than on or in connection with the Merchandising Products with no obligation to LICENSEE.

      **G.**    LICENSOR recognizes that L ICENSEE performs similar services for it s other clients and that LICENSOR's retention of LICENSEE is subject to such understanding. Provided, however, that LICENSEE's relationships with its other clients shall not unreasonably interfere with LICENSEE's performance of the terms and conditions of this Agreement.

      **H.**    LICENSEE agrees to sell Licensed Products to LICENSOR in exchange for LICENSOR's p ayment of a p rice e qual t o t he Wholesale p rice f or e ach i tem l ess 20 % p lus reasonable shipping and handling costs if applicable.

      **I.**    LICENSEE agrees that it shall use at least one of the Trademarks on each Merchandising Product on which one or more of the Artworks appears.

      **J.**    LICENSEE shall make a vailable to L ICENSOR a link between L ICENSOR'S internet website and LICENSEE'S panamone.com internet website (or such other website that LICENSEE develops for the online sale of Merchandise Products) that will enable users of LICENSOR'S internet website to purchase Merchandise Products at retail prices. For any purchases using such link, LICENSEE shall be responsible for shipping the Merchandise Products to the purchasers, and shall pay to LICENSOR the difference between the retail price and the cost of the Merchandise Products. If purchasers that initially purchased Merchandise Products via LICENSOR'S internet website were to purchase additional Merchandise Products in the future via LICENSEE'S internet website, those purchases shall be treated as if they were made via LICENSOR'S internet website, and payment shall be made to LICENSOR in accordance with this paragraph.

      **K.**    LICENSEE a cknowledges and agrees that its breach of any of the obligations contained in this Section 5 shall be considered a material breach of this Agreement sufficient to justify termination of this Agreement.

6.    **COMPENSATION**

    **A.**    Wholesale sales by LICENSEE.

        i)   Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of six percent (6%) of Wholesale Revenues attributable to Asia, and seven percent (7%) of Wholesale Revenues attributable to countries outside of Asia. In the event that Wholesale Revenues for a particular Royalty Year exceed twenty million U.S. dollars ($20,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of six percent (6%) and seven percent (7%) (for Asia and countries outside Asia, respectively) for Wholesale Revenues that exceed twenty million U.S. dollars ($20,000,000.00.

    **B.**    Online Sales



   i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of (i) six percent (6%) of Online Revenues for the first ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year, seven percent (7%) of Online Revenues for the second ten million U.S. dollars of Combined Online Revenues in each Royalty Year, and ten percent (10%) of Online Revenues for the third ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year.  In the event that Combined Online Revenues for a particular Royalty Year exceed fifty million U.S. dollars ($50,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of ten percent (10%) for Online Revenues that exceed fifty million U.S. dollars ($50,000,000.00).

**C.**   Sales by SUBLICENSEES

   i) Within forty-five (45) days following the end of each quarterly period following the Effective Date, LICENSEE will pay to LICENSOR one hundred percent (100%) of the royalty received by LICENSEE at a rate of 6% from Merchandising Sublicenses during such quarter.

**D.**   Miscellaneous

   i) All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

   ii) All fees payable hereunder shall be based upon the HSBC official exchange rate on the date on which such payment is due.  If, by any reason of any governmental or fiscal restrictions affecting the convertibility, payment cannot be made in U.S. funds, then LICENSEE shall take such reasonable actions with respect to payment due as LICENSOR may direct.

   iii) Any payment not paid by LICENSEE when due for any reason shall accrue interest payable to LICENSOR from the day after payment was due until payment is made, which interest shall be at the rate of one and one half percent (1 ½%) per month or the maximum amount permitted by U.S. law, whichever is greater.

**7.**   <u>**AUDIT**</u>

   **A.**   LICENSOR shall have the right, upon at least ten (10) days written notice and no more than once per calendar year, to inspect or authorize a third party [Big 4 or equal] to inspect LICENSEE's books and records and all other documents and materials in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

   **B.**   All books and records relevant to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three years after the date to which they pertain.

**C.**    In the event that LICENSOR or LICENSOR's agent makes an investigation of LICENSEE's books and records, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR for purposes other than with respect to the subject matter of this Agreement or disclosed to any third party for a period of five (5) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on LICENSEE's failure to pay its Royalty obligation, or its failure otherwise to meet any of its obligations under this Agreement.

## 8.    QUALITY CONTROL & SAMPLES

**A.**    The rights granted hereunder are conditioned upon LICENSEE's full and complete compliance with the marking provisions of the trademark and copyright laws of the United States and other countries in the Territory, and LICENSEE's causing Sublicensees to do the same.

**B.**    All Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as required under law or by LICENSOR.

**C.**    The Licensed Products, whether manufactured, distributed or sold by LICENSEE or a Sublicensee, shall be of a high quality in design, materials and workmanship and of a level of quality that is reasonably acceptable to LICENSOR and at least equal to the level of quality historically associated with the Trademarks (the "Quality Standard"). For the avoidance of doubt, the failure of Licensed Products to attain the Quality Standard shall be considered a material breach of this Agreement or a Merchandising Sublicense, and shall be considered sufficient grounds for termination thereof.

**D.**    At least two (2) weeks before LICENSEE or a Sublicensee begins the manufacture of a New Licensed Product or any alteration of a previously approved Licensed Product, LICENSEE shall submit to LICENSOR for approval one (1) prototype of such New Licensed Product, including all packaging, advertising and promotional materials. Moreover, at least two (2) weeks before LICENSEE or a Sublicensee first ships a New Licensed Product for sale or distribution, LICENSEE shall submit to LICENSOR for approval two (2) samples of such New Licensed Product and all associated packaging, advertising and promotional materials. In each case, LICENSOR shall have the right to deny approval of the New Licensed Product (i) in its reasonable discretion, (ii) if such New Licensed Product fails to be in compliance with the terms of this Agreement, (iii) if such New Licensed Product fails to meet the Quality Standard, or (iv) if LICENSOR determines in its reasonable discretion that such New Licensed Product is inconsistent with or damaging to the core attributes associated with the Trademarks. "New Licensed Product" shall mean a Licensed Product of a genus, model or version that has not previously been submitted to LICENSOR for approval under this subsection 8.D.

9.    **NOTICE**

A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at its above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

10.    **TRADEMARK OWNERSHIP AND REGISTRATION**

A.    LICENSOR shall determine in its sole discretion whether, when and where to file for trademark registration, or to maintain existing trademark registrations, for the Trademarks.

B.    In the event that LICENSOR elects to file a new application in a country located in the Territory for registration of any of the Trademarks for use on or in connection with Licensed Products, LICENSEE shall reimburse LICENSOR for all costs, expenses and legal fees associated with prosecuting and maintaining such application(s) for trademark registration and any resulting registration(s). Such applications and registrations shall be owned by LICENSOR and LICENSOR shall control and have the right to direct such prosecution and maintenance in its sole discretion.

C.    The parties agree to execute any documents reasonably requested by the other party to effect any of the provisions of this Section.

D.    LICENSEE acknowledges LICENSOR's exclusive ownership of the Trademarks and all associated goodwill. LICENSEE agrees that its and each Sublicensee's use of the Trademarks inures to the benefit of LICENSOR and that neither LICENSEE nor any Sublicensee shall acquire any rights in the Trademarks or the good will associated therewith. LICENSEE further agrees that it will not apply in any jurisdiction for trademark registration of any of the Trademarks or any confusingly similar alternatives, and that it will not oppose, petition to cancel or otherwise contest LICENSOR's applications or registrations for the Trademarks or similar marks.

11.    **INFRINGEMENTS**

A.    LICENSOR shall have the right, but not the obligation, at its own cost and expense, to institute and prosecute lawsuits or other enforcement efforts such as arbitrations, administrative proceedings and demand letters ("Actions") against third persons for infringement or other violation of the rights licensed in this Agreement or the Merchandising Sublicenses. Should LICENSEE learn of any potential or actual infringement or other violation of the rights licensed under this Agreement or any of the Merchandising Sublicenses, LICENSEE shall promptly notify LICENSOR. If LICENSEE should desire that LICENSOR institute an Action, LICENSEE shall make a written request to LICENSOR to do so. If LICENSOR does not institute an Action within ninety (90) days after LICENSEE has made a written request that LICENSOR do so, LICENSEE may institute and prosecute such Action on its own behalf with LICENSOR's advance written consent, which LICENSOR shall not unreasonably deny.

11

**B.**    Any Action shall be prosecuted solely at the cost and expense of the party bringing the Action. With respect to any Action brought by LICENSOR, all sums recovered, whether by judgment, settlement or otherwise, shall belong exclusively and entirely to LICENSOR. In the event LICENSEE brings an Action, all sums recovered, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees actually paid to counsel for the party bringing the Action and other out of pocket expenses incurred in such Action, shall be divided equally between LICENSOR and LICENSEE.

**C.**    Upon the reasonable request of the party bringing the Action, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such Action, including consenting to joinder in the Action. The party bringing suit shall reimburse the other party for the reasonable expenses incurred as a result of such cooperation.

## 12.    REPRESENTATIONS AND WARRANTIES

**A.**    Notwithstanding anything to the contrary herein, LICENSOR makes no representations or warranties concerning its ownership of copyrights or any other rights in the Artworks, nor with respect to the Trademarks, other than that, as of the Effective Date, it owns the trademark registrations listed in Exhibit A to this Agreement. LICENSEE acknowledges that third parties may own rights in or appurtenant to one or more of the Artworks, and that LICENSEE's use of the Artworks is at its own risk. LICENSOR agrees, however, that LICENSOR will not challenge LICENSEE on the ground that LICENSEE's reproduction of Artworks on Licensed Products or in connection with the advertising or promotion of Licensed Products, or LICENSEE's distribution of Licensed Products on which Artworks appear, infringes any copyrights that LICENSOR might own in the Artworks.

**B.**    Each of the parties represents and warrants to the other that it has the legal right, authority and capacity to enter into this Agreement and to make the covenants made in this Agreement, and that there is no other agreement, and that it will not during the term of this Agreement enter any other agreement, in conflict herewith.

## 13.    INDEMNITY

LICENSEE agrees to defend, hold harmless and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) that arise from claims of third parties against LICENSOR that relate to either LICENSEE's or a Sublicensees' use of the Trademarks, Artworks or that relate to Licensed Products or LICENSEE's actions within the scope of this Agreement or a Sublicensee's actions within the scope of a Merchandising Sublicense. LICENSEE shall ensure that each Merchandising Sublicense shall similarly provide indemnification to LICENSOR.

## 14.    INSURANCE

LICENSEE shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming LICENSOR as an additional named insured. Such policy shall provide coverage in the amount of $5 million, and protection against any and all

12

claims, demands and causes of action covered by the indemnification provisions of this Agreement, including without limitation those arising out of any breach by LICENSEE of the terms of this Agreement, claims of infringement or other violations concerning the Trademarks or Artworks, defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The policy shall obligate the insurer to provide notice to LICENSOR by Registered or Certified Mail, return receipt requested, within ten (10) days in the event of any modification, cancellation or termination thereof. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement. Each of the Merchandising Sublicenses shall contain similar insurance provisions applicable to each Sublicensee, with appropriate coverage limits as approved in advance by LICENSOR.

## 15.    **FORCE MAJEURE**

It is understood and agreed that in the event of an act of the government, or war conditions, or fire, flood or labor trouble in the factory of LICENSEE or a Sublicensee, or in the factory of those manufacturing parts necessary for the manufacture of the Licensed Products, prevent the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

## 16.    **JURISDICTION & DISPUTES**

A.    This Agreement shall be governed in accordance with the laws of the State of Massachusetts.

B.    All disputes under this Agreement shall be resolved by the courts located in the State of Massachusetts located in Boston, Massachusetts, including the United States District Court for the District of Massachusetts, and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it.

## 17.    **ASSIGNMENT/AGREEMENT BINDING ON SUCCESSORS**

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, permitted successors and permitted assigns. Any assignment of this Agreement by LICENSEE shall be subject to the express written approval of LICENSOR, which approval shall not unreasonably be withheld. For the purposes of this Section, a change of control of LICENSEE shall be deemed an assignment requiring LICENSOR's express written approval. Any assignment by LICENSEE in violation of this provision shall be considered null and void from its inception.

## 18.    **WAIVER**

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

19.    **SEVERABILITY**

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

20.    **NO JOINT VENTURE**

Nothing contained herein shall constitute this arrangement to be an employment, a joint venture or a partnership, or to create an agency relationship.

21.    **INTEGRATION**

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties (including, without limitation, the Merchandising License Agreement with an effective date of September 2, 2005 between LICENSOR and LICENSEE's predecessor, Machine Ltd.), including any option agreements that may have been entered into between the parties, and is intended as a final expression of their agreement concerning the subject matter hereof. This Agreement shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict with this Agreement.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Merchandising License Agreement on the date indicated below, effective as of the Effective Date.

**PAN AMERICAN WORLD AIRWAYS, INC.**

By: _____

Title: Senior VP General Counsel

Date: 7.20.07

Date: _____

**MACHINE PROJECT, INC.**

By: _____

Title: 4.

Date: 4.20.07

Date: _____

Approved as to termination of agreement with Machine, Ltd.

14

**<u>EXHIBIT A</u>**

<u>Trademarks:</u>
**[To be supplemented with schedule of registrations]**





# PAN AM

[substitute PAA AND WING logo (logo to side)]

# *Pan American World Airways*

15

## EXHIBIT B

Merchandising Products:

Luggage, travel bags, tote bags

Accessories, namely umbrellas, hats, belts, sun glasses

Apparel

Footwear

Watches, jewelry

Model airplanes (excluding 1:400 scale model aircraft)

Stationery, calendars, note cards, posters, prints

Memorabilia, namely, art plates, ornaments, toys, coffee mugs, towels Travel accessories, namely, locks, toiletries

Home and housewares including bedding and bathroom goods

Mineral water and alcoholic/non-alcoholic drinks

Board games, card games, video and electronic games

## EXHIBIT C

Artworks:

**EXHIBIT D**

Territories:

Asia: Means countries including China, Hong Kong, Macau, India, Malaysia, Thailand, Vietnam, Korea, Japan, Singapore, etc. within the Eurasian landmass next to Europe – lying approximately along Urals, the Urals River, the Caspian Sea, The Caucasus, The Black Sea The Bosporus and the Dardanelles straits, and the Aegean Sea, with the Suez Canal as the west boundary, the Bering Strait as the northeast boundary Golf of Aden, the Arabian Sea, and the Bay of Bengal as the South Boundary, the South China Sea, Yellow Sea, The Sea of Japan, The Sea of Okhotsk, and the Bering Sea as the east boundary and the Artic Ocean as the Northern boundary

The Rest of the world besides Germany and the EU.

ANNARBOR 86634v5

# Exhibit D



# Pan Am Systems, Inc.

Pease International Tradeport
14 Aviation Avenue
Portsmouth, NH 03801

March 14, 2008

Mr. Anthony Lucas                    **By Federal Express**
President
Machine Project, Inc.
241 37th Street, 7th Floor
New York, NY 10018

> **Re:    Notice of Termination**

Dear Mr. Lucas:

Pursuant to Sections Four, Six and Eight of the Merchandising License Agreement (the "Agreement"), please accept this letter as a notice of breach of material provisions of the Agreement. Specifically, Machine Project, Inc. ("Machine") is obligated pursuant to Section Four of the Agreement to satisfy a Minimum Performance Requirement as defined in the Agreement, an obligation that Machine has failed to meet in the First Royalty Year. Furthermore, pursuant to Section Six of the Agreement, Machine is obligated to pay royalties from sales to Pan American World Airways, Inc. ("Pan Am") within 30 days following the end of each calendar month following the January 1, 2007 Effective Date of the Agreement. To date, Machine has made only one such royalty payment in breach of that material provision. Finally, pursuant to Section Eight of the Agreement, Machine is obligated to present to Pan Am for approval any New Licensed Product prior to its manufacture, and Machine has breached this provision as well. Consequently, Pan Am is providing notice that the Agreement will terminate within 30 days of the date hereof pursuant to its terms.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Senior Vice President &
General Counsel

# Exhibit E

# RAYMOND W. M. CHIN
## Attorney At Law
### 305 Broadway, Suite 305
### New York, N.Y. 10007
### Tel.: (212) 406-2240
### Fax: (212) 406-2271

ADMITTED IN NY & NJ
By Mail and E-Mail (Sbeck@flypanam.com)                        April 9, 2008

Pan American World Airways Inc.
14 Aviation Avenue
Portsmouth, NH 038012

ATT: Stacy Beck,
    Director of Marketing and Corporate Development

                        Re: Pan Am with Machine Project et al
Dear Ms. Beck:

    We have been retained by Mr. Kinser Chiu and Machine Project, Inc. and its related companies to represent them in certain intra-corporate disputes with Anthony Lucas arising out of their status as licensee of Pan Am under certain agreements entered in September 2005, amended in January 2006 and again in January 2007. We understand you are familiar with these matters.

    In the course of our investigation this we discovered that Mr. Chiu was advised by Mr. Lucas quite recently that he (Mr Lucas) received some sort of notice from Pan Am that Machine Project and/or its affiliates or successors was in default under the license agreement and that unless this "default" was cured, Pan Am intended to declare the licensing agreement terminated.

    However Mr. Lucas has refused to date to advise the nature of the claimed default or to provide us with a copy of Pan AM's notice, thereby rendering its cure impossible.

    Would you please advise if any such notice was sent and, if so, forward a copy and our client will address the default immediately. We are advised that the efforts of our clients are finally bearing fruit and that there is a likelihood of substantial profit for all in this venture. It would seem contrary to the best interests of all to jeopardize that and be involved in litigation now.

                        Very truly yours,



RWMC/m                    RAYMOND W M CHIN



# PAN AM SYSTEMS, INC.

Pease International Tradeport
14 Aviation Avenue
Portsmouth, NH 03801

April 10, 2008

Raymond W. M. Chin, Esq.
305 Broadway, Suite 305
New York, NY 10007

Dear Mr. Chin:

I am in receipt of your letter addressed to the attention of Ms. Stacy Beck inquiring into the status of a certain License Agreement by and between Pan American World Airways, Inc. ("Pan Am") and Machine Project, Inc. ("Machine"). While I appreciate Mr. Chiu's continued interest in the success of Pan Am's branding program, I am somewhat confused by your purported representation of Machine, a company that to the best of our knowledge is wholly owned by Mr. Lucas. Accordingly, Pan Am does not believe that Mr. Chiu is in a position to correct the numerous defaults that have occurred pursuant to the Agreement, and I must therefore decline your request to provide you with the information you request.

Nevertheless, Pan Am is aware that Mr. Chiu is in possession of merchandise that was manufactured pursuant to authority granted by Machine in early 2008, and that this authority did not extend to a sale of the merchandise to anyone other than Machine, as Pan Am's licensee, or Pan Am as owner of the relevant intellectual property. Consequently, please accept this letter as a demand that Mr. Chiu provide Pan Am with an offer to purchase these goods at no more than fair market value within three (3) days of receipt of this letter, as well as proposed dates for inspection and possible delivery of the merchandise. Furthermore, please be advised that if Mr. Chiu declines to abide by this demand, Pan Am reserves all of its rights to pursue appropriate remedies to prevent any unauthorized sale of this merchandise to third parties.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Senior Vice President &
General Counsel

# RAYMOND W. M. CHIN

**Attorney At Law**
**305 Broadway, Suite 305**
**New York, N.Y. 10007**
**Tel.: (212) 406-2240**
**Fax: (212) 406-2271**

ADMITTED IN NY & NJ

April 11, 2008

Robert B. Culliford, Esq.    *(63766 2000)*
Senior Vice President & General Counsel
Pan Am Systems, Inc.
14 Aviation Avenue
Portsmouth, NH 03801

Re: <u>Machine Project, Inc. with Pan Am</u>

Dear Mr. Culliford:

We received your letter of April 10 a few moments ago and were quite take aback by its contents and tenor. We hereby represent to you that we have been retained by Mr. Chiu to act on behalf of him and Machine Project, Inc.

Unless we misunderstand it, your position is that you have unilatteraly determined that:

1] Our client is not an owner, principal or shareholder of Machine Project, Inc. and that you are not interested in seeing documentary evidence to the contrary, and

2] Machine Project, Inc. is in default in so many (heretofore undisclosed) ways under its licensing agreement with your company that it is unnecessary to specify the nature of the defaults or provide with a list of them, a copy of any notice of default or an opportunity to cure.

In view of these facts it is apparent we have no recourse except to advise our client that in our opinion litigation is his only available option - advise we are most reluctant to give in the ordinary course. If we have mis-understood your position, please advise and we would be pleased to discuss other available options with you.

Very truly yours,

RAYMOND W. M. CHIN

RWMC/m

# Exhibit F

# PAN AM SYSTEMS, INC.

Pease International Tradeport
14 Aviation Avenue
Portsmouth, NH 03801

---

**LAW DEPARTMENT**
**(603) 766-2002**

April 28, 2008

Raymond W.M. Chin, Esq.                    **By Fax (212) 406-2271**
Attorney at Law                            **and Express Mail**
305 Broadway, Suite 305
New York, NY 10007

       **Re:    Kinser Chiu**

Dear Attorney Chin:

      Please accept this letter in response to your correspondence of April 11, 2008 requesting clarification of the understanding of Pan American World Airways, Inc. ("Pan Am") as to Mr. Chiu's interest, if any, in Machine Project, Inc. ("Machine"). In response, I can assure you that Pan Am has inquired as to any interest that Mr. Chiu may have in Machine, as recently as last week when you and I spoke via telephone. Despite these inquiries, no documentation has been produced to date to support any claim that Mr. Chiu might have some form of interest in Machine, and therefore Pan Am has no choice but to rely upon the assertions made by Mr. Anthony Lucas, President of Machine, that Mr. Chiu in fact has no such interest. Nevertheless, if documentation does exist evidencing that Mr. Chiu does indeed have an interest in Machine, I am once again requesting that you forward that documentation to my attention at your earliest convenience. Pan Am will then review what is provided and respond accordingly.

      Notwithstanding the foregoing, however, the issue of whether or not Mr. Chiu has an ownership interest in Machine is irrelevant for purposes of the Notice of Termination of the Merchandising License Agreement (the "Agreement") sent by Pan Am to Machine on March 14, 2008. Specifically, pursuant to Section 9.A of the Agreement, notice was to be sent to Machine at its New York address to be effective, and there is no requirement that individual shareholders or interest holders also receive a copy of any notices. Therefore, regardless of whether Mr. Chiu has an interest in Machine, as between Pan Am and Machine, notice of termination was properly given and is effective.

Finally, you have also requested a copy of the Agreement and the above-referenced notice of termination. In response, I would suggest that you contact Mr. Lucas for these documents, as he is, to the best of our knowledge, the President of Machine.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Senior Vice President &
General Counsel

# Exhibit G

Barnes & Noble.com - Home & Gift: Vetements                                   Page 1 of 2

Home    Home & Gift    Search: Vetements

## You Searched Home & Gift For: Vetements

**1.**



### Pan Am Blue Passport Cover with Credit Card Slots

Pan Am for Vetements

**Sales Rank:** 122
**ISBN-13:** 9780641897009

A new copy is not available from Barnes & Noble.com at this time.

Add to wish list

---

**2.**



### Pan Am Airmail Design Blue and White Note Cards -Set of 12

Pan Am for Vetements
**Usually ships within 24 hours**
**ISBN-13:** 9780641897061

Online Price: **$8.95**
Members Pay: **$8.05**
Join Now

**Add to Cart**

Check store availability
Add to wish list

---

**3.**



### Pan Am Travel White and Blue Wire Journal

Pan Am for Vetements
**Usually ships within 24 hours**
**ISBN-13:** 9780641897047

Online Price: **$8.95**
Members Pay: **$8.05**
Join Now

**Add to Cart**

Check store availability
Add to wish list

---

**4.**



### Pan Am Vintage Poster Art Postcards -Set of 20

Pan Am for Vetements
**Usually ships within 24 hours**
**ISBN-13:** 9780641897078

Online Price: **$10.95**
Members Pay: **$9.85**
Join Now

**Add to Cart**

Check store availability
Add to wish list

---

**Sorted by:    Top Matches        Bestsellers        Title        Price**

# BARNES&NOBLE●

## Pan Am Airmail Design Blue and White Note Cards -Set of 12

Back | Details

**1** of **2** | Next »



Terms of Use, Copyright, and Privacy Policy
© 1997-2008 Barnesandnoble.com llc

**Back to Product Details Page**

# BARNES&NOBLE

## Pan Am Travel White and Blue Wire Journal

Details



Terms of Use, Copyright, and Privacy Policy
© 1997-2008 Barnesandnoble.com llc

**Back to Product Details Page**

## BARNES&NOBLE

### Pan Am Vintage Poster Art Postcards -Set of 20

Details



Terms of Use, Copyright, and Privacy Policy
© 1997-2008 Barnesandnoble.com llc

**Back to Product Details Page**









# Exhibit H

12/21/93    11:37    GREENBERG & TRAURIG    003

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement"), dated as of December 20, 1993 by and between Pan American World Airways, Inc., a New York corporation as debtor and debtor in possession, and Pan Am Corporation, a Delaware corporation, as debtor and debtor in possession (hereinafter collectively referred to as "Sellers"), and Eclipse Holdings, Inc., a Maryland corporation having its principal place of business in Rockville, Maryland (hereinafter referred to as "Purchaser").

WHEREAS, on January 8, 1991, Sellers and certain of their affiliates filed with the United States Bankruptcy Court Southern District of New York their respective petitions for relief under Section 301, Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") and Sellers continue to manage their properties and operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on December 4, 1991, Sellers ceased their airline operations and, since that date, Sellers have been winding down their business activities;

WHEREAS, during the course of their businesses, Sellers operated a diversified travel company in the airline, hotel and related businesses, directly and through licensing, from at least as early as 1929 until December 4, 1991, and since such dates, in connection with the liquidation of certain of their assets, have continued certain business operations;

WHEREAS, during the course of their business operations (including their business operations as debtors in possession), Sellers adopted and used certain trademarks, trade names, service marks, and worldwide registrations therefor (collectively, "The Marks"), certain of which are identified in Schedule 1 to the Trademark Assignment attached hereto as Exhibit "A";

WHEREAS, The Marks have become and remain world renown as a result of Sellers' and their respective licensees' long, extensive and exclusive use and promotion of same;

WHEREAS, The Marks currently have substantial value and goodwill owned by Sellers;

WHEREAS, Purchaser desires to carry on the business of the Sellers, in whole or in part, and, accordingly wishes to purchase The Marks from Sellers, together with any and all of the goodwill of the business of each Seller symbolized by and associated with The Marks, including, without limitation, all claims and rights of recovery for infringement of The Marks, all

1

rights of Sellers as licensor of the Marks and all registrations, applications and other rights associated with the foregoing, whether issued or pending; and

WHEREAS, Sellers are willing to sell, assign and transfer to Purchaser any and all of their respective rights, title and interests in and to The Marks, together with any and all of the goodwill of the business of each Seller symbolized thereby, associated therewith (including, without limitation, all claims and rights of recovery for infringement of The Marks and all of Sellers' rights as Licensor of The Marks, and all registrations, applications and other rights associated with the foregoing, whether issued or pending), and certain tangible items used in connection with the operation of Sellers' business, including without limitation the former WorldPass membership list, approximately 2,000 posters, and copies of portions of certain airline manuals such as the Personnel, Flight Operations and Maintenance manuals as well as the corporate graphics guidelines and, to the extent they exist, all molds and plates used in creating The Marks, (all collectively with The Marks referred to herein as the "Property").

WHEREAS, on December 3, 1993, after an auction conducted during a hearing before the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), an order was entered, inter alia, authorizing the sale to Purchaser of The Marks;

NOW THEREFOR, in consideration of the premises and the mutual agreements set forth herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Upon the terms and conditions set forth in this Agreement, Sellers agree to sell to Purchaser, and Purchaser agrees to purchase from Sellers, any and all of each Sellers' right, title and interest in and to the Property, including, without limitation, The Marks and the goodwill of the business of each Seller as symbolized by and associated with The Marks for $1,325,000 in cash (the "Purchase Price").

Sellers acknowledge and agree that the Property to be conveyed to Purchaser pursuant to this Agreement also shall include, if any, all logos, symbols, emblems, insignias, signs and signage rights (except the signage rights at 111 Broadway, New York, New York and at the building used by Sellers in Rockleigh, New Jersey, which rights shall be enjoyed by Sellers in connection with the winding up of the business affairs of Sellers as provided in paragraph 4(a), but including various signs at JFK Airport and Logan Airport and one globe design at Sellers' Rockleigh facility) (the "Additional Property") which may be owned by Sellers as of the date of this Agreement;.

2

*, provided however, that this provision will have no effect [?]
on Purchaser's obligation under paragraphs 4(b) and 4(c) of this [?]
Purchase Agreement.*

provided, however, that the cost and expense of the transfer and
delivery to Purchaser of any such Additional Property shall be
borne exclusively by Purchaser. Purchaser shall not be obligated
to incur any of Sellers' liability to any third parties in
connection with The Marks, the Property, Additional Property or
other rights conveyed hereunder by virtue of this Agreement or
the assignment of rights hereunder. Purchaser shall not provide
any additional consideration to Sellers for the Additional
Property; the Purchase Price set forth above represents all of
the consideration due and payable for such Additional Property,
which shall be conveyed to Purchaser on the closing date together
with the Property.

2.    Sellers hereby acknowledge receipt of a non-refundable
deposit in the amount of $132,500 (the "Deposit"). Sellers shall
not disburse or expend the Deposit, except at closing, or
pursuant to an order of the Bankruptcy Court. Through wire
transfer to Sellers' Account Number 89-001-96-270 at the Bank of
New York (ABA #021 0000 18), Purchaser shall pay the balance of
the Purchase Price ($1,192,500) at closing.

3.    The closing shall take place no later than 5:00 p.m. on
December 20, 1993 at the offices of Purchaser's counsel or as
otherwise agreed.

4.    Sellers and Purchaser agree to execute at closing a
Trademark Assignment of worldwide trademark rights in
substantially the form attached hereto as **Exhibit "A"**. At the
request of Purchaser and at Purchaser's cost and expense, Sellers
agree to execute such other and further assignments, agreements
and other documentation as reasonably requested by Purchaser or
as reasonably required under the laws of the various countries in
which The Marks are registered to ensure that title and all
rights of Sellers' to The Marks are transferred to and perfected
in Purchaser and that the appropriate assignments are recorded in
the appropriate trademark offices throughout the world. Sellers
hereby appoint Purchaser's attorneys, Kramer, Levin, Naftalis,
Nessen, Kamin & Frankel (or such other law firm designated by
Purchaser and reasonably acceptable to Sellers) as Sellers'
agent, and as Sellers' attorney in fact, which appointment shall
be limited, irrevocable and coupled with an interest, and which
shall be effective as of the Closing Date. Such appointment is
for the sole purpose of enabling Purchaser to execute and deliver
any documents on Sellers' behalf if necessary to effectuate the
intent of this paragraph 4. This provision and the power granted
herein shall survive the closing of the sale contemplated by this
Agreement.

3

(a)  Purchaser acknowledges and agrees that Sellers shall be entitled to use The Marks and Purchaser hereby grants effective as of the Closing Date, a license to use The Marks, as licensee, as necessary pursuant to a royalty-free, non exclusive license from Purchaser.  Such license shall commence on the Closing Date and continue until Sellers' business and that of their subsidiary and affiliated companies, are fully wound up and liquidated.  The quality of Sellers' activities under The Marks pursuant to said license shall be commensurate with Sellers' previous business reputation.  The license shall limit the use of The Marks to the business of the winding up of the business affairs of Sellers', and The Marks shall be used for no other purpose or after conclusion of such wind up period.

(b)  Purchaser acknowledges and accepts the assignments identified in Exhibit "C" hereto and shall take no action adverse to Sellers' (or the assignees' under such assignments) interests in connection with said assignments.

(c)  Purchaser acknowledges and accepts the license agreements attached hereto as Exhibit "D" and agrees that, after the closing, it shall assume all rights, duties and obligations of the Licensor pursuant to said license agreements.

5.  Sellers represent and warrant to Purchaser as follows:

(a)  Sellers are the owners of each and every one of The Marks and other assets conveyed in this Agreement; and

(b)  the information set forth in Schedule 1 to the Trademark Assignment attached hereto as Exhibit "A" is based on the records currently in Sellers' possession and is true and accurate.

6.  Purchaser acknowledges and agrees that Sellers are making all of the foregoing representations and warranties based to the best of their knowledge and that such representations shall not survive the closing.  Purchaser further acknowledges and agrees that, except as expressly set forth in paragraphs 5(a) and (b), Sellers are making no representations, warranties or covenants to Purchaser with respect to The Marks or otherwise. If notwithstanding the immediately preceding sentence, Sellers are deemed, by operation of law or otherwise to have made any other representations or warranties with respect to the purchase and sale hereunder, such representations of the warranty deemed to be made by Sellers shall not survive the closing.  Without limiting the foregoing, Purchaser hereby waives all rights, remedies, warranties, and indemnities against Sellers after the closing arising under the applicable law with respect to the foregoing representations and warranties.

4

however, that in the event the sale shall be determined not to be so exempt, then Purchaser shall be responsible for all such non-exempt Taxes.

11.    Each of Purchaser, Sellers and Sellers' subsidiaries and affiliates hereby agree that ~~at any time and from time to time after the date hereof, upon the reasonable request of each~~ party and without further consideration, it shall do, execute, acknowledge and deliver all such further acts, assignments, documents, instruments, assurances and the like as may be reasonably necessary to consummate the transactions contemplated hereby and confirm in Purchaser the benefits of the rights acquired hereunder, ~~including without limitation the title, if any, transferred hereunder to The Marks.~~ *

PAR
JHL

*    Purchaser acknowledges and agrees that Purchaser shall be responsible for all reasonable costs and expenses incurred by Sellers arising in connection with the assistance to be provided by Sellers at Purchaser's request as contemplated in this paragraph 11.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement, all as of the date first written above.

PAR JHL

* 12. This Agreement and any rights of Purchaser hereunder may be transferred, sold or assigned by Purchaser to any person or entity in which Purchaser owns a significant percentage of shares or other interests.

PAN AM CORPORATION

By: _Paul A. Rendich_
    Paul A. Rendich, Senior Vice
    President and General Counsel

PAN AMERICAN WORLD AIRWAYS, INC.

By: _Paul A. Rendich_
    Paul A. Rendich, Senior Vice
    President and General Counsel

ECLIPSE HOLDINGS, INC.

By: _David H. Lockwood_
    David Lockwood, President

6

Exhibit A

## TRADEMARK ASSIGNMENT

WHEREAS, Pan American World Airways, Inc., a New York corporation having a principal place of business at 111 Broadway, new York, New York 10006 (hereinafter referred to as "Pan Am") has adopted and continuously used worldwide the trademarks and service marks identified in Schedule 1 hereto (hereinafter referred to as "The Marks");

WHEREAS, Pan Am has registered The Marks in the United States and various countries throughout the world as indicated in Schedule 1 hereto (hereinafter referred to as "The Registrations");

WHEREAS, Eclipse Holdings, Inc., a _____ corporation having a principal place of business at Rockville, Maryland (hereinafter referred to as "Purchaser") is desirous of acquiring The Marks and The Registrations;

12/21/93     11:42     GREENBERG & TRAURIG     009

NOW, THEREFORE:

In consideration and in exchange for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pan Am does hereby sell, assign, transfer and set over to said Purchaser its entire right, title and interest in and to The Marks together with the goodwill of the business associated therewith and The Registrations.

The Marks are sold pursuant to an order of the United States Bankruptcy Court, signed by Judge Cornelius Blackshear on December 3, 1993.

PAN AMERICAN WORLD AIRWAYS, INC.

Dated: _____     By: _____
                                Name:
                                Title:

ECLIPSE HOLDINGS, INC.

Dated: _____     By: _____
                                Name:
                                Title:

12/21/93    11:43    GREENBERG & TRAURIG    010

SCHEDULE 1 TO TRADEMARK ASSIGNMENT

ATTACHED TO TRADEMARK AGREEMENT AS
EXHIBIT A

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION | DATE OF | EXPIRATION |
|---|---|---|---|---|---|---|
| USA | PAN AMERICAN WORLD AIRWAYS | 50 D.C. | 22,178-D | January 21, 1987 | | January 21, 2002 |
| | PAN AM within Globe Design | 50 D.C. | 22,171-D | January 21, 1987 | | January 21, 2002 |
| | BLUEPRINTS | 50 D.C. | 22,172-D | January 21, 1987 | | January 21, 2002 |
| | WORLDPASS | 50 D.C. | 22,173-D | January 21, 1987 | | January 21, 2002 |
| | PAN AM | 38 | 137,462-M | February 22, 1989 | | February 22, 2001 |
| Zaire | PAN AM | 12 & 14 | 11122 | June 13, 1974 | | June 13, 1989 |
| | PAN AM | 38 & 39 | 23 232 | November 10, 1974 | | November 10, 1994 |
| CZ | PAN AM | 35 | 04717 | June 12, 1975 | | Infinite |
| Fiji | PAN AM | 12 | 143/74 | December 27, 1974 | | April 3, 1995 |

Exhibit B

(Intentionally left blank)

Exhibit C

ASSIGNMENT BY PAN AMERICAN WORLD AIRWAYS, INC.

To Fernando Balivo re Pan Am International Flight Academy

Exhibit D

## LICENSE AGREEMENTS BY PAN AMERICAN WORLD AIRWAYS, INC.

- License Agreement with Pan Am International Flight Academy

- License Agreement with AeroArt International, Inc.

- License Agreement with the Pan American-National Employees Credit Union

- License Agreement with Airbus Industrie

- License Agreement with LFO Productions, Inc.

# Exhibit I

## TRADEMARK ASSIGNMENT

WHEREAS, Pan American World Airways, Inc., a New York corporation having a principal place of business at 111 Broadway, new York, New York 10006 (hereinafter referred to as "Pan Am") has adopted and continuously used worldwide the trademarks and service marks identified in Schedule 1 hereto (hereinafter referred to as "The Marks");

WHEREAS, Pan Am has registered The Marks in the United States and various countries throughout the world as indicated in Schedule 1 hereto (hereinafter referred to as "The Registrations");

WHEREAS, Eclipse Holdings, Inc., a _Maryland_ corporation having a principal place of business at Rockville, Maryland  (hereinafter referred to as "Purchaser") is desirous of acquiring The Marks and The Registrations;

NOW, THEREFORE:

In consideration and in exchange for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pan Am does hereby sell, assign, transfer and set over to said Purchaser its entire right, title and interest in and to The Marks together with the goodwill of the business associated therewith and The Registrations.

The Marks are sold pursuant to an order of the United States Bankruptcy Court, signed by Judge Cornelius Blackshear on December 3, 1993.

PAN AMERICAN WORLD AIRWAYS, INC.

Dated: 12/29/93

By: _Paul Rendich_
Name: Paul Rendich
Title: Sr. Vice President

ECLIPSE HOLDINGS, INC.

Dated: 12-29-93

By: _David H. Lockwood_
Name: David H. Lockwood
Title: President

STATE OF NEW YORK )
COUNTY OF NEW YORK)   ss.:

On the _29_ day of _December_, 1993, before me personally came _Paul Rendich_ to me known, who, being by me duly sworn did depose and say that he resides at _185 West End Ave New York_ City of _New York_ County of _New York_ State of _New York_ and that he is Senior Vice President - General Counsel of Pan Am Corporation and the authorized agent of Peter T. McHugh, Chief Executive Officer and Responsible Officer ("Authorized Agent") for Pan American World Airways, Inc., who was appointed pursuant to the Consent Order Authorizing the Appointment of a Responsible Officer for Debtors in Possession signed by the bankruptcy court on January 9, 1992, the corporation described in and which executed the above Assignment on behalf of said assignor and that he signed his name thereto with the authorization of Mr. McHugh.

Sworn to before me this
_29_ day of _Dec._ , 1993

_Jill M. Siciliano_
Notary Public

JILL M. SICILIANO
Notary Public, State of New York
No. 5002018
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires Sept. 21, 1994

3

SCHEDULE 1 TO TRADEMARK ASSIGNMENT
ATTACHED TO TRADEMARK AGREEMENT AS
EXHIBIT A

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Venezuela | PAN AMERICAN WORLD AIRWAYS | | | | |
| | PAN AM within Globe Design | 50 D.C. | 22.170-D | January 21, 1987 | January 21, 2002 |
| | SLEEPERETTE | 50 D.C. | 22.171-D | January 21, 1987 | January 21, 2002 |
| | WORLDPASS | 50 D.C. | 22.172-D | January 21, 1987 | January 21, 2002 |
| | PAN AM | 50 D.C. | 22.173-D | January 21, 1987 | January 21, 2002 |
| | PAN AM | 38 | 137.402-M | February 22, 1989 | February 22, 2004 |
| Viet Nam | PAN AM/ | 12 & 16 | 11122 | June 19, 1974 | June 19, 1989 |
| Yugoslavia | PAN AM | 38 & 39 | 23 332 | November 10, 1974 | November 10, 1998 |
| Zaire | PAN AM | 39 | 04717 | June 12, 1975 | Infinite |
| Zambia | PAN AM | 12 | 162/74 | December 27, 1974 | April 3, 1975 |

10/21/93

## SCHEDULE 1 TO TRADEMARK ASSIGNMENT

### ATTACHED TO TRADEMARK AGREEMENT AS EXHIBIT A

### PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| African & Malagassy Union (Benin, Cameroun, Central African Republic, Chad, Congo-Brazzaville, Gabon, Ivory Coast, Mali, Malagassy, Mauritania, Niger, Senegal, Togo, Zaira) | PAN AM | 39 | 64481 | August 25, 1974 | August 26, 1994 |
| Argentina | PAN AM | 39 | 1.082.827 | | |
| | PAN AM with Globe | 7, 9, 12, 17 | 1.115.051/4 | July 18, 1984 | July 19, 1994 |
| | PAN AM with Globe | 6, 9, 10, 11, 18, 20, 21 & 24 | | February 12, 1985 | February 12, 1995 |
| | PAN AM with Globe | | 1.251.319/326 | October 13, 1987 | October 13, 1997 |
| | | 1 | 1.078.132 | May 7, 1984 | May 7, 1994 |
| | | 5 | 1.091.737 | September 10, 1984 | September 10, 1994 |
| | | 8 | 1.091.738 | September 10, 1984 | September 10, 1994 |
| | | 11 | 1.203.479 | May 5, 1986 | May 5, 1996 |
| | PAN AM adjacent Globe | 12 | 1.428.731 | March 31, 1993 | March 31, 2003 |
| | | 12 | 969.149 | April 7, 1980 | April 7, 2000 |
| | | 25 | 1.254.437 | November 2, 1987 | November 2, 1997 |
| | PAN AM with Globe | 39 | 1.095.078 | October 16, 1984 | October 16, 1994 |
| | | 39 | 1.095.029 | October 16, 1984 | October 16, 1994 |
| | | 39 | 1.095.077 | October 16, 1984 | October 16, 1994 |
| | | 39 | 1.219.411 | December 9, 1986 | December 9, 1996 |

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| Argentina (Cont'd) | PAN AMERICAN WORLD AIRWAYS | 12 | 1.369.711 | December 27,1989 | December 27,1999 |
| | | 4,17,18,12,7 28,9,16 & 25 | 1.128.715 to 723 | April 8, 1985 | April 8, 1995 |
| | | 42 | 1.076.242 | April 11, 1984 | April 11, 1994 |
| | | 35 | 1.075.707/9 | April 6, 1984 | April 6, 1994 |
| | | 18 | 1.014.156 | January 18, 1991 | January 18, 2001 |
| | | 39 | 1.225.645 | March 2, 1987 | March 2, 1997 |
| | SLEEPERETTE | 7 | 1.093.494 | October 1, 1984 | October 1, 1994 |
| | | 12 | 1.128.893 | April 8, 1985 | April 8, 1995 |
| | | 20 | 1.080.906 | June 8, 1984 | June 8, 1994 |
| | | 39 | 1.268.635 | February 1, 1988 | February 1, 1998 |
| | PANAMAC | 9 | 1.428.719 | March 31, 1991 | March 31, 2001 |
| Austria | PAN AM with Globe | | | | |
| Bahamas | PAN AM with Globe | 19 & 25 | 40.555 | February 3, 1959 | February 3, 1999 |
| Bahrain | PAN AM with Globe | 6 | 3303 | May 3, 1974 | May 3, 1992? |
| | | 50(10) | 3304 | May 3, 1974 | May 3, 1998 |
| Benelux | SLEEPERETTE | 39 | BH152 | April 27, 1981 | April 27, 1996 |
| | | 39 | BH102 | February 6, 1980 | February 6, 1995 |
| | PAN AM | 7, 9, 12, 16, 18, & 28 | 65.472 | December 10, 1971 | December 10, 1994 |
| | PAN AM | 7, 9, 12, 16, 18, 21 & 28 | 86559B | March 16, 1959 | Infinite |

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Benelux (Cont'd) | PAN AM | 39 | 155.901 | July 14, 1988 | December 18, 1998 |
| | PAN AM with Globe | 7, 9, 12, 16, 18, 21, 28, 32 & 34 | 65.471 | June 8, 1969 | December 10, 1996 |
| | PAN AM with Globe | 39 | 157.926 | October 14, 1988 | December 18, 1998 |
| | SLEEPERETTE | 7, 8, 12, 16, 20, 21, 24 & 25 | 65.474 | December 10, 1971 | December 10, 1997 |
| | SLEEPERETTE | 39 | | July 14, 1988 | December 18, 1998 |
| Bermuda | PAN AM with Globe | 6 & 39 | 4255 | October 21, 1958 | October 21, 2000 |
| Bolivia | PAN AM within Globe | 39 | 15812-C | September 30, 1991 | September 30, 2001 |
| Brazil | PAN AM | 38, 20/30 | 06215696 | January 10, 1976 | January 10, 1996 |
| | PAN AM with Globe | 38, 20/30 | 06215700 | January 10, 1976 | January 10, 1996 |
| | SLEEPERETTE | 38, 30/40 | 7.074.581 | February 25, 1980 | February 25, 2000 |
| Bulgaria | PAN AM with Globe | 38 & 39 | Y-56 | March 22, 1974 | March 22, 1994 |
| Burma | PAN AM with Globe | | | February 11, 1959 | Infinite |

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| anada | PAN AM with Globe | | 114.828 | July 31, 1959 | July 31, 2004 |
| | SLEEPERETTE | | 102.863 | March 16, 1971 | March 16, 2001 |
| hile | PAN AM adjacent Globe | 39 | 360.718 | March 23, 1960 | October 6, 2000 |
| | | 16 | 357.082 | March 23, 1960 | October 6, 2000 |
| | PAN AMERICAN WORLD AIRWAYS | 39 | 360.719 | October 9, 1967 | October 9, 2000 |
| | PAN AM within Globe | 16 | 363.394 | January 7, 1991 | January 7, 2001 |
| hina The People's Republic f China) | PAN AM | 19-airplanes, autos, buses, trucks | 159.089 | June 30, 1982 | June 29, 1992 |
| | | 21-(metal) signs | 159.094 | June 30, 1982 | June 29, 1992 |
| | | 30-(plastic) tags | 159.100 | | |
| | | 52-luggage, passport cases | 159.105 | | |
| | | 59-stationery, invoices, menus | 159.109 | June 30, 1982 | June 29, 1992 |

## PAN AMERICAN WORLD AIRWAYS, INC.
## TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| hina (Cont'd) | GLOBE DESIGN and PAN AM | 63-newspapers, mags, models, Paper, decals | 159.114 | | |
| | | 19159.090 | | | |
| | | 21 | 159.093 | | |
| | | 30 | 159.101 | | |
| | | 52 | 159.104 | | |
| | | 59 | 159.110 | | |
| | | 63 | 159.113 | | |
| | | 44-playing cards | 159.122 | | |
| | | 72-matches, lighters | 159.123 | | |
| | PAN AM with GLOBE | 19 | 159.091 | | |
| | | 21 | 159.092 | | |
| | | 30 | 159.102 | | |
| | | 52 (90) | 159.103 | | |
| | | 59 | 159.111 | | |
| | | 63 | 159.112 | | |
| | | 74-insignias | 159.124 | | |
| | THEATRE-IN-THE-AIR | 14-projectors | 159.084 | | |
| | | 63-motion pictures | 159.121 | | |
| | | 21-(metal) signs | 159.097 | June 30, 1982 | June 29, 1992 |
| | SLEEPERETTE | 50-reclining chair | 159.106 | June 30, 1982 | June 29, 1992 |
| | | 63-printed matter | 159.120 | | |

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| hina (Cont'd) | PANAMAC | 16-computer equipment for communications | 159.086 | | |
| | | | 159.118 | | |
| | | 63 | 16 | | |
| | | 63 | 159.119 | 159.087 | |
| | PARACOM | 16 | 159.085 | | |
| | | 63 | 159.117 | | |
| | FALCON | 19 | 159.088 | | |
| | | 21 | 159.096 | | |
| | | 30 | 159.099 | | |
| | | 59 | 159.108 | | |
| | | 63 | 159.116 | | |
| | PAN AM with Globe | TM | 13680 | June 30, 1982 | June 29, 1992 |
| | | CM | 45.328 | | |
| | Globe/PAN AM | TM | 15678 | July 7, 1972 | Infinite |
| | | CM | 45.326 | December 6, 1972 | Infinite |
| | PAN AM CARGO | TM | 15679 | July 7, 1972 | Infinite   4 |
| | | CM | 45.327 | December 6, 1972 | Infinite |
| | PAN AM | 39 | 155.980 | January 3, 1964 | Infinite |
| | PAN AM within Globe | 39 | 155.979 | January 3, 1964 | January 3, 1994 |
| osta Rica | | | | | January 3, 1994 |
| zechoslovakia (Slowakische Republik) (Tschechische Republik) | SLEEPERETTE | 39 | 155.977 | January 3, 1984 | January 1, 1994 |

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Denmark | PAN AM within Globe | 12, 39 | 2170/64 | June 13, 1964 | June 13, 1994 |
| | PAN AM with Globe | 7, 12 & 16 | 2137/59 | November 14, 1959 | November 14, 1999 |
| | SLEEPERETTE | 12 & 39 | 1/64 | January 4, 1964 | January 4, 1994 |
| Dominican Republic | PAN AM within Globe | 70 | 349 | September 11, 1959 | September 10, 1999 |
| Fiji | PAN AM | 39, 16, 13 | 2830/40/1/2/3/4 | December 15, 1959 | December 15, 2001 |
| | PAN AM with Globe Device | 17, 18, 50, 25 | 2838 | December 15, 1959 | December 15, 2001 |
| Finland | PAN AM with Globe<br>PAN AM | 28, 31 & 35 | 35 481<br>58 495 | July 14, 1960<br>June 22, 1961 | July 14, 2000<br>June 22, 2001 |
| France | PAN AM with Globe | 4, 7, 9, 12, 16,<br>18, 28, & 35-42 | 1058,640<br>(1 474 561) | August 5, 1968 | July 17, 1998 |
| | PAN AM/ | 7 thru 42 | 1058,641<br>(1 474 558) | August 5, 1968 | July 17, 1998 |
| | PAN AMERICAN WORLD AIRWAYS | 7 thru 42 | 1058,642<br>(1 474 559) | August 5, 1968 | July 4, 1998 |
| | SLEEPERETTE | 20,39 & 42 | 1058,661<br>(1474564) | August 5, 1968 | July 4, 1998 |
| | THEATRE-IN-THE-AIR | 41 | 1058,652<br>(1474652) | August 5, 1968 | July 17, 1998 |

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| France (cont'd.) | PANAMAC | 12, 38, 39 & 42 | 1073.823 (1474565) | August 5, 1968 | July 4, 1998 |
|  | PANTHERE | 35, 38, 39, 42 | 1271.538 | March 27, 1984 | March 27, 1994 |
| Germany | PAN AM | 18 | 876.518 | December 28, 1970 | March 23, 1998 |
|  |  | 12 | 857.596 | May 26, 1969 | March 22, 1998 |
|  |  | 39 | 993.748 | November 23, 1979 | April 2, 1999 |
|  | PAN AM Adjacent Globe | 25 | 1.120.759 | July 22, 1987 | July 22, 1997 |
|  | PAN AM within Globe | 12, 16, 18 & 28 | 737.979 | June 30, 1960 | February 12, 1999 |
|  |  | 39 | 993.724 | November 22, 1979 | April 2, 1999 |
|  |  | 25 | 1.120.757 | July 22, 1987 | July 22, 1997 |
|  | SLEEPERETTE | 10 | 641.250 | July 7, 1953 | October 18, 2001 |
|  |  | 39 | 996.804 | January 26, 1980 | April 2, 1999 |
|  | PANTHER | 39 | 1.068.501 | September 25, 1984 | September 23, 1993 |
|  | PAN AM with Globe | 35, 38 & 42 | 1.271.538 | March 27, 1984 | March 27, 1994 |
| Ghana | PAN AM | 39 | 9440 | April 19, 1959 | April 9, 2001 |
| Great Britain | PAN AM with Globe |  |  | December 26, 1961 | December 26, 1991 |
|  |  |  |  | April, 1970 | December, 2000 |

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| Greece | PAN AM | 12 | 52.783 | May 22, 1974 | May 22, 1994 |
| Guatemala | PAN AM with Globe | 12 | 11.792 | December 9, 1959 | June 15, 1999 |
| | | 21 | 11.793 | December 9, 1959 | June 15, 1999 |
| | | 35 & 42 | 11.794 | December 9, 1959 | June 15, 1999 |
| | | 14 | 11.850 | December 9, 1959 | June 15, 1999 |
| | | 25 | 11.851 | December 9, 1959 | June 15, 1999 |
| Guyana | PAN AM with Globe | 12 | 4519A | July 29, 1959 | July 29, 1994 |
| | | 16 | 4524A | July 29, 1959 | July 29, 1994 |
| Honduras | SLEEPERETTE | 39 | 90 | May 16, 1980 | May 16, 2000 |
| Hong Kong | PAN AM with Globe | 10 | 6148 | April 25, 1962 | April 25, 1992 |
| Hungary | PAN AM | 12 | 125 | February 10, 1960 | September 21, 1994 |
| | | 16 | 1228 | December 1, 1965 | June 3, 2000 |
| | | 18 | 1229 | December 1, 1965 | June 3, 2000 |
| | PAN AM with Globe | 39 | 119.641 | November 27, 1967 | November 27, 1997 |
| | | 38 | 119.640 | November 27, 1967 | November 27, 1997 |
| | | 22 | 90 | October 2, 1979 | May 16, 1990 |
| | PANAMAC | 12 | 120.082 | March 24, 1968 | March 26, 1997 |
| | | 38 | 119.642 | November 27, 1967 | November 27, 1997 |

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Hungary (cont'd.) | | | | | |
| Iceland | THEATRE-IN-THE-AIR | 38 & 41 | 119.644 | November 27, 1967 | November 27, 1997 |
| | PAN AM with Globe | 35, 38 & 39 | 38/3959 | April 18, 1959 | April 18, 1999 |
| | SLEEPERETTE | 39 | 86/3951 | September 18, 1951 | September 18, 2001 |
| India | Pan Am with Globe | 16 | 18354 | March 5, 1973 | March 4, 1997 |
| Indonesia | Pan Am with Globe | 16,18,34 | 265.605 | March 18, 1980 | February 6, 2001 |
| Iran | PAN AM with Globe | 12, 35 | 18 891 | January 14, 1959 | January 15, 1999 |
| | SLEEPERETTE | 12, 35 | 18 893 | January 14, 1959 | January 15, 1999 |
| Ireland | PAN AM with Globe | 12 | 62 352 | December 23, 1958 | December 22, 2000 |
| | | 16 | 62 353 | December 23, 1958 | December 22, 2000 |
| Israel | PAN AM | 39 / 42 | 39007 / 39009 | April 3, 1974 / April 3, 1974 | April 3, 1994 / April 3, 1994 |
| | PAN AMERICAN | 39 / 42 | 39008 / 39010 | April 3, 1974 / April 3, 1974 | April 3, 1994 / April 3, 1994 |
| Italy | SLEEPERETTE | 20 & 39 | 39812C/77 | January 28, 1977 | January 28, 1997 |
| | PAN AM within Globe | 6, 11, 12, 16, 17 & 20 | 363 322 | December 4, 1958 | December 4, 1998 |

# Exhibit J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**3241**

---------------------------------------x
                     :

In re                    :     Chapter 11 Case Nos.
                     :     91 B 10080 (CB)

PAN AM CORPORATION et al., :     through
                     :     91 B 10087 (CB)

        Debtors.      :

---------------------------------------x

DEC 1993

      ORDER AUTHORIZING THE SALE TO ECLIPSE HOLDINGS, INC. OF
    ALL OF DEBTORS' RIGHT, TITLE AND INTEREST IN CERTAIN
TRADEMARKS, TRADE NAMES, SERVICE MARKS, GOODWILL AND RELATED
   PROPERTY PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE

       Upon the verified motion dated November 2, 1993 of the

above-captioned debtors and debtors in possession (collectively,

"Debtors"), for entry of an order pursuant to sections 105, 363

and 365 of title 11 of the United States Bankruptcy Code (the

"Motion," as further described below), authorizing the sale,

transfer and assignment to Cobb Partners, Inc. ("Cobb"), pursuant

to a purchase agreement dated October 28, 1993, a copy of which

is annexed to the Motion as Exhibit A (the "Agreement"), of all

of the right, title and interest of Pan American World Airways,

Inc. and Pan Am Corporation (collectively, "Pan Am") in certain

trademarks, trade names and service marks and worldwide

registrations therefor (collectively, the "Marks"), together with

the considerable goodwill of the business of Pan Am symbolized

thereby or associated therewith (including, without limitation,

all claims and rights of recovery for infringement of the Marks

and all of Pan Am's rights as Licensor of the Marks, and all

registrations, applications and other rights associated with the

foregoing, whether issued or pending), and certain tangible items

RECEIVED
- 3 1993
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

used in connection with the operation of Pan Am's business, as
further described in the Agreement (collectively, the "Property,"
as defined in the Agreement); and upon the proceedings held on
the Motion on December 2, 1993 (the "Hearing"), at which an
auction was conducted among Cobb and three additional bidders
appearing by counsel on that date, one of which was Eclipse
Holdings, Inc. ("Eclipse"); and Eclipse having made the winning
bid of $1,325,000 in cash for the Property, such offer to include
a non-refundable deposit of $132,500 (the "Eclipse Deposit") due
by wire transfer at 5:00 p.m. on Friday, December 3, 1993, with
closing to occur no later than fifteen (15) days after entry of
this Order (the "Eclipse Offer"), the Eclipse Deposit being
secured by a check in the above amount endorsed and given to Pan
Am at the Hearing pursuant to representations made by counsel for
Eclipse on the record thereof; and it being understood and agreed
by Eclipse that its bid is upon substantially the same terms and
conditions as set forth in the Agreement, as modified by a letter
dated November 29, 1993 from Paul A. Rendich, General Counsel of
Pan Am, to counsel for Cobb, which as described by counsel for
Pan Am on the record of the Hearing, sets forth certain
clarifications relating to the Agreement (the "Rendich Letter"),
a copy of which is annexed hereto as Exhibit B (the Rendich
Letter and the Agreement collectively referred to herein as the
"Enhanced Agreement"); and it appearing that the Eclipse Offer is
the highest and best offer for the Property; and it appearing
that the Eclipse Offer was made in good faith as part of a fair

2

auction of the Property; and it appearing that the sale of the Property to Eclipse (the "Sale") is fair, reasonable and in the best interests of creditors and Debtors' estates; and it appearing that the Sale encompasses and includes all of the considerable goodwill which is associated with the Marks; and Cobb having agreed on the record to have its last bid of $1,200,800 for the Property stand second to the Eclipse Offer and remain open on that basis until 6:00 p.m. on Friday, December 3, 1993, secured by the non-refundable deposit of $60,000 previously transmitted to Pan Am pursuant to the Agreement; and the Official Committee of Unsecured Creditors and the Ad Hoc Committee of Administrative and Priority Creditors having no objection; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges (July 10, 1984) (Ward, Acting C.J.); and notice of the Motion having been served on all those having filed a notice of appearance in the above-captioned proceeding; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, that the Sale is approved pursuant to section 363 of the Bankruptcy Code, and that the Debtors be, and hereby are, authorized to take all steps and to execute, deliver and perform any and all agreements, documents and instruments necessary and appropriate to consummate the Sale, including but not limited to entering into a purchase agreement with Eclipse upon substantially the same terms and conditions as the Enhanced Agreement, provided, however, that the purchase

3

price shall be $1,325,000 in cash, as described herein; and it is further

ORDERED, that pursuant to section 363(f) of the Bankruptcy Code, Pan Am be, and hereby is, authorized to sell, transfer and deliver the Property to Eclipse free and clear of all liens, claims, interests and encumbrances, except as specifically described in the Agreement, and Eclipse shall acquire the Property pursuant to section 363(f) of the Bankruptcy Code, free and clear of all liens, claims, interests and encumbrances, except as specifically described in the Agreement, with existing liens, if any, to attach to the proceeds of the Sale; and it is further

ORDERED, that Eclipse shall be entitled to the protection of section 363(m) of the Bankruptcy Code with respect to the Sale in the event this Order or any authorization contained herein is reversed or modified on appeal; and it is further

ORDERED, that pursuant to section 1146(c) of the Bankruptcy Code, the Sale shall be exempt from any and all stamp, value-added, transfer, recording and other similar taxes (other than income taxes), any transfer or recording fees or other similar costs incurred or assessed by any federal, state, local or foreign taxing authority (including interest and penalties, if any) in connection with the Sale; and it is further

ORDERED, that this Court shall retain jurisdiction to implement and enforce the terms and provisions of this Order and

4

the agreement to be entered into between Pan Am and Eclipse pursuant thereto, including any disputes relating thereto or with respect to the proceeds of the Sale, the sale, transfer and/or delivery of the Property, and Eclipse's peaceful use and enjoyment thereof after the closing of the Sale, free and clear of all encumbrances.

Dated:    New York, New York
          December 3, 1993

_Cornelius Blackshear_
UNITED STATES BANKRUPTCY JUDGE

NO OBJECTION TO ENTRY
OF THE FOREGOING ORDER:

MARCUS MONTGOMERY WOLFSON & BURTEN P.C.

By: _Marc E. Richards_
    Marc E. Richards (MR 9465)
    A Member of the Firm

Counsel for the Official
    Committee of Unsecured
    Creditors

5

# Exhibit K



## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into this 20th day of December, 1993, by and among COBB PARTNERS, INC, a Florida corporation, or any assign controlled by Charles E. Cobb, Jr. (collectively, the "Purchaser"), ECLIPSE HOLDINGS, INC, a Maryland Corporation (the "Seller"), and David Lockwood, David Scott and Richard Bartel (collectively, the "Principal Shareholders").

WHEREAS, on December 3, 1993 the Seller obtained the rights to acquire certain Assets (as defined below) pursuant to an Order (the "Order") of the Bankruptcy Court of the Southern District of New York (the "Bankruptcy Court") dated December 3, 1993; and

WHEREAS, pursuant to the Order, the Seller anticipates entering into a Purchase Agreement (the "Pan Am Agreement") with Pan American World Airways and Pan Am Corporation (together "Pan Am") whereby Seller will acquire from Pan Am the Marks, the Property and the Additional Property, as defined in the Pan Am Agreement (collectively, the "Assets"), subject to the terms and conditions set forth in the Pan Am Agreement.

WHEREAS, the Sellers and the Principal Shareholders have agreed to sell or cause the sale and transfer of the Assets to the Purchaser, and the Purchaser has agreed to purchase and accept the rights to such Assets, subject to the terms of this Agreement and the Pan Am Agreement.

NOW THEREFORE, in consideration of the premises and the mutual agreements, representations, warranties, covenants and understandings hereinafter set forth, the parties hereto agree as follows:

1.   PURCHASE AND SALE OF ASSETS. Subject to the condition set forth in paragraph 6(a) hereof, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases and accepts delivery of, all of Seller's right, title and interest in and to the Assets, including, without limitation, all rights and interest of any kind or nature relating to any and all claims or causes of actions of the Seller and the Principal Shareholders with respect to the Assets.

2.   PURCHASE PRICE AND PAYMENT.

a.   Upon the terms and conditions set forth in this Agreement, the Purchaser agrees to pay the following purchase price for the Assets (the "Purchase Price"):

(i)   $50,000 in cash payable to the Seller (the "Eclipse Payment"); and

Monday, December 20, 1993  6:25pm
KL2:40073.4

(ii) $1,325,000 in cash payable to Pan Am (the "Pan Am Payment").

b.   Through wire transfer to Pan Am's Account Number at the Bank of New York #89-001-96-270 or as Pan Am shall otherwise direct, the Purchaser shall transmit to Pan Am the Pan Am Payment at 9:00 a.m. on December 20, 1993.

c.   Through check or wire transfer to the account of the Sellers' attorneys in New York, the Purchaser shall deliver the ~~Eclipse Payment upon satisfaction of the conditions set forth in~~ Section 6.

3.   REPRESENTATIONS AND WARRANTIES OF THE SELLER AND THE PRINCIPAL SHAREHOLDERS.  In order to induce the Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller and the Shareholders hereby jointly and severally represent and warrant to the Purchaser as follows:

3.1 Corporate Status.   The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland, and has all requisite corporate power and authority to own, operate and lease its properties and assets, to carry on its business as it is now being conducted, to execute, deliver and perform its obligations under this Agreement and transfer the Assets to the Purchaser.  The Seller is duly qualified to do business, and is in good standing, in all jurisdictions in which it is required by laws it to be so qualified.  The Shareholders are the principal shareholders of the Seller, collectively owning in excess of 90% of all issued and outstanding capital stock.

3.2 Authority.

(a)  The execution, delivery and performance by the Seller of this Agreement and of each and every document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all necessary corporate action of the Seller.  This Agreement has been duly executed and delivered by the Seller and constitutes (and, when executed and delivered, each such other documents and instruments will constitute) a valid and binding obligation of such Seller, enforceable against each Seller in accordance with its terms.

(b)  Each of the Shareholders has the full power of authority to execute, deliver and perform this Agreement and each and every document and instrument contemplated hereby.  This Agreement has been executed and delivered by the Shareholders and constitutes a valid and binding obligation of the Shareholders, enforceable in accordance with its terms.

(c)  Conflict With Instruments; Consents.  Neither the execution and delivery by the Seller or the Shareholders of this

Monday, December 20, 1993  6:18pm
KL2:40073.4

—2—

Agreement nor the consummation by the Seller of the Shareholders of the transactions contemplated hereby, nor compliance by the Seller or the Shareholders with any of the provisions hereof, will (i) conflict with or result in a breach of any provision of the Articles of Incorporation or Bylaws of the Seller, (ii) result in the breach of, or conflict with, any of the terms and conditions of, or constitute a default (with or without the ~~giving of notice~~ or the lapse of time or both) with respect to, or result in the cancellation or termination of, or the acceleration of the performance of any obligations or of any indebtedness under any ~~contract, agreement, commitment, indenture, mortgage, note, bond,~~ license or other instrument or obligation to which any of the Seller or the Shareholders or any of the Assets may by bound or affected, (iii) result in the creation of a lien, security interest, charge or encumbrance upon any of the Assets, or (iv) violate any law or any rule or regulation of any administrative agency or governmental body, or any order, writ, injunction or decree of any court, administrative agency or governmental body to which any of the Seller, the Shareholders or the Assets may be subject. Except with respect to the approval of the Bankruptcy Court which may be necessary, no approval, authorization, consent or other order or action of, or filing with or notice to any court, administrative agency or other governmental authority, or any other person; is required for the execution and delivery by the Seller or the Shareholders of this Agreement or the consummation by any of them of the transactions contemplated hereby.

3.3   <u>Litigation, Etc.</u>   To the best knowledge of the Seller and the Shareholders, except for a possible claim by Lupowitz, Inc. or Sam Lupowitz, there is no litigation, suit, proceeding, action, claim or investigation at law or in equity, pending, or, threatened against, or affecting in any way the Assets, the Seller or the Seller' ability sell and transfer the Assets or perform the obligations as contemplated by this Agreement. As of the closing of the transactions contemplated hereby neither the Seller, the Shareholders (nor any of the Assets if the condition set forth in paragraph 6(a) are not satisfied) is subject to any restriction, order, writ, injunction or decree of any court or any federal, state, municipal or other governmental authority, department, commission, board, bureau, agency, or other instrumentality affecting the consummation of the proposed transaction.

3.4   <u>Ownership and Condition of Assets.</u>

(a)   Subject to the terms of the Order, the Pan Am Agreement, Section 3.3 hereof and any subsequent order of the Bankruptcy Court, the Seller has good, valid and marketable title to the Assets, free and clear of any and all liens, encumbrances, mortgages, security interests, pledges, claims, or other restrictions or charges whatsoever.

(b)   Except as set forth herein, the Principal Shareholders have not, directly or indirectly, acquired any right, title or interest in or to any of the Assets.

(c) Except as set forth herein or in the Pan Am Agreement, neither the Seller nor the Principal Shareholders have granted to any person any license or right, whether exclusive or nonexclusive, to assemble, market, sell, lease, license or distribute the Assets or any products relating to the Assets, and has not sold, transferred, assigned or conveyed any or its right, title and interest, or any option to purchase or acquire any of its right, title or interest, in and to any of the Assets.

4. <u>Covenants of the Seller and the Principal Shareholders.</u> To induce the Purchaser to enter into this Agreement and perform the transactions contemplated hereby, the Seller and each Principal Shareholder promise, covenant and agree with the Purchaser as follows:

(a) Upon the request of Purchaser, and without further consideration, the Seller and each Principal Shareholder, shall do, execute, acknowledge and deliver all such further acts, assignments, assurances, as may be reasonably necessary or desirable, in the sole and absolute discretion of the Purchaser, to consummate the transactions contemplated hereby and confirm in the Purchaser the benefits of the rights acquired herein including, without limitation, attending the closing scheduled for December 20, 1993 at the offices of Kramer Levin (Seller's counsel, 919 Third Ave, 40th Floor, New York, NY 10022) or at Pan Am.

5. <u>Covenants of the Purchaser.</u> To induce the Seller to enter into this Agreement and as a condition to the conveyance of the Assets to Purchaser, the Purchaser promises, covenants and agrees with the Seller as follows:

(a) Together with the Seller, the Purchaser shall instruct Pan Am to refund to the Seller the deposit in the amount of $132,500 (the "Refund") held by Pan Am pursuant to the Court Order and the Pan Am Agreement. Seller shall use the Refund to make an offer to its investors to refund any investment relating to the Pan Am Agreement. The Refund shall be held in escrow by New York counsel for Seller until the condition in Section 6(c) has been satisfied or waived.

(b) Upon transfer of the Assets to Purchaser in accordance with this Agreement or the court order referred to in paragraph 6(a), Purchaser shall deliver a Letter of Intent in the form attached as Exhibit A. the ("Letter of Intent").

6. <u>Conditions to the Transfer of Funds.</u> The obligation of the Purchaser to transfer and deliver (i) the Pan Am Payment shall be subject to the condition set forth in (a) below and (ii) the Eclipse Payment shall be subject to each of the following conditions, subject to the right of the Purchaser, with respect to (i) and (ii), to waive any one or all of such conditions:

(a)  Entry by the Bankruptcy Court of an order modifying the Order, substituting Purchaser for Seller as the party with the rights to acquire the Assets from Pan Am.

(b)  As of 12:00 noon on December 20, 1993, no person shall have filed and served any litigation or protest relating to the sale and transfer of the Assets to the Purchaser; and

(c)  The Seller shall have received the written consent of all shareholders of the Seller (and any persons holding any ~~options or rights to become shareholders, if any) (collectively,~~ the "Interested Parties") to the transactions contemplated by this Agreement, and such consent shall contain a waiver of all rights and interests of the Interested Parties with respect to the Assets.

(d)  This Agreement shall terminate automatically and without notice if the transactions contemplated hereby have not closed by 5 p.m. on January 7, 1994, except the provisions of Section 12 which shall survive termination.

7.  **MISCELLANEOUS.**

7.1  _Entire Agreement._  This Agreement and the Letter of Intent constitute the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior negotiations, understandings, agreements, arrangements and understandings, both oral and written, among the parties hereto with respect to such subject matter.

No Third Party Beneficiary.  Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person, firm, corporation, partnership, association or other entity, other than the parties hereto and their respective successors and assigns, any rights or remedies under or by reason of this Agreement.

7.2  _Severability._  The invalidity of any one or more of the words, phrases, sentences, clauses, sections or subsections, contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall be declared invalid by a court of competent jurisdiction, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, section or sections, or subsection or subsections had not been inserted.

7.3  _Counterparts._  This Agreement may be executed in any numbers of counterparts and by the separate parties hereto in separate counterparts, each of which shall be deemed to be one and the same instrument.

Monday, December 20, 1993  6:18pm
KL2:40073.4

—5—

7.4 <u>Notices.</u>    All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed to have been duly given, when delivered by hand or five(5) days after deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, as follows:

If to the Purchaser:

COBB PARTNERS INC.
2533 Ponce de Leon Boulevard
Penthouse 1111
Coral Gables, Florida 33134
Attn: Charles E Cobb, Jr.
Chairman and CEO

With a copy to:

Greenberg, Traurig, Hoffman,
Lipoff, Rosen, & Quentel, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Attn: Fernando C. Alonso

If to the Seller:

ECLIPSE HOLDINGS, INC.
100 Park Ave., Suite 260
Rockville, Md. 20850-2618

If to the Principal
Shareholders:

David Lockwood
100 Park Ave., Suite 260
Rockville, Md. 20850-2618

Richard Bartel
100 Park Ave., Suite 260
Rockville, Md. 20850-2618

David Scott
1522 K Street, NW
4th Floor
Washington, DC 20005

8.    <u>Successors and Assigns.</u>  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. None of the parties hereto shall assign any of its right or obligations hereunder except to a subsidiary or affiliate or with the express written consent of the other parties hereto.

9.    <u>Applicable Law.</u> This Agreement shall be governed by, and shall be construed, interpreted and enforced in accordance with, the internal laws of the State of Florida.

10.    <u>Confidentiality.</u> Except to the extent required for any party to obtain any approvals or consents required by the terms

hereof or as required by a Court of law, no party hereto shall divulge the existence of the terms of this Agreement, the transactions contemplated hereby or any information about another party that such party may have acquired in connections with the transaction, without the prior written approval of all of the parties hereto.

11.  <u>Attorneys' Fees.</u>  In the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the parties hereto agree that the prevailing party or parties shall be entitled to recover from the other party or parties upon final judgment by a court of competent jurisdiction on the merits reasonable attorneys' fees and expenses, including attorney's fees and expenses for any appeal, and costs incurred in bringing such suit or proceeding.  The Seller and the Principal Shareholders acknowledge and agree that the Purchaser shall have the right to offset from the Eclipse Payment all sums representing harm or damages suffered by the Purchaser from any representation or warranty by the Principal Shareholders or the Seller which are inaccurate or false in any respect, provided however that (i) such right of offset shall terminate 21 days after the closing of the transactions hereunder and (ii) during such 21 days the Seller may use the proceeds of the Eclipse Payment to pay the Seller's direct liabilities.

12.  <u>Release and Hold Harmless.</u>  With the exception of the rights and obligations hereunder or under the Letter of Intent, the parties hereto acknowledge and agree that they are hereby extending to each other a full mutual general release of all claims of any kind held by such parties against the others arising prior to the date hereof.  Each Principal Shareholder acknowledges and agrees that he has no direct interest in, lien on or claim against any of the Assets.  Any warranties or representations of David Scott are with respect to his best knowledge and belief.

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement on the date first above written.

SELLER
ECLIPSE HOLDINGS, INC

By: _____
David Lockwood, President

_____
David Lockwood, Principal Shareholder

_____
David Scott, Principal Shareholder

Monday, December 20, 1993  6:18pm                    —7—
KL2:40073.4

hereof or as required by a court of law, no party hereto shall divulge the existence of the terms of this Agreement, the transactions contemplated hereby or any information about another party that such party may have acquired in connections with the transaction, without the prior written approval of all of the parties hereto.

11.   Attorneys' Fees.   In the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the parties hereto agree that the prevailing party or parties shall be entitled to recover from the other party or parties upon final judgment by a court of competent jurisdiction on the merits reasonable attorneys' fees and expenses, including attorney's fees and expenses for any appeal, and costs incurred in bringing such suit or proceeding.   The Seller and the Principal Shareholders acknowledge and agree that the Purchaser shall have the right to offset from the Eclipse Payment all sums representing harm or damages suffered by the Purchaser from any representation or warranty by the Principal Shareholders or the Seller which are inaccurate or false in any respect, provided however that (i) such right of offset shall terminate 21 days after the closing of the transactions hereunder and (ii) during such 21 days the Seller may use the proceeds of the Eclipse Payment to pay the Seller's direct liabilities.

12.   Release and Hold Harmless.   With the exception of the rights and obligations hereunder or under the Letter of Intent, the parties hereto acknowledge and agree that they are hereby extending to each other a full mutual general release of all claims of any kind held by such parties against the others arising prior to the date hereof.   Each Principal Shareholder acknowledges and agrees that he has no direct interest in, lien on or claim against any of the Assets.   Any warranties or representations of David Scott are with respect to his best knowledge and belief.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement on the date first above written.

SELLER
ECLIPSE HOLDINGS, INC

By: _____
David Lockwood, President


_____
David Lockwood, Principal Shareholder

_____
David Scott, Principal Shareholder

Richard Bartel, Principal Shareholder

PURCHASER
COBB PARTNERS, INC.

By: _____
Charles E. Cobb, Jr., Chairman
and CEO

PRINCIPAL SHAREHOLDERS

Richard Bartel
_____

David Lockwood
_____

David Scott
_____

Monday, December 20, 1993  6:18pm
KLZ:40073.4

—8—

DEC 27 '99  05:47PM KRAMER LEVIN NESSEN KAMIN                    P. 924

_(signature)_

Richard Bartel, Principal Shareholder.

PURCHASER
COBB PARTNERS, INC.

By: _____
Charles E. Cobb, Jr., Chairman
and CEO

PRINCIPAL SHAREHOLDERS

_(signature)_

Richard Bartel

David Lockwood

_(signature)_

David Scott

Monday, December 20, 1995  4:16pm
K12:60075.4

-8-

TOTAL P.18

_(signature)_

Richard Bartel, Principal Shareholder

**PURCHASER**
COBB PARTNERS, INC.

By: _____
Charles F. Cobb, Jr., Chairman
and CEO

**PRINCIPAL SHAREHOLDERS**

_(signature)_

Richard Bartel

David Lockwood

David Scott

Monday, December 20, 1993  6:11pm
KL2:40073.4

- 8 -

# Exhibit L



COBB PARTNERS, INC.
2333 Ponce de Leon Boulevard
Penthouse 1111
Coral Gables, Florida  33134

December 29, 1993

David Lockwood, President
Eclipse Holdings, Inc,
100 Park Avenue
Suite 260
Rockville, MD 20850-2618

Dear Mr. Lockwood:

     Reference is made to that certain Asset Purchase
Agreement, dated December 20, 1993, between Cobb Partners, Inc.
("Cobb Partners") and Eclipse Holdings, Inc. ("Eclipse") (the
"Purchase Agreement").  Pursuant to Section 6 of the Purchase
Agreement, Cobb Partners hereby waives the condition set forth in
subsection 6(a) of the Purchase Agreement and confirms that
(based upon the representation of Eclipse in the following
paragraph) the conditions in subsections 6(b)and (c) of the
Purchase Agreement have been satisfied.  This letter shall not be
construed as a waiver of any other term or condition of the
Purchase Agreement.

     Reference is also made to that certain Purchase
Agreement, dated December 20, 1993, (the "Pan Am Agreement")
between Pan American World Airways, Inc. and Eclipse.

     Eclipse represents and warrants that the persons and
entities listed below constitute all of the shareholders of
Eclipse, all persons and entities holding any options or rights
to become shareholders and there are no other persons known to
Eclipse ~~or anybody acting for them~~ to be investors relating to the
Pan Am Agreement or the Assets (as defined in the Pan Am

Agreement):

David H. Lockwood
Richard C. Bartel
Dana McKinley
Michael Maw
International Development &
  Enterprise Alliance, Inc.
Taihang-IDEA, Inc.
Deja A.S. Lockwood
Audrey Cox
David Scott

Cobb Partners hereby agrees to cause the $50,000 cash payment referenced in subsection 2a(i) of the Purchase Agreement to be wire-transferred to an account specified by Eclipse on the date hereof.

Eclipse and Cobb Partners hereby agree that the "Purchaser" under the Purchase Agreement shall be Pan American World Airways, Inc., a Delaware corporation.

The parties hereto agree that the disclosure of (i) the portions of the Purchase Price set forth in paragraph 2(ii) of the Purchase Agreement or (ii) the Letter Agreement (as defined in the Purchase Agreement) shall not be deemed to be a breach of Section 10 of the Purchase Agreement.

Very truly yours,

COBB PARTNERS, INC.

By _____
Charles E. Cobb, Jr., President

Accepted and Agreed to this
29th day of December, 1993.

ECLIPSE HOLDINGS, INC.

By: _____
David H. Lockwood, President

2

# Exhibit M

## TRADEMARK ASSIGNMENT

WHEREAS, Pan American World Airways, Inc., a New York corporation having a principal place of business at 111 Broadway, New York, New York 10006 (hereinafter referred to as "Pan Am") has adopted and used worldwide the trademarks and service marks identified in Schedule 1 hereto (hereinafter referred to as "The Marks");

WHEREAS, Pan Am has registered The Marks in the United States and various countries throughout the world as indicated in Schedule 1 hereto (hereinafter referred to as "The Registrations");

WHEREAS, Pan Am has previously sold, transferred and conveyed all of its right, title and interest in and to The Marks and the Registrations to Eclipse Holdings, Inc., a Maryland corporation ("Eclipse");

WHEREAS, Pan American World Airways, Inc., a Delaware corporation, (hereinafter referred to as "Purchaser") as assignee of Cobb Partners, Inc., a Florida corporation, is desirous of acquiring The Marks and The Registrations;

NOW, THEREFORE:

In consideration and in exchange for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Eclipse does hereby sell, assign, transfer and set over to said Purchaser its entire right, title and interest in and to The Marks together

with the goodwill of the business associated therewith and The
Registrations.

ECLIPSE HOLDINGS, INC.

Dated: 12-29-93

By: David H Lockwood
Name: David H. Lockwood
Title: President

PAN AMERICAN WORLD AIRWAYS, INC.
(Delaware)

Dated: 12-29-93

By: _____
Name: CHARLES E. COBB JR.
Title: CHAIRMAN

TRADEMARK
REEL 1094 FRAME 203

2

## CORPORATE ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     :ss.:
COUNTY OF NEW YORK  )

On the 29th day of December, in the year one thousand nine hundred and ninety three before me personally came David H. Lockwood, to me known, who being by me duly sworn, did depose and say that he resides at 3148 Gershwin Lane, Silver Spring, MD 20904 and is the President of Eclipse Holdings, Inc., the assignor above named, and acknowledged that he executed the foregoing Assignment on behalf of said assignor and pursuant to authority duly received.

_Jill M Siciliano_
Notary Public

**JILL M. SICILIANO**
**Notary Public, State of New York**
**No. 5002018**
**Qualified in Westchester County**
**Certificate Filed in New York County**
**Commission Expires Sept. 21, 19_94_**

REEL 1094 FRAME 204

TRADEMARK

3

SCHEDULE 1 TO TRADEMARK ASSIGNMENT

ATTACHED TO TRADEMARK AGREEMENT AS
EXHIBIT A

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Venezuela | PAN AMERICAN WORLD AIRWAYS | 50 D.C. | 22.170-D | January 21, 1987 | January 21, 2002 |
| | PAN AM within Globe Design | 50 D.C. | 22.171-D | January 21, 1987 | January 21, 2002 |
| | SLEEPERETTE | 50 D.C. | 22.172-D | January 21, 1987 | January 21, 2002 |
| | WORLDPASS | 50 D.C. | 22.173-D | January 21, 1987 | January 21, 2002 |
| | PAN AM | 38 | 137.402-M | February 22, 1989 | February 22, 2004 |
| Viet Nam | PAN AM | 12 & 16 | 11122 | June 19, 1974 | June 19, 1989 |
| Yugoslavia | PAN AM | 38 & 39 | 23 332 | November 10, 1974 | November 10, 1998 |
| Zaire | PAN AM | 39 | 04717 | June 12, 1975 | infinite |
| Zambia | PAN AM | 12 | 162/74 | December 27, 1974 | April 3, 1995 |

10/21/93

REEL 0 9 4 FRAME 2 0 5

TRADEMARK

SCHEDULE 1 TO TRADEMARK ASSIGNMENT

ATTACHED TO TRADEMARK AGREEMENT
AS EXHIBIT A

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| African & Malagasy Union (Benin, Cameroun, Central African Republic, Chad, Congo-Brazzaville, Gabon, Ivory Coast, Mali, Malagasy, Mauritania, Niger, Senegal, Togo, Zaire) | PAN AM | 39 | 64481 | August 25, 1974 | August 26, 1994 |
| Argentina | PAN AM | 39 | 1.082.827 | July 18, 1984 | July 19, 1994 |
| | PAN AM with Globe | 7, 9, 12, 17 | 1.115.051/4 | February 12, 1985 | February 12, 1995 |
| | PAN AM with Globe | 6, 9, 10, 11, 19, 20, 21, 4, 24 | 1.251.319/326 | October 13, 1987 | October 13, 1997 |
| | PAN AM with Globe | 1, 5, 8, 11, 12 | 1.078.132, 1.091.737, 1.091.738, 1.203.479, 1.428.731 | May 7, 1984, September 10, 1984, September 10, 1984, May 5, 1986, March 31, 1993 | May 7, 1994, September 10, 1994, September 10, 1994, May 5, 1996, March 31, 2003 |
| | PAN AM adjacent Globe | 12, 35, 39 | 969.149, 1.254.437, 1.095.078 | April 7, 1980, November 2, 1987, October 16, 1984 | April 7, 2000, November 2, 1997, October 16, 1994 |
| | PAN AM with Globe | 39, 39, 39 | 1.095.029, 1.095.077, 1.215.411 | October 16, 1984, October 16, 1984, December 9, 1986 | October 16, 1994, October 16, 1994, December 9, 1996 |

REEL 1014 FRAME 0205

**PAN AMERICAN WORLD AIRWAYS, INC.**
**TRADEMARKS**

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Argentina (Cont'd) | PAN AMERICAN WORLD AIRWAYS | 12 | 1.369.711 | December 27,1989 | December 27,1999 |
| | | 4,17,18,12,7 28,9,16 & 25 | 1.128.715 to 723 | April 8, 1985 | April 8, 1995 |
| | | 42 | 1.076.242 | April 11, 1984 | April 11, 1994 |
| | | 35 | 1.075.707/9 | April 6, 1984 | April 6, 1994 |
| | | 18 | 1.014.136 | January 18,1991 | January 18, 2001 |
| | | 39 | 1.225.645 | March 2, 1987 | March 2, 1997 |
| | SLEEPERETTE | 7 | 1.093.494 | October 1, 1984 | October 1, 1994 |
| | | 12 | 1.128.893 | April 8, 1985 | April 8, 1995 |
| | | 20 | 1.080.906 | June 8, 1984 | June 8, 1994 |
| | | 39 | 1.268.635 | February 1, 1988 | February 1, 1998 |
| | PANAMAC | 9 | 1.428.719 | March 31, 1993 | March 31, 2003 |
| Austria | PAN AM with Globe | 19 & 28 | 40.555 | February 3, 1959 | February 3, 1999 |
| Bahamas | PAN AM with Globe | 6 | 3303 | May 3, 1974 | May 3, 1998 |
| | | 50(10) | 3304 | May 3, 1974 | May 3, 1998 |
| Bahrain | PAN AM with Globe | 39 | BM152 | April 27, 1981 | April 27, 1996 |
| Benelux | SLEEPERETTE | 39 | BM102 | February 6, 1980 | February 6, 1995 |
| | PAN AM | 7, 9, 12, 16, 18, & 28 | 65.472 | December 10, 1971 | December 10, 1996 |
| | PAN AM | 7, 9, 12, 16, 18, 21 & 28 | 86559B | March 16, 1959 | Infinite |

TRADEMARK
REEL 0094 FRAME 207

**PAN AMERICAN WORLD AIRWAYS, INC.**
**TRADEMARKS**

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Benelux (Cont'd) | PAN AM | 39 | 155.901 | July 14, 1988 | December 18, 1998 |
| | PAN AM with Globe | 7, 9, 12, 16, 18, 21, 28, 32 & 34 | | | |
| | PAN AM with Globe | 39 | 65.471 | June 8, 1969 | December 10, 1996 |
| | SLEEPERETTE | 39 | 157.926 | October 14, 1988 | December 18, 1998 |
| | SLEEPERETTE | 7, 8, 12, 16, 20, 21, 24 & 25 | 65.474 | December 10, 1971 | December 10, 1997 |
| Bermuda | PAN AM with Globe | 6 & 39 | | July 14, 1988 | December 18, 1998 |
| Bolivia | PAN AM within Globe | 39 | 4255 | October 21, 1958 | October 21, 2000 |
| Brazil | PAN AM | 38.20/30 | 15812-C | September 30, 1991 | September 30, 2001 |
| | PAN AM with Globe | 38.20/30 | 06215696 | January 10, 1976 | January 10, 1996 |
| | SLEEPERETTE | 38.30/40 | 06215700 | January 10, 1976 | January 10, 1996 |
| Bulgaria | PAN AM with Globe | 38 & 39 | 7.074.581 | February 25, 1980 | February 25, 2000 |
| Burma | PAN AM with Globe | | Y-56 | March 22, 1974 | March 22, 1994 |
| | | | | February 11, 1959 | Infinite |

TRADEMARK

REEL 1094 FRAME 208

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| Canada | PAN AM with Globe | | 114.828 | July 31, 1959 | July 31, 2004 |
| Chile | SLEEPERETTE | | 102.863 | March 16, 1971 | March 16, 2001 |
| | PAN AM adjacent Globe | 39<br>16 | 360.718<br>357.082 | March 23, 1960<br>March 23, 1960 | October 6, 2000<br>October 6, 2000 |
| | PAN AMERICAN WORLD AIRWAYS | 39 | 360.719 | October 9, 1967 | October 9, 2000 |
| | PAN AM within Globe | 16 | 363.394 | January 7, 1991 | January 7, 2001 |
| China<br>(The People's Republic<br>of China) | PAN AM | 19-airplanes,<br>autos, buses,<br>trucks | 159.089 | June 30, 1982 | June 29, 1992 |
| | | 21-(metal)<br>signs | 159.094 | June 30, 1982 | June 29, 1992 |
| | | 30-(plastic)<br>tags | 159.100 | | |
| | | 52-luggage,<br>passport cases | 159.105 | | |
| | | 59-stationery,<br>invoices,<br>menus | 159.109 | June 30, 1982 | June 29, 1992 |

TRADEMARK

REEL 1094 FRAME 209

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION DATE OF | EXPIRATION |
|---|---|---|---|---|---|
| China (Cont'd) | | 63-newspapers, mags, models, paper, decals | 159.114 | | |
| | GLOBE DESIGN and PAN AM | 19159.090 | | | |
| | | 21 | 159.093 | | |
| | | 30 | 159.101 | | |
| | | 52 | 159.104 | | |
| | | 59 | 159.110 | | |
| | | 63 | 159.113 | | |
| | | 64-playing cards | 159.122 | | |
| | | 72-matches, lighters | 159.123 | | |
| | PAN AM with GLOBE | 19 | 159.091 | | |
| | | 21 | 159.092 | | |
| | | 30 | 159.102 | | |
| | | 52 | 159.103 | | |
| | | 59 | 159.111 | | |
| | | 63 | 159.112 | | |
| | | 74-insignias | 159.124 | | |
| | THEATRE-IN-THE-AIR | 14-projectors | 159.084 | June 30, 1982 | June 29, 1992 |
| | | 63-motion pictures | 159.121 | | |
| | SLEEPERETTE | 21-(metal) signs | 159.097 | June 30, 1982 | June 29, 1992 |
| | | 58-reclining chair | 159.106 | | |
| | | 63-printed matter | 159.120 | | |

TRADEMARK
REEL 1094 FRAME 210

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| China (Cont'd) | PANAMAC | 16-computer equipment for communications | 159.086 | | |
| | | 63 | 159.118 | | |
| | | PANTRAC | 16 | | |
| | | 63 | 159.119 | 159.087 | |
| | PANACOM | 16 | 159.085 | | |
| | | 63 | 159.117 | | |
| | FALCON | 19 | 159.088 | | |
| | | 21 | 159.096 | | |
| | | 30 | 159.099 | June 30, 1982 | June 29, 1992 |
| | | 59 | 159.108 | | |
| | | 63 | 159.116 | | |
| Costa Rica | PAN AM with Globe | TM | 15680 | July 7, 1972 | Infinite |
| | | CM | 45.328 | December 6, 1972 | Infinite |
| | Globe/PAN AM | TM | 15678 | July 7, 1972 | Infinite |
| | | CM | 45.326 | December 6, 1972 | Infinite |
| | PAN AM CARGO | TM | 15679 | July 7, 1972 | Infinite |
| | | CM | 45.327 | December 6, 1972 | Infinite |
| Czechoslovakia (Slowakische Republik) (Tschechische Republik) | PAN AM | 39 | 155.980 | January 3, 1964 | January 3, 1994 |
| | PAN AM within Globe | 39 | 155.979 | January 3, 1964 | January 3, 1994 |
| | SLEEPERETTE | 39 | 155.977 | January 3, 1984 | January 3, 1994 |

REEL 1094 FRAME 211

TRADEMARK

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Denmark | PAN AM within Globe | 12, 39 | 2170/64 | June 13, 1964 | June 13, 1994 |
| | PAN AM with Globe | 7, 12 & 16 | 2137/59 | November 14, 1959 | November 14, 1999 |
| | SLEEPERETTE | 12 & 39 | 1/64 | January 4, 1964 | January 4, 1994 |
| Dominican Republic | PAN AM within Globe | 70 | 349 | September 11, 1959 | September 10, 1959 |
| Fiji | PAN AM | 39, 16, 13 | 2830/40/1/2/3/4 | December 15, 1959 | December 15, 2001 |
| | PAN AM with Globe Device | 37, 38, 50, 25 | 2038 | December 15, 1959 | December 15, 2001 |
| Finland | PAN AM with Globe / PAN AM | 28, 31 & 35 | 35 481 / 58 495 | July 14, 1960 / June 22, 1961 | July 14, 2000 / June 22, 2001 |
| France | PAN AM with Globe | 7, 9, 12, 16, 18, 28, & 35-42 | 1058.640 (1 474 563) | August 5, 1968 | July 17, 1998 |
| | PAN AM | 7 thru 42 | 1058.641 (1 474 558) | August 5, 1968 | July 17, 1998 |
| | PAN AMERICAN WORLD AIRWAYS | 7 thru 42 | 1058.642 (1 474 559) | August 5, 1968 | July 4, 1998 |
| | SLEEPERETTE | 20,39 & 42 | 1058.661 (1474564) | August 5, 1968 | July 4, 1998 |
| | THEATRE-IN-THE-AIR | | 1058.652 (1474562) | August 5, 1968 | July 17, 1998 |

REEL 1094 FRAME 212
TRADEMARK

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| France (cont'd.) | PANAMAC | 12, 38, 39 & 42 | 1073.823 (1474565) | August 5, 1968 | July 4, 1998 |
| | PANTHERE | 35, 38, 39, 42 | 1271.538 | March 27, 1984 | March 27, 1994 |
| Germany | PAN AM | 18 | 876.518 | December 28, 1970 | March 23, 1998 |
| | | 12 | 857.596 | May 20, 1969 | March 22, 1998 |
| | | 39 | 993.748 | November 23, 1979 | April 2, 1999 |
| | PAN AM Adjacent Globe | 25 | 1.120.759 | July 22, 1987 | July 22, 1997 |
| | PAN AM within Globe | 12, 16, 18 & 28 | 737.979 | June 30, 1960 | February 12, 1999 |
| | | 39 | 993.724 | November 22, 1979 | April 2, 1999 |
| | | 25 | 1.120.757 | July 22, 1987 | July 22, 1997 |
| | SLEEPERETTE | 10 | 641.250 | July 7, 1953 | October 18, 2001 |
| | | 39 | 996.804 | January 26, 1980 | April 2, 1999 |
| | PANTHER | 39 | 1.068.501 | September 25, 1984 | September 25, 1994 |
| | | 35, 38 & 42 | 1.271.538 | March 27, 1984 | March 27, 1994 |
| Ghana | PAN AM with Globe | 39 | 9440 | April 19, 1959 | April 9, 2001 |
| Great Britain | PAN AM | | | December 26, 1961 | December 26, 1991 |
| | PAN AM with Globe | | | April, 1970 | December, 2000 |

REEL 1094 FRAME 213

TRADEMARK

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Greece | PAN AM | 12 | 52.783 | May 22, 1974 | May 22, 1994 |
| Guatemala | PAN AM with Globe | 12 | 11.792 | December 9, 1959 | June 15, 1999 |
| | | 21 | 11.793 | December 9, 1959 | June 15, 1999 |
| | | 35 & 42 | 11.794 | December 9, 1959 | June 15, 1999 |
| | | 14 | 11.850 | December 9, 1959 | June 15, 1999 |
| | | 25 | 11.851 | December 9, 1959 | June 15, 1999 |
| Guyana | PAN AM with Globe | 12 | 4519A | July 29, 1959 | July 29, 1994 |
| | | 16 | 4524A | July 29, 1959 | July 29, 1994 |
| Honduras | PAN AM | 39 | 90 | May 16, 1980 | May 16, 2000 |
| | SLEEPERETTE | 10 | 6148 | April 25, 1962 | April 25, 1992 |
| Hong Kong | PAN AM with Globe | 12 | 125 | February 10, 1960 | September 11, 1994 |
| | | 16 | 1228 | December 1, 1965 | June 3, 2000 |
| | | 18 | 1229 | December 1, 1965 | June 3, 2000 |
| Hungary | PAN AM | 39 | 119.641 | November 27, 1967 | November 27, 1997 |
| | PAN AM with Globe | 38 | 119.640 | November 27, 1967 | November 27, 1997 |
| | | 22 | 90 | October 2, 1979 | May 16, 1990 |
| | PANAMAC | 12 | 120.082 | March 26, 1968 | March 26, 1997 |
| | | 16 | 119.642 | November 27, 1967 | November 27, 1997 |

REEL 1094 FRAME 214
TRADEMARK

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Hungary (cont'd.) | THEATRE-IN-THE-AIR | 38 & 41 | 119.644 | November 27, 1967 | November 27, 1997 |
| Iceland | PAN AM with Globe | 35, 38 & 39 | 38/1959 | April 18, 1959 | April 18, 1999 |
| | SLEEPERETTE | 39 | 86/1951 | September 18, 1951 | September 18, 2001 |
| India | Pan Am with Globe | 16 | 18354 | March 5, 1973 | March 4, 1997 |
| Indonesia | Pan Am with Globe | 16,18,34 | 265.605 | March 18, 1980 | February 6, 2001 |
| Iran | PAN AM with Globe | 12, 35 | 18 891 | January 14, 1959 | January 15, 1999 |
| | SLEEPERETTE | 12, 35 | 18 893 | January 14, 1959 | January 15, 1999 |
| Ireland | PAN AM with Globe | 12 | 62 352 | December 23, 1958 | December 22, 2000 |
| | | 16 | 62 353 | December 23, 1958 | December 22, 2000 |
| Israel | PAN AM | 39 | 39007 | April 3, 1974 | April 3, 1994 |
| | | 42 | 39009 | April 3, 1974 | April 3, 1994 |
| | PAN AMERICAN | 39 | 39008 | April 3, 1974 | April 3, 1994 |
| | | 42 | 39010 | April 3, 1974 | April 3, 1994 |
| Italy | SLEEPERETTE | 20 & 39 | 39812C/77 | January 28, 1977 | January 28, 1997 |
| | PAN AM within Globe | 9,11,13,14, 12, 16, 17 & 20 | 363 322 | December 4, 1958 | December 4, 1998 |

REEL 1091 FRAME 215

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Jamaica | PAN AM with Globe | 12 | 7867 | August 31, 1959 | August 30, 1994 |
| Jordan | PAN AM with Globe | 12 | 6349 | May 29, 1962 | May 28, 1993 |
| | | 12 | 6348 | May 29, 1962 | May 28, 1993 |
| Kenya | PAN AM | 12 | 20938 | March 11, 1974 | March 11, 1995 |
| Korea (South) | PAN AM | 108 | 2617 | August 8, 1980 | August 7, 1999 |
| | PAN AM with Globe | 108 | 2618 | August 8, 1980 | August 7, 1999 |
| | SLEEPERETTE | 108 | 2619 | August 8, 1980 | August 7, 1999 |
| Lebanon | PAN AM with Globe | | 28852 | November 13, 1973 | November 12, 1988 |
| Liberia | PAN AM | | 6779/1177 | July 6, 1974 | July 6, 1994 |
| | PAN AM with Globe | | 6779/1178 | July 6, 1979 | July 6, 1994 |
| | SLEEPERETTE | | 6779/1176 | July 6, 1979 | July 6, 1994 |
| Liechtenstein | PAN AM | 12 | 3966 | April 22, 1974 | April 22, 1994 |
| Malaysia | PAN AM | 16 | M-30853 | December 9, 1958 | December 9, 1993 |
| | | | M-30854 | December 9, 1958 | December 9, 1993 |

REEL 1094 FRAME 0916
TRADEMARK

PAN AMERICAN WORLD AIRWAYS, INC.
TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Mexico | PAN AM | 50/39 | 245761 | January 16, 1980 | January 16, 1995 |
| | PAN AMERICAN | 50/39 | 245760 | January 16, 1980 | January 16, 1995 |
| | PAN AM | 50/39 | 245193 | January 16, 1980 | January 16, 1995 |
| | SLEEPERETTE | 50/39 | 246485 | June 19, 1980 | June 18, 2000 |
| Monaco | PAN AM | 12, 38, 39 | 89.12654 | April 16, 1974 | May 10, 1999 |
| Morocco | PAN AM with Globe | | 5.5.513 | July 21, 1961 | July 17, 2001 |
| | PAN AM with Globe | | 31.514 | September 15, 1961 | September 10, 2001 |
| New Zealand | PAN AM | 12 | B109250 | April 27, 1961 | August 11, 1995 |
| Nicaragua | PAN AM | 39 | 0058229 | February 28, 1977 | March 10, 1997 |
| | PAN AM with Globe | 39 | 1172262 | February 28, 1977 | March 10, 1997 |
| | THEATRE-IN-THE-AIR | 41 | 18-178 | August 28, 1968 | August 27, 1998 |
| | PANAMAC | 16 | 18-180 | August 28, 1968 | August 27, 1998 |
| Norway | PAN AM with Globe | 38 & 39 | 59369 | May 11, 1962 | May 3, 1992 |

TRADEMARK

REEL 1094 FRAME 217

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Pakistan | PAN AM | 16 | 30059 | February 10, 1959 | February 9, 1996 |
|  |  | 28 | 30695 | May 2, 1959 | May 2, 1996 |
| Panama | PAN AM | 39 | 756 | April 4, 1972 | April 4, 1992 |
|  | PAN AM with Globe | 39 | 736 | February 17, 1972 | February 17, 1992 |
|  | SLEEPERETTE | 39 | 586 | January 24, 1967 | January 24, 1997 |
|  |  | 12 | 239 | March 24, 1954 | March 24, 1994 |
| Paraguay | PAN AM with Globe | 12 | 142.132 | July 6, 1979 | July 6, 2000 |
|  |  | 39 | 142.134 | June 10, 1970 | June 2, 2000 |
|  |  | 16 | 142.133 | July 6, 1970 | July 6, 2000 |
|  |  | 12 | 95.224 | July 6, 1970 | July 6, 1990 |
|  |  | 18 | 95.225 | July 6, 1970 | July 6, 1990 |
|  |  | 39 | 94.816 | June 10, 1970 | June 2, 2000 |
|  | PAN AMERICAN (GLOBE) | 39 | 146.792 | May 31, 1971 | May 31, 2001 |
|  |  | 12 | 146.790 | May 31, 1971 | May 31, 2001 |
|  |  | 16 | 146.791 | May 31, 1971 | May 31, 2001 |
| Peru | PAN AM | 35, 39, 42 | 2390, 2389, 2388 | January 27, 1961 | October 16, 1993 |
|  | PAN AMERICAN | 35, 39, 42 | 2393, 2392, 2391 | January 27, 1961 | October 16, 1993 |

REEL 1094, FRAME 218

TRADEMARK

**PAN AMERICAN WORLD AIRWAYS, INC.**
**TRADEMARKS**

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| Portugal | PAN AM with Globe | 39 | 1.103 | August 27, 1959 | August 27, 2019 |
| | PAN Am within Globe | 39 | 208.529 | April 11, 1988 | April 11, 1998 |
| | PAN AM | 39 | 208.528 | April 11, 1988 | April 11, 1998 |
| Romania | PAN AM with Globe | 6, 8, 9, 12, 16, 18 & 21 | 3437 | April 25, 1962 | April 25, 1997 |
| Saudia Arabia | PAN AM | 39 | 76 | January 1, 1955 | perpetual |
| Seychelles | SLEEPERETTE | 39 | 152/17 | October 28, 1985 | July 7, 1995 |
| Sierra Leone | PAN AM | 12 | 1418 | January 4, 1985 | January 4, 1999 |
| | PAN AM | 22 | 9943 | February 17, 1975 | February 17, 2003 |
| Singapore | PAN AM with Globe | 16 | 24233 | December 1958 | December 9, 1993 |
| | | 12 | 24235 | December 1958 | December 9, 1993 |

REEL 1094 FRAME 219

TRADEMARK

## PAN AMERICAN WORLD AIRWAYS, INC. TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | REGISTRATION | DATE OF EXPIRATION |
|---|---|---|---|---|---|
| South Africa | PAN AM | 39 | 4340 | August 22, 1972 | August 22, 1992 |
| | | 42 | 4341 | August 22, 1972 | August 22, 1992 |
| | PAN AM with Globe | 39 | 4489 | September 1, 1972 | September 1, 1992 |
| | | 39 | 4338 | August 22, 1972 | August 22, 1992 |
| | | 42 | 4339 | August 22, 1972 | August 22, 1992 |
| | THEATRE-IN-THE-AIR | 41 | 3270 | June 20, 1972 | June 20, 1992 |
| | PANAMAC | 39 | 3272 | June 20, 1972 | June 20, 1992 |
| Spain | PAN AM with Globe | 39 | 868-164 | November 7, 1980 | November 7, 1995 |
| | PAN AM with Globe | 12 & 39 | 350-282 | May 30, 1959 | October 26, 1995 |
| | SLEEPERETTE | 12 | 275-092 | August 9, 1985 | October 14, 1995 |
| Surinam | PAN AM | | 2598 | February 24, 1960 | July 18, 2000 |
| Sweden | PAN AM with Globe | 12 | 91.041 | August 20, 1959 | December 23, 2000 |
| | SLEEPERETTE | 7, 16, 21 & 25 | 73.966 | March 4, 1983 | April 30, 1993 |
| | PAN AM with Globe | 12,35,39 | 143140 | May 18, 1973 | May 18, 1993 |
| Switzerland | PAN AM with Globe | 16 | 309.417 | May 11, 1959 | May 11, 1999 |
| Syria | PAN AM with Globe | | 3708 | June 21, 1959 | June 21, 1999 |

REEL 1091 FRAME 220
TRADEMARK

## PAN AMERICAN WORLD AIRWAYS, INC.
## TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| Taiwan | PAN AM | 7 / 4 | 180 & 181 / 155 & 156 | June 1, 1974 / May 1, 1974 | June 1, 1994 / April 30, 1994 |
| | PAN AMERICAN WORLD AIRWAYS | 7 / 4 | 280 / 320 | November 1, 1974 / December 1, 1974 | October 31, 1994 / November 30, 1994 |
| | PAN AM within Globe | 7 / 4 | 625 / 605 | March 1, 1976 / May 1, 1976 | March 1, 1994 / April 30, 1994 |
| | GLOBE device | 7 / 4 | 626 / 606 | March 1, 1976 / March 1, 1976 | February 28, 1996 / February 28, 1996 |
| Trinidad | PAN AM with Globe | 39 | 714 | October 15, 1987 | October 15, 2002 |
| Tunisia | PAN AM with Globe | 15 | 260 | September 6, 1961 | September 6, 2006 |
| Turkey | PAN AM within Globe | | 50979 | November 11, 1984 | November 11, 1994 |
| U.S.S.R. (Russian Federation) | PAN AM with Globe | 39 | 40 390 | November 14, 1969 | November 14, 1999 |
| | PAN AM | 39 | 40 297 | November 14, 1969 | November 14, 1999 |
| | SLEEPERETTE | 39 | 66638 | March 12, 1979 | March 12, 1999 |
| U.S.A. | PAN AM | 105 | 725737 | December 26, 1961 | December 26, 2001 |
| | PAN AM within Globe | 105 | 668729 | October 21, 1958 | October 20, 1998 |

REEL 1094 FRAME 221

TRADEMARK

REEL 094 FRAME 222

TRADEMARK

## PAN AMERICAN WORLD AIRWAYS, INC.
### TRADEMARKS

| COUNTRY | MARK | CLASS | REG. NO. | DATE OF REGISTRATION | EXPIRATION |
|---|---|---|---|---|---|
| U.S.A. (cont'd.) | Globe with PAN AM | 39 | 1160329 | July 7, 1981 | July 7, 2001 |
| | SLEEPERETTE | 105 | 852763 | July 11, 1950 | July 11, 2000 |
| | THEATRE-IN-THE-AIR | 107 | 815637 | September 20, 1966 | September 20, 2006 |
| | PANAMAC | 105 | 783387 | January 12, 1965 | January 12, 2005 |
| | PANTRAC | 105 | 1063515 | April 12, 1977 | April 11, 1997 |
| | WORLDPAK | 39 | 1337203 | May 21, 1985 | May 21, 2005 |
| | WORLDPASS | 39 | 1257122 | November 8, 1983 | November 8, 2003 |
| | YOU CAN'T BEAT THE EXPERIENCE | 39 | 1236737 | May 3, 1983 | May 3, 2003 |
| Uruguay | PAN AM | 38 39 42 | 243.226 243.225 243.224 | April 2, 1992 April 2, 1992 April 2, 1992 | April 2, 2001 April 2, 2001 April 2, 2001 |
| | PAN AM within Globe Design | 24 | 175.485 | June 10, 1961 | June 10, 1991 |
| | PANAMAC | 39 | 235.606 | December 17, 1990 | December 17, 2000 |
| | SLEEPERETTE | 1, 2, 3, 5, 7, 16, 17, 19, 20, 22, 24, 26, 27 & 28 | 207.487 | April 21, 1986 | April 21, 1996 |
| | THEATRE IN THE AIR | 38 & 41 | 232.810 | December 17, 1980 | December 17, 2000 |

RELEASED
PATENT AND TRADEMARK
OFFICE

JAN 27 1994